1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT FOR THE

7               EASTERN DISTRICT OF CALIFORNIA

8

9   STARLITE DEVELOPMENT (CHINA)  )      No. CV-F-07-1767 OWW/DLB
    LTD.,                         )
10                                )      MEMORANDUM DECISION AND
                                  )      ORDER GRANTING  MCA
11                                )      FINANCIAL GROUP AND MORRIS
              Plaintiff,          )      C. AARON'S MOTION TO DISMISS
12                                )      THE FOURTH AND SEVENTH
          vs.                     )      CAUSES OF ACTION WITH LEAVE
13                                )      TO AMEND (Doc. 13)
                                  )
14  TEXTRON FINANCIAL             )
    CORPORATION, et al.,          )
15                                )
                                  )
16            Defendants.         )
                                  )
17  _____)

18       Before the Court is Defendant MCA Financial Group (MCA) and

19  Morris C. Aaron's (Aaron) motion to dismiss the Fourth and

20  Seventh Causes of Action of the First Amended Complaint pursuant

21  to Rule 12(b)(6), Federal Rules of Civil Procedure.[1]

22       Plaintiff Starlite Development (China) Ltd. (hereafter

23  referred to as Starlite) filed an action in the Stanislaus County

24  _____

25       [1]Defendant Textron Financial Corporation (Textron) also moves
    to dismiss and to strike the First Amended Complaint.  Those
26  motions are resolved by separate Memorandum Decision.

                                  1

Superior Court.  Starlite filed a First Amended Complaint (FAC) on November 27, 2007 against Textron Financial Corporation (Textron); MCA Financial Group, Ltd. (MCA); Morris C. Aaron (Aaron); and John F. Turner & Co., Inc. and JFTC, Inc. (collectively, Turner Company) and Does 1-20.[2]  The action was removed to this Court on December 5, 2007.

The FAC alleges:

13.  Beginning in or about 2002, Starlite entered into an ongoing business relationship with Turner Company, pursuant to which Starlite sold box calendars to Turner Company.  During the years 2002 through 2004, Starlite's sales to Turner Company were between $400,000-$600,000 annually.

14.  In 2005 Turner Company ordered both wall calendars and box calendars from Starlite. Accordingly, Starlite's financial year 2005 sales to Turner Company increased by approximately 240% to $1.46 million.

15.  In 2006, Turner Company increased its orders for box calendars and wall calendars and added desk calendars, which increased Starlite's sales to Turner by approximately 180% over 2005.  On January 19, 2006, Turner Company submitted a written purchase order for 3.25 million calendars (plus additional box calendars), on the following payment terms: 10% to be paid before the first shipment, and the remaining balance to be paid 30% in each of the months of October, November, and December 2006.

16.  Beginning in or about January 2006 and ending in or about August 2006, Turner Company submitted purchase orders to Starlite for calendars, which Starlite produced, shipped and invoiced.  Starlite's last

---

[2]The FAC also named Mark Turner, John F. Turner and Kathleen A. Turner as Defendants.  By Order filed on December 20, 2007, these defendants were dismissed without prejudice (Doc. 9).

shipment of calendars to Turner Company occurred in October 2006.  Other than a $195,575 and a $62,118 payment made in April and June 2006, respectively, Turner Company and Defendants have not paid anything for Starlite's 2006 calendars.  The total unpaid debt owing from Turner Company to Starlite according to Starlite's books is $2,693,989.

17.   In October 2006, when Turner Company's first 30% partial payment became due and went unpaid, Starlite attempted to make contact with Turner Company on numerous occasions, however, Starlite's calls and e-mail messages went unanswered, until November 10, 2007 when Aaron finally contacted Starlite via e-mail correspondence and introduced himself to Starlite as the 'court appointed Restructuring Officer for [the Turner Company].'

18.   After having made contact with Aaron, Starlite was informed that Turner Company was nearly insolvent and under the control of Aaron and Turner Company's primary lender, Textron.  Starlite was informed that Aaron had been appointed as the Chief Restructuring Officer over Turner Company in March 2006, after Textron sued Turner Company and its principals after their insolvency became known to Textron in two separate actions (*Textron v. John F. Turner, et al.*, 1:06-CV-00160-OWW-LJO; and *Textron v. John F. Turner Company*, 1:06-cv-00162-OWW-LJO) filed in the United States District Court for the Eastern District of California (collectively, the 'Federal Actions').  Textron filed a motion to appoint a receiver in the federal action against the Turner Company on or about February 16, 2006.  Turner Company stated in its opposition that it intended on filing bankruptcy pursuant to Chapter 11.  Textron and Turner Company then stipulated that Textron would withdraw its motion for a receiver on the condition that Turner Company allow MCA and Aaron to take over the management of Turner Company as 'Chief Restructuring Officer' and, among other things, ensure that all receivables directed to Turner Company were actually shuttled to a lockbox controlled by Textron.

3

19.   During November and December of 2006, Aaron repeatedly told Richard Lim, Senior Vice President of Marketing and sales for Starlite, that Aaron was working with Textron to come up with a payment plan to pay Starlite and that Starlite's payment had always been 'in the budget.'   Plaintiff is informed and believes, and thereon alleges that at the time Aaron made these representations to Richard Lim, such representations were false, in that the truth was that Textron had no intention to pay Starlite the balance due for the calendars and Aaron knew this.

20.   At the same time MCA and Aaron were placed in management control of the Turner Company in March 2006, in order to ensure that no other creditors of Turner Company would be notified of Turner Company's insolvency and the lockbox credit arrangement established by Textron, Textron and Turner Company stipulated that the entire file contents of two separate Federal Actions would be sealed from public view.   In or around December of 2006, Aaron finally provided Starlite, and thereafter Starlite's counsel in or around later April, 2007, a copy of the Stipulation and Order Appointing Chief Restructuring Officer, for Preliminary Injunction, and for Sealing of Documents, filed in the matter of *Textron v. John F. Turner Company*, 1:06-CV-00162-OWW-LJO (the 'Personal Action') on or around March 27, 2006.   Until Starlite intervened to unseal the records in the above-entitled case, however, neither Turner Company, Textron, MCA nor Aaron provided Starlite any further information regarding the two cases, despite Starlite's repeated requests for information.

21.   As a result of the concealment of the two legal actions, Starlite was not advised of the insolvency of Turner Company, or of the fact that Turner Company was no longer in charge of its business operations.   Based on such lack of knowledge, Starlite continued to accept purchase orders from Turner Company and continued to manufacture and ship calendars to Turner Company throughout the Spring and Summer of 2006, with no

4

information or reason to believe that Turner Company would not be able or willing to pay the balance due of over $2 million that remains unpaid to this date.

22.   In sharp contrast to the lack of knowledge about the insolvency of Turner Company, Textron, MCA, Aaron and all defendants were well aware of the state of insolvency of Turner Company, Turner Company's inability to pay Starlite, and/or Textron's intent not to approve funding to pay for the calendars that Starlite was delivering to Turner Company throughout the Spring and Summer of 2006.  With full knowledge, Defendants, including Turner Company, Textron, MCA, and Aaron and allowed [sic] Turner Company to receive and sell the calendars to its customers and knowingly received all payments to Turner Company from those customers.  Defendants knowingly reaped the benefits of Turner Company being able to sell the Starlite produced calendars knowing full well that Turner Company could not pay for them and/or that Textron never intended to authorize payment for them.

23.   To assure that no payments could be made by Turner Company to its creditors without Textron's prior approval, in February 2006 a 'lockbox' arrangement was established so that all funds received by Turner Company were paid directly to the control of Textron. Recently, it was discovered that Textron asserted as early as February 2006 that over $600,000.00 had been wrongfully diverted from Textron by Turner Company to pay Starlite for 2005 shipments of Starlite produced 2006 calendars to Turner Company.  However, neither Textron nor any of the defendants ever informed Starlite of such alleged misappropriated payment (until during the discovery process in this action) because such information would have alerted Starlite to the insolvency and situation of Turner Company.

24.   Instead, in continuance of the subterfuge, on or about April 1, 2006, Textron funded and paid what Defendants estimated the 10% pre-shipment payment would

be for 2007 box calendars and wall calendars that had been ordered by directly wiring funds to Starlite's bank account in the amount of $195,575.23. At that time, Starlite had not yet sent Turner Company a statement for the 10% pre-shipment payment on the wall and box calendars, but only for the 10% due on two particular orders which totaled $63,249.98. Textron funded and Defendants, and each of them allowed, and paid this additional early payment of over $130,000 to insure a sense of confidence in Turner Company by Starlite. Defendants, and each of them knew that without this pre-payment, Starlite would not ship the calendars and Textron wanted to ensure the calendars were shipped so they could control and usurp the proceeds of the calendars and utilize said proceeds to pay down Turner Company's debt to Textron.

25. On or about June 16, 2007, Textron approved the funding and allowed the use of $62,117.59 to make yet another early payment to Starlite (again in excess of the 10% pre-shipment payment that Starlite had not yet sent Turner Company a statement for). Textron funded and allowed, and Defendants paid this additional payment in excess of over $17,500.00 to Starlite with Turner Company stating that the company had 'extra cash flow available' (a false statement) to insure a continued sense of confidence in Turner Company by Starlite. Defendants, and each of them knew that without this pre-payment, Starlite would not ship the calendars and Textron wanted to ensure the calendars were shipped so they could control and usurp the proceeds of the calendars and utilize said proceeds to pay down Turner Company's debt to Textron.

26. At all relevant times, Defendants and each of them knew that the Starlite produced calendars would constitute Turner Company's major source of account receivables since Starlite was Turner Company's principal supplier of calendars.

27. Textron closely monitored the finances and business operations of Turner Company by

6

placing a Textron agent on site at Turner
Company's offices in January 2006 and later
through the imposition of MCA and Aaron as
CRO of Turner Company in March 2006, and
Textron knew of the deepening insolvency of
Turner Company.

28.   Textron knew how much revenue was being
produced by the Starlite product because all
calendar purchasers paid for the calendars by
remitting their funds to the 'lock box'
account over which Textron had exclusive
control.   Textron knew that Turner Company
had no funds available with which to pay
Starlite for the Starlite produced calendars
without Textron's approval because the only
way Turner Company would have any funds
available was from its accounts receivable
which were all in Textron's control via the
'lock box.'   Textron was simultaneously
expropriating the revenues from the Starlite
produced calendar sales to pay off Turner
Company's outstanding debt to Textron.

29.   Following shipment of the 2007 calendars
by Starlite, receipt and use of the 2007
calendars by Turner Company to fill its
customers' orders for the Starlite produced
2007 calendars, and receipt by Textron (via
the Lockbox) of the Starlite product
generated receivables, Defendants made no
payment on the accounts owed to Starlite for
its product.   No payment was made by MCA,
Aaron or Textron even though by receipt and
use of the Starlite calendars the debt to
Starlite was a 'bona-fide obligation' and the
receivables collected from the sale of the
Starlite product constituted 'funds
available,' and thus, should have been paid
pursuant to the Stipulation and Order
Appointing Chief Restructuring Officer, for
Preliminary Injunction, and for Sealing of
Documents described above.   Instead, Textron
converted the funds to itself, and Aaron, MCA
and Turner Company substantially assisted
Textron in doing so.

30.   Starlite has demanded payment from
Defendants to no avail.   According to
Starlite's books, the sum of $2,693,989
remains owed and unpaid.   Although Aaron,

7

after counsel for Starlite repeatedly
requested an acknowledgment of Turner
Company's debt to Starlite, finally supplied
Starlite's counsel with a spreadsheet
regarding Turner Company's account with
Starlite claiming offsets of over $400,000
for charges allegedly 'historically not
charged' and other smaller offsets for
product related issues, such offsets have not
yet been confirmed.  However, it is
undisputed that Turner Company owes Starlite
at least $2,193,123.96.

The FAC alleges two cause of action against MCA and Aaron,

the Fourth and Seventh Causes of Action.

The Fourth Cause of Action is for aiding and abetting fraud.

The Fourth Cause of Action incorporates by reference the

allegations in Paragraphs 13-30 and the allegations in Paragraphs

39-45 in the Second Cause of Action for fraud against the Turner

Defendants.   The Second Cause of Action alleges:

39.   The Turner Defendants entered into the
foregoing contractual relationship [with
Starlite for the sale and purchase of
calendars] knowing full that the Turner
Company was insolvent.  Despite such
knowledge, the Turner Defendants made
numerous purchase orders for additional
product from Starlite with the knowledge that
they would be unable to pay Starlite for the
goods delivered.  The Turner Defendants made
the purchase orders having no intention to
pay for the goods delivered.  In addition,
the Turner Defendants made early, additional,
and excess payments as alleged above for the
purpose of insuring a false sense of
confidence in Turner Company by Starlite.

40.   The affirmative representations made by
the Turner Defendants were in fact false, and
were demonstrated to be false when, instead
of increasing their business with Starlite,
the Turner Defendants actually terminated all
further business between the two entities.

8

41.   In addition to the affirmative misrepresentations noted above, the Turner Defendants knew and concealed the true facts, and despite repeated statements by Starlite regarding its understanding of the Turner Company's position, the Turner Defendants failed to advise Starlite of their true motivations and intentions.  The Turner Defendants made such misrepresentations of fact and concealed material facts, with the knowledge and intent that Starlite would rely upon them.

42.   Had the material misrepresentations not been made, and had the concealed facts been disclosed, such that Starlite was aware of the Turner Defendants's [sic] motivations and intentions, Starlite would not have continued to manufacture and ship any more calendars to Turner Defendants, and would not have suffered the loss of approximately $2.6 million as a result.

43.   The Turner Defendants made the affirmative misrepresentations and concealed material facts from Starlite with the intent to deceive and defraud Starlite.

44. As a direct, legal and proximate result of the fraudulent misrepresentations and concealment made by the Turner Defendants as herein alleged, Starlite has been damaged in any amount according to proof at trial.

The Fourth Cause of Action against MCA and Aaron for aiding and abetting fraud then alleges:

55.   MCA and Aaron had knowledge of all of the fraudulent acts of Turner Company and of the misrepresentations of the Turner Company as alleged above.

56.   MCA and Aaron have been in control of the management and operations of Turner Company (along with Textron) since March 2006.  MCA and Aaron knew that its actions and inactions as alleged herein would assist Turner Company in the commission of a fraud, and MCA and Aaron's actions and inactions did substantially assist Turner Company in the

9

1    commission of a fraud.

2        The Seventh Cause of Action is for negligent interference

3    with contractual and economic relationship (and is also alleged

4    against Textron):

5            73.  At all times relevant herein, a
             contractual relationship existed between
6            Starlite and Turner Company, and such
             contractual relationship produced substantial
7            economic benefit to Starlite.

8            74.  At all times relevant herein, Defendants
             had actual knowledge of the existence of the
9            contractual and economic relationship that
             existed between Starlite and Turner Company,
10           and had actual knowledge that such
             relationship produced substantial economic
11           benefit to Starlite.

12           75.  At all relevant times, Defendants
             Textron, MCA and Aaron had defacto [sic]
13           management and control of Turner Company and
             had actual knowledge of Turner Company's
14           insolvency.

15           76.  In doing the things alleged above,
             Defendants negligently caused disruption to
16           the contractual and economic relationship
             between Starlite and Turner Company.

17
             77.  The contractual and economic
18           relationship between Starlite and Turner
             Company was actually interfered with and
19           disrupted.  Such interference and disruption
             has caused, and will continue to cause in the
20           future, a substantial decline in Starlite's
             revenues, in an amount according to proof.

21
     The FAC prays for compensatory and punitive damages, interest,
22
     costs and attorneys' fees, a declaration that Defendants hold any
23
     funds received directly from sales of the Starlite calendars up
24
     to the amount of funds due to Starlite by Turner Company in trust
25
     for Starlite, and an order compelling Defendants to convey to
26

                                   10

Starlite the funds due to Starlite.

MCA and Aaron move to dismiss the Fourth and Seventh Causes of Action for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure.  Defendants assert that MCA and Aaron, acting in their capacities as Turner Company's court-appointed Chief Restructuring Officer, are immune from a suit for damages under the derived judicial immunity doctrine.  In their reply brief, Defendants further argue that Starlite has not alleged fraud against them with the specificity required by Rule 9(b), Federal Rules of Civil Procedure, and that Starlite has not plead with specificity that Aaron knowingly and intentionally gave "substantial assistance to JFTC [Turner Company] *with the intent to facilitate the commission of a particular fraud.*"  Also, in their reply brief, Defendants argue that the Seventh Cause of Action for negligent interference with contractual and economic relationship fails to state a claim because there are no facts alleged detailing how the CRO negligently interfered with Starlite's contract with the Turner Company.

A.  <u>GOVERNING STANDARDS</u>.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001).  "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.,* 523 F.3d 934, 938 (9th Cir.2008),

quoting *Bell Atlantic Corp. v. Twombley*, ___ U.S. ___, 127 S.Ct. 1955, 1974 (2007).  "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic, id.* at 1964-1965.  Dismissal of a claim under Rule 12(b)(6) is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).

Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of

12

1  the complaint.  *See Morley v. Walker*, 175 F.3d 756, 759 (9th

2  Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th

3  Cir. 1980)  When ruling on a motion to dismiss, the court may

4  consider the facts alleged in the complaint, documents attached

5  to the complaint, documents relied upon but not attached to the

6  complaint when authenticity is not contested, and matters of

7  which the court takes judicial notice.  *Parrino v. FHP, Inc.*, 146

8  F.3d 699, 705-706 (9th Cir.1988).[3]

9       B.   BACKGROUND.

10       On February 14, 2006, Textron filed a Complaint for judicial

11  foreclosure of deed of trust, for money due under written

12  guaranty, for intentional and negligent misrepresentation, and

13  conversion against John F. Turner and Kathleen A. Turner.

14  *Textron Financial Corporation v. John F. Turner, et al.*, No. CV-

15  F-06-160 OWW.  On February 14, 2006, Textron filed a Complaint

16  for breach of contract, conversion, fraud, and appointment of

17  receiver against John F. Turner Company.  *Textron Financial*

18  *Corporation v. John F. Turner Company*, No. CV-F-06-162 OWW.

19  These actions were consolidated by Order filed on July 26, 2006,

20  (Doc. 19), and are referred to in this Memorandum Decision as the

21  "Textron Federal Actions."

22       On February 16, 2006, Textron moved for a temporary

23  restraining order pending appointment of a receiver (Doc. 7) and

24  moved for appointment of a receiver (Doc. 9).  A hearing on the

25  _____

26       [3]Both parties have filed requests for judicial notice of
     various documents.  No party has objected to the other's request.

13

motion for temporary restraining order was held on March 6, 2006. A Temporary Restraining Order was issued on March 8, 2006 (Doc. 22), setting forth the following findings of fact:

> 1.   Turner Company has entered into a Loan and Security Agreement ('Agreement') with Textron whereby Textron made loans to Turner Company, and Turner Company granted Textron a security interest in essentially all assets of Turner Company ('Collateral').
>
> 2.   Pursuant to the terms of the Agreement, Turner Company is required to remit to Textron, among other things, all proceeds of Turner Company's accounts receivable ('Proceeds').
>
> 3.   Pursuant to the terms of the Agreement, on or about February 7, 2006, a lockbox ('Lockbox') had been established, and all proceeds were to be deposited into the Lockbox.
>
> 4.   Pursuant to the terms of the Agreement, Turner Company was required to submit to Textron, on a weekly basis, borrowing base certificates setting forth, among other things, the amounts of Turner Company's accounts receivable and inventory, and the amount (if any) of loans and advances that Turner Company was eligible to receive under the formula set forth in the Agreement.
>
> 5.   Turner Company was required to make payments to Textron as required by the Agreement.
>
> 6.   In or about December 2005, Turner Company failed to remit Proceeds to Textron in the amount of approximately $2.5 million and Turner Company has subsequently failed to remit additional Proceeds to Textron.
>
> 7.   Turner Company failed timely to submit borrowing base certificates to Textron, including without limitation the borrowing base certificate for the last week of December 2005.

14

8. The borrowing base certificate that Turner Company submitted in January and February 2006 show an Overadvance exceeding $2,000,000.

9. Turner Company has failed to make payments to Textron as required under the Agreement.

10. Turner Company has wrongfully acted to deprive Textron of access to its online bank account information.

11. Pursuant to the terms of the Agreement, Textron has issued to Turner Company notice of default and has demanded payment of the Overadvance.

12. Notwithstanding Textron's demand, Turner Company has continued to collect Proceeds without remitting them to Textron or the Lockbox.

13. There is no adequate remedy at law because, among other things, Textron is entitled to the Collateral, and Turner Company's financial conditions suggest that Turner Company will not be able to respond in damages if the Proceeds are diverted and dissipated.

14. There is immediate danger of grave and irreparable injury to Textron in that Turner Company will continue to collect, divert and/or dissipate Proceeds and other Collateral and thereby deprive Textron of the ability to recover its claims against Turner Company.

The Temporary Restraining Order restrained Turner Company from disposing of any cashier's checks or certified checks related to the business of Turner Company, from directing any account debtors of Turner Company to remit payments to Turner Company rather than to the established Lockbox, and otherwise interfering with Textron's efforts to collect Turner Company's accounts

15

receivable; restrained Turner Company from diverting, depositing or transferring accounts receivable proceeds anywhere except for the Lockbox; and restrained Turner Company from preventing Textron's online access to Turner Company's bank account information.  A hearing on the motion for preliminary injunction and the motion for appointment of a receiver were set for March 20, 2006 (Doc. 22).

At the March 20, 2006 hearing, the Court issued a tentative ruling and ordered counsel to submit a proposed order regarding the preliminary injunction and appointment of a receiver (Doc. 29).

On March 24, 2006, the Stipulation and Order Appointing Chief Restructuring Officer, For Preliminary Injunction, and For Sealing of Documents (March 24 Stipulation and Order) was filed:

> IT IS HEREBY STIPULATED AND AGREED by and between plaintiff Textron Financial Corporation ('Textron') and Defendant John F. Turner and Company ('Turner Company'), through their respective counsel of record, as follows:
>
> A.  Disposition of Pending Motions.
>
> 1.  Textron's Motion for Appointment of Receiver is hereby withdrawn without prejudice.
>
> 2.  Textron's Motion for Preliminary Injunction is hereby granted on the terms set forth in Part C below.
>
> B.  Appointment of Chief Restructuring Officer.
>
> 1.  Morris C. Aaron of MCA Financial Group, Ltd. is hereby appointed immediately as the Chief Restructuring Officer ('CRO') of Turner

Company on the following terms and conditions.

2.   The CRO shall:

(a) Take possession of and safeguard all of the books and records (including computer records) of Turner Company, wherever located, and Turner Company shall immediately provide the CRO with all necessary passwords for accessing Turner Company's computers and related software, including Turner Company's web site;

(b) Collect all of Turner Company's accounts receivable, existing or future, by directing payment thereof to the Lockbox that had been established on or about February 7, 2006 pursuant to the Loan and Security Agreement, as amended ('Agreement') between Textron and Turner Company ('Lockbox');

(c) Remit to Textron via deposit to the Lockbox, any and all collections of Turner Company's accounts receivable that may come directly into the possession of the CRO, promptly upon receipt;

(d) Take possession of and safeguard all assets of Turner Company, including without limitation all inventory, equipment, cash, checks, bank accounts and license agreements;

(e) At the discretion of the CRO, obtain advances from Textron pursuant to the Agreement as currently in effect or as further amended, supplemented and/or modified by the CRO and Textron in their discretion (nothing herein shall constitute an order for Textron to make advances except to the extent, if any, required by the Agreement as currently in effect), solicit and maintain relationships with suppliers and licensors, create inventory and finished goods, solicit and obtain orders from customers, sell goods to customers, hire or terminate or make changes to the terms and conditions of employment of Turner Company's officers and employees (nothing herein shall constitute an order permitting the CRO to abrogate existing

17

employment contracts, if any), pay the bona fide obligations of Turner Company in the ordinary course of business (with all officers and employees of Turner Company being subject to the authority of the CRO); and

(f) At the discretion of the CRO, sell any or all assets of Turner Company in a commercially reasonable manner for the maximum possible value or, if unable to do so and the CRO determines that it shall be unable to do so, liquidate the business through an orderly wind-down of its operations.

3.   The CRO shall have, use, operate, manage, and control all books, financial records, other records and writings of Turner Company regarding Turner Company's business.

4.   The CRO is authorized and empowered to enter and gain access to any premises from where Turner Company conducts its business, maintains its books and records or stores its inventory, including but not limited to 1911 Yosemite Boulevard, Modesto, California 95354 (collectively, the 'Business Premises'), for the purpose of performing the CRO's duties and obligations under this Stipulation.

5.   The CRO is authorized and empowered to receive and collect Turner Company's mail, whether at the United States Post Office, from a courier or delivery service, at any Business Premises, or elsewhere, whether or not such mail was sent by U.S. Mail or by courier or delivery services, and the CRO is authorized to open such mail and to take possession of all checks, money orders, and other payments constituting or evidencing payment on accounts receivable of Turner Company or for sales of inventory or equipment by Turner Company.

7.   The CRO shall have the power to execute documents and do acts necessary, convenient and incidental to the foregoing.

8.   The CRO shall bear no personal liability for any actions or omissions which the CRO in

18

his or its good faith business judgment believes to be in conformity with the provisions of this Stipulation.

9.   Turner Company shall immediately turn over to the CRO all of Turner Company's books and records with respect to its bank accounts, inventory, accounts receivable and the proceeds thereof, and shall immediately provide the CRO with online access to all of Turner Company's bank accounts.

C.   Preliminary Injunction.

1.   Turner Company and its officers, employees, agents and anyone acting on behalf of Turner Company are hereby restrained and enjoined, during the pendency of the above-captioned action, from (a) disposing of any cashier's checks or certified checks related to the business of Turner Company, whether payable to cash, John F. Turner, Kathleen A. Turner, or anyone else, (b) collecting any accounts receivable of Turner Company, except at the direction of the CRO, (c) directing any account debtors of Turner Company to remit payments to Turner Company rather than to the Lockbox, and (d) otherwise interfering with the CRO's efforts to collect Turner Company's accounts receivable.

2.   Turner Company and its officers, employees, agents, and anyone acting on behalf of Turner Company shall not, during the pendency of the above-captioned action, divert, deposit or transfer accounts receivable proceeds of Turner Company, anywhere except for the Lockbox.

3.   Turner Company and its officers, employees, agents, and anyone acting on behalf of Turner Company shall not, during the pendency of the above-captioned action, prevent in any way Textron's full online access to Turner Company bank account information (for all accounts in the name of, or for the benefit of, Turner Company), and are hereby restrained and enjoined from hereafter, during the pendency of the above-captioned action, taking any actions to deprive Textron to full online access to such

19

bank account information.

4.   Turner Company, its officers, directors, shareholders, general partners, limited partners, agents, managers and employees, and all other persons with actual or constructive knowledge of this Order and each of them, shall not, during the pendency of the above-captioned action:

    (a) Directly or indirectly interfere in any manner with the discharge of the duties of the CRO or the CRO's possession of and operation or management of Turner Company's business, the books and records thereof, bank accounts, the collection of accounts receivable, or the performance of license agreements and the right to use licensed material;

    (b) Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage, create a security interest in, encumber, conceal, or in any manner whatsoever deal in or dispose of the whole or any part of the books and records, inventory, equipment, accounts receivable, bank accounts, or other assets of Turner Company, or any proceeds of the foregoing, except at the direction of the CRO; or

    (c) Do any act which will, or which will tend to, impair, defeat, divert, prevent or prejudice the preservation of Turner Company's business, the books and records, inventory, equipment, accounts receivable, bank accounts, license agreements, or other assets of Turner Company, or proceeds of the foregoing.  Nothing in this paragraph shall be construed to prohibit any employee of Turner Company from voluntarily terminating his or her employment.

D.   Sealing of Documents.

1.  All documents currently on file with the Court in the above-captioned action shall forthwith be placed under seal pursuant to Local Rule 39-141.

2.  All documents hereafter filed with the

Court in the above-captioned action shall be filed under seal pursuant to Local Rule 39-141.

3.  All documents sealed or filed under seal pursuant to this Stipulation shall remain under seal unless and until otherwise ordered by the Court.

(Doc. 31).

C.  <u>DOCTRINE OF DERIVATIVE JUDICIAL IMMUNITY</u>.

Defendants contend that "for all practical purposes" they are acting as the receiver of Turner Company and move for dismissal of Starlite's claims against them under the doctrine of derivative judicial immunity.  Defendants assert that Starlite has admitted that Defendants are acting as the receiver of Turner Company, referring to Starlite's opposition to Textron's demurrer to Starlite's complaint in the Stanislaus County Superior Court prior to removal that "Textron and Turner Company agreed to the appointment of a particular receiver-type entity, which they entitle 'Chief Restructuring Officer'."

In *New Alaska Development Corp. v. Guetschow*, 869 F.2d 1298 (9th Cir.1989), the Ninth Circuit held that "absolute judicial immunity generally immunizes persons ... who, pursuant to court appointment, administer the affairs of litigants."  *Id.* at 1302. "Absent broad immunity, receivers would be a 'lightening rod for harassing litigation aimed at judicial orders.'" *Id.* at 1303. "To limit the harassment of receivers 'as quickly as possible,' a plaintiff is required to allege the absence of judicial immunity ... Failure to allege 'that the judge's ultimate actions were not

21

1  judicial or beyond the scope of the court's jurisdiction'

2  requires dismissal.  *Ashelman*, 793 F.2d at 1078."  *Id.*

3       Starlite argues that Defendants are not entitled to the

4  protection of this immunity.  Starlite contends that Defendants

5  were not appointed as receiver within the meaning of the Local

6  Rules of Practice.  Starlite refers to the definition of

7  "receiver" in Rule 66-232(a)(2), Local Rules of Practice:

8  "'receiver shall mean any receiver appointed either after giving

9  notice of (i) at least the notice of hearing upon the motion for

10 appointment of receiver required by L.R. 78-230, or (ii) such

11 lesser notice of hearing on the motion as may be agreed to by the

12 parties sought to be subjected to the receivership and the

13 Court."  Rule 66-232(e) provides for reports of receivers to be

14 filed with the Court and served on the parties and that "[a]t the

15 hearing, the Court shall approve or disapprove the receiver's

16 report and determine whether the receivership shall be

17 continued."  Rule 66-232(g) requires a prior court order before a

18 receiver may employ an attorney, accountant or investigator.

19 Rule 66-232(h) requires that "[a] receiver shall deposit all

20 funds received in a depository designated by he Court, entitled

21 'Receiver's Account' together with the name and number of the

22 action."  Rule 66-232(i) provides that "[a] receiver shall not

23 act until a sufficient undertaking as determined by the Court is

24 filed with the Clerk."

25      Starlite argues that there is nothing in the March 24

26 Stipulation and Order analogous to the requirements of Rule 66-

232.  Starlite contends that "the Court appears not to have retained jurisdiction to review, monitor, and/or supervise the CRO's conduct."  Starlite further notes the waiver of liability in the March 24 Stipulation and Order and argues: "If the CRO was a 'true arm of the court' with guaranteed immunity under the official or judicial immunity doctrine, there certainly would be no purpose to expressly add the aforementioned immunity clause in the Stipulation and Order."

As Defendants reply, they have been filing interim reports in the Textron Federal Actions with the Court "[i]n accordance with Court order dated March 23, 2006, and Local Rule 39-141." *See* Defendants Supplemental Request for Judicial Notice, Exhibits 7, 8, 9, 10.  Defendants also applied for an order approving the CRO's retention of Snell & Wilmer LLP to represent the Turner Company in Starlite's Stanislaus Superior Court action, which the Court approved. (Docs. 84 & 86).  These actions establish that the Court retained jurisdiction in the Textron Federal Actions to review, monitor and supervise the CRO.  Textron and Turner Company used the term "Court Restructuring Officer" was used in lieu of "receiver" because Textron and Turner Company  wanted to avoid the possible termination of contracts with Turner Company pursuant to contract provisions to that effect if a Receiver was appointed.  The CRO was appointed under the Local Rule governing appointment of a receiver and was intended by the Court to act as a receiver.

Starlite argues that Defendants are not a receiver within

23

the meaning of the law.   Starlite cites *Kohlrautz v. Oilmen Participation Corporation,* 441 F.3d 827, 836 (9th Cir.2006) as support for its contention that "it is well-settled that a 'receiver must not exceed the limits of the authority granted by the court and must act for the benefit of all persons interested in the property.'"

At issue in *Kohlrautz* was whether Nevada or Texas law of official immunity for court-appointed receivers applied.   The Ninth Circuit concluded that a Nevada court would apply Nevada rather than Texas law of official immunity for court-appointed receivers under the circumstances of the case.   441 F.3d at 833-836.   When describing Nevada's official immunity for court-appointed receivers law, the Ninth Circuit cited the Nevada Supreme Court's opinion in *Anes v. Crown Partnership*, 113 Nev. 195, 932 P.2d 1067 (1997), which held that "the receiver must not exceed the limits of the authority granted by the court and must act for the benefit of all persons interested in the property." *Id.* at 836.   This hardly establishes Starlite's "well-settled law" contention.   *Kohlrautz* has nothing to do with the appointment of a receiver under federal law.   Nonetheless, Am.Jur.2d: Receivers, § 83 states:

> It is a general rule that a receiver stands in the position of a representative and a protector of the interests of creditors, shareholders, and depositors, in the property in receivership.   In other words, a receiver represents all the parties interested in the litigation in which he or she is appointed, and hold the property in receivership for the benefit of all persons interested in it.

24

1    At the time the CRO was appointed by the Court in the

2  Textron Federal Actions, the only parties to the Federal Actions

3  were Textron and the Turner Defendants.

4    As Defendants argue, Starlite's complaint that the CRO must

5  remit all accounts receivable to the Lockbox "demonstrates

6  Starlite's fundamental misunderstanding" of the March 24

7  Stipulation and Order:

8           Starlite ... continues to overlook the fact
           that the CRO Order is an Order of this Court.
9           The CRO has no discretion to divert [Turner
           Company's] accounts receivable somewhere
10          other than the Lockbox.  If it did, it would
           be in violation of the CRO Order.  Yet
11          Starlite contends that the CRO is not a
           receiver entitled to the protections of the
12          doctrine of derivative judicial immunity
           *because* the CRO complied with the CRO Order
13          and remitted all accounts receivable to the
           Lockbox instead of diverting the accounts
14          receivable to some other source for the
           benefit of [Turner Company's] creditors.
15          Starlite's position produces an anomalous
           result - the CRO is not considered a 'true
16          judicial officer of this Court' and receiver-
           immunity does not apply because the CRO did
17          what it was required to do by this Court's
           Order.

18

19    With regard to Starlite's reference to the immunity

20  provision in the March 24 Stipulation and Order as negating that

21  Defendants is a receiver, the provision simply mirrors the

   immunity already afforded court-appointed receivers.
22

23    Starlite argues that the Amended Complaint need not allege

24  Defendants' absence of judicial immunity in order to state a

25  claim against them.  Starlite cites *New Alaska Development Corp.*,

   *supra*, 869 F.2d at 1305 n.9.  The Ninth Circuit declined to hold
26

                                  25

that the receiver "is absolutely immune from allegations that he
stole New Alaska's assets or slandered Cassity."   The Ninth
Circuit then noted:

> In the *Property Management* case, the eleventh
> circuit held that a receiver appointed by a
> state court to manage the affairs of a
> securities firm was absolutely immune from
> claims that he defamed the firm and converted
> and embezzled corporate assets during the
> receivership.  Despite these allegations of
> corporate plundering, the court strictly
> construed a plaintiff's pleading obligations
> and affirmed a Rule 12(b)(6) motion to
> dismiss due to plaintiff's failure to
> 'expressly allege in the complaint that [the
> receiver] was not acting pursuant to the
> orders of the appointing judge.'  752 F.2d at
> 603.  It is unclear, therefore, whether the
> court would have accepted plaintiff's
> allegations as piercing the receiver's
> judicial immunity had the plaintiff made the
> further allegation concerning judicial
> authorization.  It is far from clear why the
> court faulted the plaintiff for not alleging
> that the receiver's theft was not court-
> authorized.  Certainly no court is empowered
> to permit a receiver to steal corporate
> assets.  As we hold that appellants fail to
> allege proper fourteenth amendment violations
> in connection with [the receiver's] alleged
> theft and slander, we need not analyze the
> wisdom of the *Property Management* court's
> pleading requirement.

Starlite argues that this footnote establishes that "a party
should not be deprived of its day in court against a judicial
officer when the complaint sufficiently alleges the acts that
constitute the abuse of authority."

Starlite's contention is without merit.  *New Alaska*
specifically held that "[f]ailure to allege 'that the judge's
ultimate actions were not judicial or beyond the scope of the

court's jurisdiction' requires dismissal.  *Ashelman*, 793 F.2d at 1078."  Footnote 9 in *New Alaska* is inconsistent with this specific holding.  Because the immunity accorded receivers is analogous to absolute judicial immunity, the same pleading standards apply, as the Ninth Circuit acknowledged.  Further, there are no allegations in the FAC of theft by MCA or Aaron.

Starlite cites *New Alaska*, where allegations of theft and slander were not accorded derivative immunity, and *Kohlrautz*, where the receiver acted outside the scope of the authority granted to him by the state court when he acted partially toward one of the parties to divorce proceedings by providing legal advice and accepting loans and advances from her and made misrepresentations to the Texas court in order bring a third party into the litigation.  441 F.3d at 836.  Accepting the allegations of the Amended Complaint as true, Starlite argues that Defendants' motion to dismiss must be denied because Starlite has alleged that the CRO aided and abetted the fraudulent activity of Textron and the Turner Company and that it knowingly interfered with Starlite's contractual and economic relationship with Turner Company.  Starlite contends:

> Such conduct is unlawful and not normally performed by a court-appointed receiver.  Furthermore, given Starlite's allegations, the Court can infer the CRO was acting partially toward Textron at the very least.

Starlite's contention lacks merit.  All of the actions alleged to have been taken by Defendants were taken pursuant to the March 24 Stipulation and Order and were permitted by the

1   March 24 Stipulation and Order.  There was no obligation on

2   Defendants to contact all of the Turner Company's creditors and,

3   in fact, the Court issued an order sealing all documents related

4   to the Textron litigation.  There is nothing alleged in the

5   Amended Complaint that was done or not done by Defendants that

6   was outside the scope of the Stipulation and Order.

7        Starlite argues that Defendants' motion to dismiss should be

8   denied because further discovery "may be needed" to determine

9   whether the CRO's conduct can be considered judicial in nature:

10  "Discovery into communications by and between the CRO and Textron

11  and/or [the Turner Company], among other things, may evidence

12  further conduct by the CRO acting in concert with these

13  defendants to commit the acts complained of in the FAC."

14       Defendants contend that Starlite's request that dismissal be

15  deferred pending completion of discovery should be denied.

16  Defendants cite *In re First Alliance Mortg. Co.*, 471 F.3d 977,

17  993 (9th Cir.2006):

18              The California Court of Appeal recently had
                occasion to articulate the proper standard
19              for imposing liability for aiding and
                abetting a tort.  In *Casey v. U.S. Bank
20              National Assn.,* 127 Cal.App.4th 1138 ...
                (2005), the court acknowledged that
21              'California has adopted the common law rule'
                that '[l]iability may ... be imposed on one
22              who aids and abets the commission of an
                intentional tort if the person ... *knows* the
23              other's conduct constitutes a breach of a
                duty and gives substantial assistance or
24              encouragement to the other to so act.' ....
                The court in *Casey* specified that to satisfy
25              the knowledge prong, the defendant must have
                'actual knowledge of the specific primary
26              wrong the defendant substantially assisted.'

                                28

....

Relying on this authority, Defendants contend that Starlite has not pled with specificity that the CRO knowingly and intentionally gave assistance to the Turner Company "*with the intent* to facilitate the commission of a particular fraud, as it must." Defendants assert that Starlite only alleges that "MCA and Aaron knew that its action and inactions as alleged herein would assist Turner Company in the commission of a fraud, and MCA and Aaron's actions and inactions did substantially assist Turner Company in the commission of a fraud." Defendants complain that Starlite has not even pleaded fraud by the Turner Company with the specificity required by Rule 9(b), Federal Rules of Civil Procedure:

> Starlite should not be permitted to make vague and conclusory allegations of fraud that lack the specificity required by Rule 9(b) and then hope to do discovery later to bolster its defective allegations.

Defendants' reference to the specificity requirements of Rule 9(b) were not raised until their reply brief. Grounds for dismissal raised for the first time in a reply brief are disregarded. Because the FAC was filed in state court and removed to this court, Defendants' contention that Starlite is ignoring the requirements of Rule 9(b) and hopes to be able to comply with them following discovery is misplaced. Although there is no question that the Federal Rules of Civil Procedure apply to this removed action, *see* Rule 81(c)(1), Federal Rules of Civil Procedure, the specificity requirements of Rule 9(b) do not

apply to a claim of aiding and abetting fraud.  *See Neilson v.*
*Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1119
(C.D.Cal.2003):

> Under Rule 9(b) of the Federal Rules of Civil
> Procedure, while fraud must be pled with
> specificity, '[m]alice, intent, knowledge,
> and other condition of mind of a person may
> be averred generally.' ... Although this
> obviates the necessity of pleading detailed
> facts supporting the allegations of
> knowledge, it does not relieve a pleader of
> the burden of alleging the nature of the
> knowledge a defendant purportedly possessed.
> In the case of an aider and abettor under
> California law, there must be actual
> knowledge of the primary violation.

MCA and the CRO were appointed as the result of a noticed
motion for appointment of a receiver, in compliance with the
requirements of law.  The CRO is a court-appointed officer with
specific court-ordered duties to administer the financial affairs
and operations to the Turner Company.  The assigned duties
include, *inter alia*, to maintain custody of all books and records
of Turner Company, to collect and preserve assets, collect
accounts receivable, to advance funds, conduct business
operations and negotiate with customers, suppliers, and third
parties, and to sell any or all assets.  The CRO is acting under
the jurisdiction of the Court and derives his authority and
function solely from the Court Order.  As the FAC is pleaded,
Defendants are entitled to quasi-judicial immunity from
liability.

At the hearing, Starlite contended that it could amend to
allege that Defendants' actions exceeded the Court's Order or

1  otherwise violated the law.  Based on these representations and

2  because leave to amend should be freely granted, Starlite will be

3  permitted to file a Second Amended Complaint.

4                              <u>CONCLUSION</u>

5       For the reasons stated:

6       1.  Defendants MCA Financial Group and Morris C. Aaron's

7  motion to dismiss the Fourth and Seventh Causes of Action in the

8  First Amended Complaint is GRANTED WITH LEAVE TO AMEND;

9       2.  Starlite shall file a Second Amended Complaint in

10 accordance with the rulings herein within 30 days of the filing

11 date of this Memorandum Decision and Order.

12      IT IS SO ORDERED.

13 Dated:   <u>July 7, 2008</u>              <u>/s/ Oliver W. Wanger</u>
                                   UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

31