1

2

3

4

5

6        IN THE UNITED STATES DISTRICT COURT FOR THE

7              EASTERN DISTRICT OF CALIFORNIA

8

| | | |
|---|---|---|
| 9 STARLITE DEVELOPMENT (CHINA) ) | No. CV-F-07-1767 OWW/DLB | |
| LTD., ) | | |
| 10 ) | MEMORANDUM DECISION AND | |
| ) | ORDER DENYING IN PART AND | |
| 11 ) | GRANTING IN PART WITH LEAVE | |
| ) | TO AMEND TEXTRON FINANCIAL | |
| 12 Plaintiff, ) | CORPORATION'S MOTION TO | |
| ) | DISMISS AND DENYING | |
| 13 vs. ) | TEXTRON'S MOTION TO STRIKE | |
| ) | (Docs. 20 & 21) | |
| 14 TEXTRON FINANCIAL ) | | |
| CORPORATION, et al., ) | | |
| 15 ) | | |
| ) | | |
| 16 Defendants. ) | | |
| ) | | |
| 17 _____) | | |

18      Before the Court is Defendant Textron Financial

19 Corporation's (Textron) motion to dismiss the First Amended

20 Complaint pursuant to Rule 12(b)(6), Federal Rules of Civil

21 Procedure, and motion to strike pursuant to Rule 12(f), Federal

22 Rules of Civil Procedure.[1]

23      Plaintiff Starlite Development (China) Ltd. (hereafter

24 _____

25      [1]Defendants MCA Financial Group, Ltd. and Morris C. Aaron
also move to dismiss the First Amended Complaint.  That motion is
26 resolved by separate Memorandum Decision.

1

referred to as Starlite) filed an action in the Stanislaus County Superior Court.  Starlite filed a First Amended Complaint (FAC) on November 27, 2007 against Textron Financial Corporation (Textron); MCA Financial Group, Ltd. (MCA); Morris C. Aaron (Aaron); and John F. Turner & Co., Inc. and JFTC, Inc. (collectively, Turner Company) and Does 1-20.[2]  The action was removed to this Court on December 5, 2007.

The FAC alleges:

> 13.  Beginning in or about 2002, Starlite entered into an ongoing business relationship with Turner Company, pursuant to which Starlite sold box calendars to Turner Company.  During the years 2002 through 2004, Starlite's sales to Turner Company were between $400,000-$600,000 annually.

> 14.  In 2005 Turner Company ordered both wall calendars and box calendars from Starlite. Accordingly, Starlite's financial year 2005 sales to Turner Company increased by approximately 240% to $1.46 million.

> 15.  In 2006, Turner Company increased its orders for box calendars and wall calendars and added desk calendars, which increased Starlite's sales to Turner by approximately 180% over 2005.  On January 19, 2006, Turner Company submitted a written purchase order for 3.25 million calendars (plus additional box calendars), on the following payment terms: 10% to be paid before the first shipment, and the remaining balance to be paid 30% in each of the months of October, November, and December 2006.

> 16.  Beginning in or about January 2006 and ending in or about August 2006, Turner Company submitted purchase orders to Starlite

---

[2] The FAC also named Mark Turner, John F. Turner and Kathleen A. Turner as Defendants.  By Order filed on December 20, 2007, these defendants were dismissed without prejudice (Doc. 9).

for calendars, which Starlite produced,
shipped and invoiced.  Starlite's last
shipment of calendars to Turner Company
occurred in October 2006.  Other than a
$195,575 and a $62,118 payment made in April
and June 2006, respectively, Turner Company
and Defendants have not paid anything for
Starlite's 2006 calendars.  The total unpaid
debt owing from Turner Company to Starlite
according to Starlite's books is $2,693,989.

17.  In October 2006, when Turner Company's
first 30% partial payment became due and went
unpaid, Starlite attempted to make contact
with Turner Company on numerous occasions,
however, Starlite's calls and e-mail messages
went unanswered, until November 10, 2007 when
Aaron finally contacted Starlite via e-mail
correspondence and introduced himself to
Starlite as the 'court appointed
Restructuring Officer for [the Turner
Company'.'

18.  After having made contact with Aaron,
Starlite was informed that Turner Company was
nearly insolvent and under the control of
Aaron and Turner Company's primary lender,
Textron.  Starlite was informed that Aaron
had been appointed as the Chief Restructuring
Officer over Turner Company in March 2006,
after Textron sued Turner Company and its
principals after their insolvency became
known to Textron in two separate actions
(*Textron v. John F. Turner, et al.*, 1:06-CV-
00160-OWW-LJO; and *Textron v. John F. Turner
Company*, 1:06-cv-00162-OWW-LJO) filed in the
United States District Court for the Eastern
District of California (collectively, the
'Federal Actions').  Textron filed a motion
to appoint a receiver in the federal action
against the Turner Company on or about
February 16, 2006.  Turner Company stated in
its opposition that it intended on filing
bankruptcy pursuant to Chapter 11.  Textron
and Turner Company then stipulated that
Textron would withdraw its motion for a
receiver on the condition that Turner Company
allow MCA and Aaron to take over the
management of Turner Company as 'Chief
Restructuring Officer' and, among other
things, ensure that all receivables directed

3

to Turner Company were actually shuttled to a lockbox controlled by Textron.

19.   During November and December of 2006, Aaron repeatedly told Richard Lim, Senior Vice President of Marketing and sales for Starlite, that Aaron was working with Textron to come up with a payment plan to pay Starlite and that Starlite's payment had always been 'in the budget.'   Plaintiff is informed and believes, and thereon alleges that at the time Aaron made these representations to Richard Lim, such representations were false, in that the truth was that Textron had no intention to pay Starlite the balance due for the calendars and Aaron knew this.

20.   At the same time MCA and Aaron were placed in management control of the Turner Company in March 2006, in order to ensure that no other creditors of Turner Company would be notified of Turner Company's insolvency and the lockbox credit arrangement established by Textron, Textron and Turner Company stipulated that the entire file contents of two separate Federal Actions would be sealed from public view.   In or around December of 2006, Aaron finally provided Starlite, and thereafter Starlite's counsel in or around later April, 2007, a copy of the Stipulation and Order Appointing Chief Restructuring Officer, for Preliminary Injunction, and for Sealing of Documents, filed in the matter of *Textron v. John F. Turner Company*, 1:06-CV-00162-OWW-LJO (the 'Personal Action') on or around March 27, 2006.   Until Starlite intervened to unseal the records in the above-entitled case, however, neither Turner Company, Textron, MCA nor Aaron provided Starlite any further information regarding the two cases, despite Starlite's repeated requests for information.

21.   As a result of the concealment of the two legal actions, Starlite was not advised of the insolvency of Turner Company, or of the fact that Turner Company was no longer in charge of its business operations.   Based on such lack of knowledge, Starlite continued to accept purchase orders from Turner Company

4

and continued to manufacture and ship
calendars to Turner Company throughout the
Spring and Summer of 2006, with no
information or reason to believe that Turner
Company would not be able or willing to pay
the balance due of over $2 million that
remains unpaid to this date.

22.  In sharp contrast to the lack of
knowledge about the insolvency of Turner
Company, Textron, MCA, Aaron and all
defendants were well aware of the state of
insolvency of Turner Company, Turner
Company's inability to pay Starlite, and/or
Textron's intent not to approve funding to
pay for the calendars that Starlite was
delivering to Turner Company throughout the
Spring and Summer of 2006.  With full
knowledge, Defendants, including Turner
Company, Textron, MCA, and Aaron and allowed
[sic] Turner Company to receive and sell the
calendars to its customers and knowingly
received all payments to Turner Company from
those customers.  Defendants knowingly reaped
the benefits of Turner Company being able to
sell the Starlite produced calendars knowing
full well that Turner Company could not pay
for them and/or that Textron never intended
to authorize payment for them.

23.  To assure that no payments could be made
by Turner Company to its creditors without
Textron's prior approval, in February 2006 a
'lockbox' arrangement was established so that
all funds received by Turner Company were
paid directly to the control of Textron.
Recently, it was discovered that Textron
asserted as early as February 2006 that over
$600,000.00 had been wrongfully diverted from
Textron by Turner Company to pay Starlite for
2005 shipments of Starlite produced 2006
calendars to Turner Company.  However,
neither Textron nor any of the defendants
ever informed Starlite of such alleged
misappropriated payment (until during the
discovery process in this action) because
such information would have alerted Starlite
to the insolvency and situation of Turner
Company.

24.  Instead, in continuance of the

subterfuge, on or about April 1, 2006, Textron funded and paid what Defendants estimated the 10% pre-shipment payment would be for 2007 box calendars and wall calendars that had been ordered by directly wiring funds to Starlite's bank account in the amount of $195,575.23.  At that time, Starlite had not yet sent Turner Company a statement for the 10% pre-shipment payment on the wall and box calendars, but only for the 10% due on two particular orders which totaled $63,249.98.  Textron funded and Defendants, and each of them allowed, and paid this additional early payment of over $130,000 to insure a sense of confidence in Turner Company by Starlite.  Defendants, and each of them knew that without this pre-payment, Starlite would not ship the calendars and Textron wanted to ensure the calendars were shipped so they could control and usurp the proceeds of the calendars and utilize said proceeds to pay down Turner Company's debt to Textron.

25.  On or about June 16, 2007, Textron approved the funding and allowed the use of $62,117.59 to make yet another early payment to Starlite (again in excess of the 10% pre-shipment payment that Starlite had not yet sent Turner Company a statement for). Textron funded and allowed, and Defendants paid this additional payment in excess of over $17,500.00 to Starlite with Turner Company stating that the company had 'extra cash flow available' (a false statement) to insure a continued sense of confidence in Turner Company by Starlite.  Defendants, and each of them knew that without this pre-payment, Starlite would not ship the calendars and Textron wanted to ensure the calendars were shipped so they could control and usurp the proceeds of the calendars and utilize said proceeds to pay down Turner Company's debt to Textron.

26.  At all relevant times, Defendants and each of them knew that the Starlite produced calendars would constitute Turner Company's major source of account receivables since Starlite was Turner Company's principal supplier of calendars.

27.   Textron closely monitored the finances and business operations of Turner Company by placing a Textron agent on site at Turner Company's offices in January 2006 and later through the imposition of MCA and Aaron as CRO of Turner Company in March 2006, and Textron knew of the deepening insolvency of Turner Company.

28.   Textron knew how much revenue was being produced by the Starlite product because all calendar purchasers paid for the calendars by remitting their funds to the 'lock box' account over which Textron had exclusive control.   Textron knew that Turner Company had no funds available with which to pay Starlite for the Starlite produced calendars without Textron's approval because the only way Turner Company would have any funds available was from its accounts receivable which were all in Textron's control via the 'lock box.'   Textron was simultaneously expropriating the revenues from the Starlite produced calendar sales to pay off Turner Company's outstanding debt to Textron.

29.   Following shipment of the 2007 calendars by Starlite, receipt and use of the 2007 calendars by Turner Company to fill its customers' orders for the Starlite produced 2007 calendars, and receipt by Textron (via the Lockbox) of the Starlite product generated receivables, Defendants made no payment on the accounts owed to Starlite for its product.   No payment was made by MCA, Aaron or Textron even though by receipt and use of the Starlite calendars the debt to Starlite was a 'bona-fide obligation' and the receivables collected from the sale of the Starlite product constituted 'funds available,' and thus, should have been paid pursuant to the Stipulation and Order Appointing Chief Restructuring Officer, for Preliminary Injunction, and for Sealing of Documents described above.   Instead, Textron converted the funds to itself, and Aaron, MCA and Turner Company substantially assisted Textron in doing so.

30.   Starlite has demanded payment from Defendants to no avail.   According to

7

Starlite's books, the sum of $2,693,989
remains owed and unpaid.  Although Aaron,
after counsel for Starlite repeatedly
requested an acknowledgment of Turner
Company's debt to Starlite, finally supplied
Starlite's counsel with a spreadsheet
regarding Turner Company's account with
Starlite claiming offsets of over $400,000
for charges allegedly 'historically not
charged' and other smaller offsets for
product related issues, such offsets have not
yet been confirmed.  However, it is
undisputed that Turner Company owes Starlite
at least $2,193,123.96.

The FAC alleges five causes of action against Textron: the
Third Cause of Action for aiding and abetting fraud; the Fifth
Cause of Action for intentional interference with economic
advantage; the Sixth Cause of Action for intentional interference
with contract; the Seventh Cause of Action for negligent
interference with contract and economic relationship; and the
Eighth Cause of Action for unjust enrichment and imposition of
constructive trust.

    A.   BACKGROUND.

    As alleged in the FAC, Textron was Turner Company's "primary
lender."  On April 25, 2000, Textron filed a UCC-1 Financing
Statement with the California Secretary of State giving Textron a
security interest in "[a]ll accounts, chattel paper, general
intangibles, documents, inventory, equipment and fixtures in
which Debtor [the Turner Company] now or hereafter has rights,
wherever located, including but not limited to, deposit accounts,
copyrights, patents, trademarks, trade names and trade secrets;
the books and records pertaining thereto, in whatever medium

8

(including computerized data); and the products and proceeds of the foregoing." (Textron's Request for Judicial Notice, Exhibit B).

On February 14, 2006, Textron filed a Complaint for judicial foreclosure of deed of trust, for money due under written guaranty, for intentional and negligent misrepresentation, and conversion against John F. Turner and Kathleen A. Turner. *Textron Financial Corporation v. John F. Turner, et al.*, No. CV-F-06-160 OWW. On February 14, 2006, Textron filed a Complaint for breach of contract, conversion, fraud, and appointment of receiver against John F. Turner Company. *Textron Financial Corporation v. John F. Turner Company*, No. CV-F-06-162 OWW. These actions were consolidated by Order filed on July 26, 2006 (Doc. 19) and are referred to in this Memorandum Decision as the "Textron Federal Actions."

On February 16, 2006, Textron moved for a temporary restraining order pending appointment of a receiver (Doc. 7) and moved for appointment of a receiver (Doc. 9). A hearing on the motion for temporary restraining order was held on March 6, 2006. A Temporary Restraining Order was issued on March 8, 2006 (Doc. 22), setting forth the following findings of fact:

> 1. Turner Company has entered into a Loan and Security Agreement ('Agreement') with Textron whereby Textron made loans to Turner Company, and Turner Company granted Textron a security interest in essentially all assets of Turner Company ('Collateral').
>
> 2. Pursuant to the terms of the Agreement, Turner Company is required to remit to

Textron, among other things, all proceeds of Turner Company's accounts receivable ('Proceeds').

3.  Pursuant to the terms of the Agreement, on or about February 7, 2006, a lockbox ('Lockbox') had been established, and all proceeds were to be deposited into the Lockbox.

4.  Pursuant to the terms of the Agreement, Turner Company was required to submit to Textron, on a weekly basis, borrowing base certificates setting forth, among other things, the amounts of Turner Company's accounts receivable and inventory, and the amount (if any) of loans and advances that Turner Company was eligible to receive under the formula set forth in the Agreement.

5.  Turner Company was required to make payments to Textron as required by the Agreement.

6.  In or about December 2005, Turner Company failed to remit Proceeds to Textron in the amount of approximately $2.5 million and Turner Company has subsequently failed to remit additional Proceeds to Textron.

7.  Turner Company failed timely to submit borrowing base certificates to Textron, including without limitation the borrowing base certificate for the last week of December 2005.

8.  The borrowing base certificate that Turner Company submitted in January and February 2006 show an Overadvance exceeding $2,000,000.

9.  Turner Company has failed to make payments to Textron as required under the Agreement.

10.  Turner Company has wrongfully acted to deprive Textron of access to its online bank account information.

11.  Pursuant to the terms of the Agreement, Textron has issued to Turner Company notice

10

of default and has demanded payment of the Overadvance.

12.  Notwithstanding Textron's demand, Turner Company has continued to collect Proceeds without remitting them to Textron or the Lockbox.

13. There is no adequate remedy at law because, among other things, Textron is entitled to the Collateral, and Turner Company's financial conditions suggest that Turner Company will not be able to respond in damages if the Proceeds are diverted and dissipated.

14.  There is immediate danger of grave and irreparable injury to Textron in that Turner Company will continue to collect, divert and/or dissipate Proceeds and other Collateral and thereby deprive Textron of the ability to recover its claims against Turner Company.

The Temporary Restraining Order restrained Turner Company from disposing of any cashier's checks or certified checks related to the business of Turner Company, from directing any account debtors of Turner Company to remit payments to Turner Company rather than to the established Lockbox, and otherwise interfering with Textron's efforts to collect Turner Company's accounts receivable; restrained Turner Company from diverting, depositing or transferring accounts receivable proceeds anywhere except for the Lockbox; and restrained Turner Company from preventing Textron's online access to Turner Company's bank account information.  A hearing on the motion for preliminary injunction and the motion for appointment of a receiver were set for March 20, 2006 (Doc. 22).

At the March 20, 2006 hearing, the Court issued a tentative

11

ruling and ordered counsel to submit a proposed order issuing the

preliminary injunction and appointment of a receiver (Doc. 29).

On March 24, 2006, the Stipulation and Order Appointing

Chief Restructuring Officer, For Preliminary Injunction, and For

Sealing of Documents (March 24 Stipulation and Order) was filed:

> IT IS HEREBY STIPULATED AND AGREED by and
> between plaintiff Textron Financial
> Corporation ('Textron') and Defendant John F.
> Turner and Company ('Turner Company'),
> through their respective counsel of record,
> as follows:
>
> A.  Disposition of Pending Motions.
>
> 1.  Textron's Motion for Appointment of
> Receiver is hereby withdrawn without
> prejudice.
>
> 2.  Textron's Motion for Preliminary
> Injunction is hereby granted on the terms set
> forth in Part C below.
>
> B.  Appointment of Chief Restructuring
> Officer.
>
> 1.  Morris C. Aaron of MCA Financial Group,
> Ltd. is hereby appointed immediately as the
> Chief Restructuring Officer ('CRO') of Turner
> Company on the following terms and
> conditions.
>
> 2.  The CRO shall:
>
> (a) Take possession of and
> safeguard all of the books and records
> (including computer records) of Turner
> Company, wherever located, and Turner Company
> shall immediately provide the CRO with all
> necessary passwords for accessing Turner
> Company's computers and related software,
> including Turner Company's web site;
>
> (b) Collect all of Turner Company's
> accounts receivable, existing or future, by
> directing payment thereof to the Lockbox that
> had been established on or about February 7,

2006 pursuant to the Loan and Security Agreement, as amended ('Agreement') between Textron and Turner Company ('Lockbox');

(c) Remit to Textron via deposit to the Lockbox, any and all collections of Turner Company's accounts receivable that may come directly into the possession of the CRO, promptly upon receipt;

(d) Take possession of and safeguard all assets of Turner Company, including without limitation all inventory, equipment, cash, checks, bank accounts and license agreements;

(e) At the discretion of the CRO, obtain advances from Textron pursuant to the Agreement as currently in effect or as further amended, supplemented and/or modified by the CRO and Textron in their discretion (nothing herein shall constitute an order for Textron to make advances except to the extent, if any, required by the Agreement as currently in effect), solicit and maintain relationships with suppliers and licensors, create inventory and finished goods, solicit and obtain orders from customers, sell goods to customers, hire or terminate or make changes to the terms and conditions of employment of Turner Company's officers and employees (nothing herein shall constitute an order permitting the CRO to abrogate existing employment contracts, if any), pay the bona fide obligations of Turner Company in the ordinary course of business (with all officers and employees of Turner Company being subject to the authority of the CRO); and

(f) At the discretion of the CRO, sell any or all assets of Turner Company in a commercially reasonable manner for the maximum possible value or, if unable to do so and the CRO determines that it shall be unable to do so, liquidate the business through an orderly wind-down of its operations.

3.   The CRO shall have, use, operate, manage, and control all books, financial records,

other records and writings of Turner Company regarding Turner Company's business.

4.   The CRO is authorized and empowered to enter and gain access to any premises from where Turner Company conducts its business, maintains its books and records or stores its inventory, including but not limited to 1911 Yosemite Boulevard, Modesto, California 95354 (collectively, the 'Business Premises'), for the purpose of performing the CRO's duties and obligations under this Stipulation.

5.   The CRO is authorized and empowered to receive and collect Turner Company's mail, whether at the United States Post Office, from a courier or delivery service, at any Business Premises, or elsewhere, whether or not such mail was sent by U.S. Mail or by courier or delivery services, and the CRO is authorized to open such mail and to take possession of all checks, money orders, and other payments constituting or evidencing payment on accounts receivable of Turner Company or for sales of inventory or equipment by Turner Company.

7.   The CRO shall have the power to execute documents and do acts necessary, convenient and incidental to the foregoing.

8.   The CRO shall bear no personal liability for any actions or omissions which the CRO in his or its good faith business judgment believes to be in conformity with the provisions of this Stipulation.

9.   Turner Company shall immediately turn over to the CRO all of Turner Company's books and records with respect to its bank accounts, inventory, accounts receivable and the proceeds thereof, and shall immediately provide the CRO with online access to all of Turner Company's bank accounts.

C.   Preliminary Injunction.

1.   Turner Company and its officers, employees, agents and anyone acting on behalf of Turner Company are hereby restrained and enjoined, during the pendency of the above-

14

captioned action, from (a) disposing of any cashier's checks or certified checks related to the business of Turner Company, whether payable to cash, John F. Turner, Kathleen A. Turner, or anyone else, (b) collecting any accounts receivable of Turner Company, except at the direction of the CRO, (c) directing any account debtors of Turner Company to remit payments to Turner Company rather than to the Lockbox, and (d) otherwise interfering with the CRO's efforts to collect Turner Company's accounts receivable.

2.   Turner Company and its officers, employees, agents, and anyone acting on behalf of Turner Company shall not, during the pendency of the above-captioned action, divert, deposit or transfer accounts receivable proceeds of Turner Company, anywhere except for the Lockbox.

3.   Turner Company and its officers, employees, agents, and anyone acting on behalf of Turner Company shall not, during the pendency of the above-captioned action, prevent in any way Textron's full online access to Turner Company bank account information (for all accounts in the name of, or for the benefit of, Turner Company), and are hereby restrained and enjoined from hereafter, during the pendency of the above-captioned action, taking any actions to deprive Textron to full online access to such bank account information.

4.   Turner Company, its officers, directors, shareholders, general partners, limited partners, agents, managers and employees, and all other persons with actual or constructive knowledge of this Order and each of them, shall not, during the pendency of the above-captioned action:

     (a) Directly or indirectly interfere in any manner with the discharge of the duties of the CRO or the CRO's possession of and operation or management of Turner Company's business, the books and records thereof, bank accounts, the collection of accounts receivable, or the performance of license agreements and the right to use

15

licensed material;

(b) Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage, create a security interest in, encumber, conceal, or in any manner whatsoever deal in or dispose of the whole or any part of the books and records, inventory, equipment, accounts receivable, bank accounts, or other assets of Turner Company, or any proceeds of the foregoing, except at the direction of the CRO; or

(c) Do any act which will, or which will tend to, impair, defeat, divert, prevent or prejudice the preservation of Turner Company's business, the books and records, inventory, equipment, accounts receivable, bank accounts, license agreements, or other assets of Turner Company, or proceeds of the foregoing.  Nothing in this paragraph shall be construed to prohibit any employee of Turner Company from voluntarily terminating his or her employment.

D.   Sealing of Documents.

1.  All documents currently on file with the Court in the above-captioned action shall forthwith be placed under seal pursuant to Local Rule 39-141.

2.  All documents hereafter filed with the Court in the above-captioned action shall be filed under seal pursuant to Local Rule 39-141.

3.  All documents sealed or filed under seal pursuant to this Stipulation shall remain under seal unless and until otherwise ordered by the Court.

(Doc. 31).

Until the Stipulation and Order Appointing Chief Restructuring Officer, For Preliminary Injunction, and For Sealing of Documents was filed on March 26, 2006, the Textron Federal Actions were available to the public.

16

**B.   <u>MOTION TO DISMISS</u>.**

**1.   <u>Governing Standards</u>.**

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001).  "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.,* 523 F.3d 934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombley*, ___ U.S. ___, 127 S.Ct. 1955, 1974 (2007).  "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, *id.* at 1964-1965.  Dismissal of a claim under Rule 12(b)(6) is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of

all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).

Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint.  *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)  When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice.  *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir.1988).[3]

2.   <u>Third Cause of Action for Aiding and Abetting Fraud</u>.

The Third Cause of Action is against Textron for aiding and abetting fraud.  The Third Cause of Action incorporates by reference all preceding allegations, including the Second Cause of Action against the Turner Defendants for fraud (which has been voluntarily dismissed by Starlite).  The Second Cause of Action against the Turner Defendants alleges:

---

[3]Both parties have filed requests for judicial notice of various documents.  No party has objected to the other's request.

39.   The Turner Defendants entered into the foregoing contractual relationship [with Starlite for the sale and purchase of calendars] knowing full that the Turner Company was insolvent.  Despite such knowledge, the Turner Defendants made numerous purchase orders for additional product from Starlite with the knowledge that they would be unable to pay Starlite for the goods delivered.  The Turner Defendants made the purchase orders having no intention to pay for the goods delivered.  In addition, the Turner Defendants made early, additional, and excess payments as alleged above for the purpose of insuring a false sense of confidence in Turner Company by Starlite.

40.   The affirmative representations made by the Turner Defendants were in fact false, and were demonstrated to be false when, instead of increasing their business with Starlite, the Turner Defendants actually terminated all further business between the two entities.

41.   In addition to the affirmative misrepresentations noted above, the Turner Defendants knew and concealed the true facts, and despite repeated statements by Starlite regarding its understanding of the Turner Company's position, the Turner Defendants failed to advise Starlite of their true motivations and intentions.  The Turner Defendants made such misrepresentations of fact and concealed material facts, with the knowledge and intent that Starlite would rely upon them.

42.   Had the material misrepresentations not been made, and had the concealed facts been disclosed, such that Starlite was aware of the Turner Defendants's [sic] motivations and intentions, Starlite would not have continued to manufacture and ship any more calendars to Turner Defendants, and would not have suffered the loss of approximately $2.6 million as a result.

43.   The Turner Defendants made the affirmative misrepresentations and concealed material facts from Starlite with the intent to deceive and defraud Starlite.

19

1    44. As a direct, legal and proximate result
     of the fraudulent misrepresentations and
2    concealment made by the Turner Defendants as
     herein alleged, Starlite has been damaged in
3    any amount according to proof at trial.

4    The Third Cause of Action then alleges:

5    47.  At all relevant times, Textron
     controlled Turner Company's working capital
6    which Turner Company required to make
     payments to vendors in order to continue in
7    business.

8    48.  At all relevant times, Textron had
     exclusive control over and access to all
9    funds paid to Turner Company for the Starlite
     produced calendars purchased through the
10   'lock box' arrangement.

11   49.  At all relevant times, Textron could and
     did influence, direct and control the
12   business decisions of the CRO and the
     principal officers of Turner Company through
13   its exclusive control of funding operating
     expenses.
14
     50.  Textron placed an agent, representative
15   or employee at Turner Company's business
     offices to monitor and audit Turner Company's
16   business operations in January 2006 and
     imposed MCA and Aaron as CRO of Turner
17   Company in March 2006.

18   51.  Textron continued to make advances to
     Turner Company for specific operating
19   expenses despite Turner Company's deepening
     insolvency in order to allow Turner Company
20   to continue to operate so that Starlite
     produced calendars could be received and sold
21   by Turner Company.

22   52.  Textron had knowledge of all of the
     fraudulent acts of Turner Company and of the
23   CRO with regard to Starlite alleged above.

24   53.  Textron knew that its actions and
     inactions as alleged herein would assist
25   Turner Company in the commission of a fraud,
     and Textron's actions and inactions did
26   substantially assist Turner Company in the

commission of a fraud.

Textron moves to dismiss the Third Cause of Action on the ground that it was entitled to enforce its rights as a secured creditor, including the collection of proceeds of goods Starlite sold to Turner Company, without subjecting itself to liability for aiding and abetting any alleged fraud by Turner Company. Textron further contends that Starlite has not properly pleaded a claim for aiding and abetting fraud.

In *Casey v. U.S. Bank National Assn.,* 127 Cal.App.4th 1138, 1144, 1145-1146 (2005), the Court of Appeals explained:

> California has adopted the common law rule
> for subjecting a defendant to liability for
> aiding and abetting a tort.  'Liability may
> ... be imposed on one who aids and abets the
> commission of an intentional tort if the
> person (a) knows the other's conduct
> constitutes a breach of duty and gives
> substantial assistance or encouragement to
> the other to so act or (b) gives substantial
> assistance to the other in accomplishing a
> tortious result and the person's own conduct,
> separately considered, constitutes a breach
> of duty to the third person.' ....
>
> ...
>
> California courts have long held that
> liability for aiding and abetting depends on
> proof the defendant had actual knowledge of
> the specific primary wrong the defendant
> substantially assisted.

Textron argues that, because Starlite's aiding and abetting claim is based on fraud, it must be plead with the specificity required by Rule 9(b), Federal Rules of Civil Procedure.

As Starlite contends, Textron's assertion that the aiding and abetting cause of action must satisfy Rule 9(b) is without

merit.  The case upon which Textron relies, *Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1119 (C.D.Cal.2003), does not so hold.  *Neilson* ruled:

> Under Rule 9(b) of the Federal Rules of Civil Procedure, while fraud must be pled with specificity, '[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally.' ... Although this obviates the necessity of pleading detailed facts supporting the allegations of knowledge, it does not relieve a pleader of the burden of alleging the nature of the knowledge a defendant purportedly possessed. In the case of an aider and abettor under California law, there must be actual knowledge of the primary violation.

Textron argues that Starlite's "generic" allegations of knowledge do not suffice to state a claim upon which relief can be granted:

> Starlite admits that (a) [Textron] sued Turner Company and sought appointment of a receiver for Turner Company in February 2006 and (b) a month later, this Court issued the CRO Order appointing the CRO to 'take over the management of Turner Company' [Amended Complaint, ¶ 18]; this negates any potential allegation (not expressly made by Starlite in any event) that [Textron] was aiding or abetting any fraud by Turner Company as of January 19, 2006, when Turner Company submitted its purchase order to Starlite for the calendars for which Starlite has not been paid [Amended Complaint, ¶ 15].  By the time [Textron] directly wired funds to Starlite's bank account on or about April 1, 2006 [Amended Complaint, ¶ 24], this Court had already appointed the CRO to take control fo Turner Company, thereby precluding any fraud by Turner Company that [Textron] could have aided or abetted.
>
> ....

Starlite responds that the FAC adequately alleges Textron's

actual knowledge of Turner Company's fraud:

> The allegations in the FAC ... allege Textron's *knowledge* of [Turner Company's] obligation to Starlite, that Textron actively assisted [Turner Company] to give Starlite the false *perception* of [Turner Company's] solvency by authorizing and providing the funds for [Turner Company's] 'early payments' to Starlite, and that Textron *intended* to induce Starlite to produce and ship the 3.25 million calendar order in a timely manner so that Textron could benefit from the sale thereof.  Starlite has also alleged that the CRO, as Textron's agent, falsely assured Starlite that payment to Starlite was 'in the budget,' despite the fact it knew Textron intended to keep all further receivables for its own benefit.

Textron further moves for dismissal of the Third Cause of Action to the extent the Third Cause of Action is based on any allegation that Textron failed to disclose information concerning Turner Company's financial situation to Starlite.  Textron asserts that such allegation "ignores [Textron's] obligation not to disclose confidential information regarding its borrower." Further, because it had no relationship with Starlite, and did not enter into any transaction with Starlite, Textron cannot be held liable for concealing or failing to disclose any fact(s) to Starlite.

In *LiMandri v. Judkins*, 52 Cal.App.4th 326, 336-337 (1997), the Court of Appeals held:

> There are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the

defendant actively conceals a material fact
from the plaintiff; and (4) when the
defendant makes partial representations but
also suppresses some material facts ...' ...
None of these circumstances apply in the
instant case.

Clearly, there was no fiduciary relationship
between Judkins as counsel for Security and
LiMandri as counsel for the Deddehs.  Each of
the other three circumstances in which
nondisclosure may be actionable presupposes
the existence of some other relationship
between the plaintiff and defendant in which
a duty to disclose can arise.  As set forth
in BAJI No. 12.36 (8th ed. 1994), 'where
material facts are known to one party and not
to the other, failure to disclose them is not
actionable fraud unless there is some
*relationship* between the parties which gives
rise to a duty to disclose such known facts.'
....

As a matter of common sense, such a
relationship can only come into being as a
result of some sort of *transaction* between
the parties.

Starlite argues that dismissal under Rule 12(b)(6) on this

ground is not warranted:

Textron also argues that it could not have
engaged in a scheme with [Turner Company]
with regard to [Turner Company's] placement
of the 3.25 million-calendar order while it
was itself engaged in contested litigation
against [Turner Company] at that time.
However, whether or not evidence exists that
can counter the allegations in Starlite's FAC
is not to be considered in ruling on a Rule
12(b)(6) motion to dismiss.  Regardless,
Textron is not innocent here merely because
it was also engaged in litigation against
[Turner Company].  Textron itself admits that
it began examining [Turner Company's]
operations and finances in late 2005, and in
early January of 2006, having placed one of
its agents at [Turner Company's] headquarters
for said purpose [sic] ... Moreover, the
allegations sufficiently alleged ...

24

> Textron's active involvement in the fraud at
> issue.  Textron secretly gained complete
> control of [Turner Company's] finances, then
> secretly authorized and funded early payments
> to induce Starlite to produce and ship the
> calendars, never intending to pay for the
> calendars once they were received.

Starlite argues that Textron's alleged dominion and control over Turner Company created a duty to Turner Company and to Turner Company's other creditors, including Starlite.

Starlite cites *Credit Managers Association v. Superior Court*, 51 Cal.App.3d 353 (1975), *Commons v. Schine*, 35 Cal.App.3d 141 (1974), *Pension Trust Fund for Operating Engineers v. Federal Ins. Co.*, 307 F.3d 944 (9th Cir.2002), and *United States v. Vaccarella*, 735 F.Supp. 1421 (S.D.Ind.1990).

*Credit Managers Association* involved an action by an assignee for the benefit of creditors of a corporation against a bank, an investment company, and a business consultant.  The plaintiff alleged that the bank, as a creditor of the assignor corporation, had coerced it into employing the consultant to manage it, that the defendants owed the corporation a fiduciary duty which they had breached, and that, as a proximate result of the defendants' actions, the corporation's assets were grossly mismanaged and wasted, rendering the corporation insolvent.  The Court of Appeals held that the complaint stated a cause of action against a general demurrer:

> Credit Managers' first amended complaint
> directly or indirectly alleged, in effect,
> that Jer Meraj, against its will, was
> compelled by Bank to employ Mordy as business
> consultant and that it was compelled to

> surrender to Mordy complete management
> control of Jer Meraj to such an extent that
> Mordy was able to overrule and supplant the
> board of directors and shareholders in its
> operation of the business.   Under such
> circumstances in our view a trial court could
> properly conclude that Mordy had the same
> fiduciary obligation to Jer Meraj and its
> creditors and to the stockholders of *Jer
> Meraj* that the officers and directors of Jer
> Meraj would have had to such creditors and
> such shareholders ... Directors of a
> corporation are trustees of the stockholders
> and indirectly for the creditors.

51 Cal.App.3d at 359-360.   The Ninth Circuit cited *Credit*

*Managers* in *Pension Trust Fund for Operating Engineers,* when it

held that "a lender, such as PTF, owes a fiduciary duty to a

borrower when it excessively controls or dominates the borrower."

307 F.3d at 955.   *Commons* involved an action by the trustee in

bankruptcy of a limited partnership against an individual and a

corporation, seeking damages arising out of a preference.

*Commons* held in pertinent part:

> One who dominates and controls an insolvent
> corporation may not ... assert the general
> immunity of creditor preferences from attack.
> He may not use his power to secure for
> himself an advantage over other creditors of
> the corporation ... The corporate controller-
> dominator is treated in the same manner as a
> director of an insolvent corporation and thus
> occupies a fiduciary relationship to its
> creditors ... He is liable to those creditors
> for any preference he has taken for his
> benefit and to their disadvantage.   In
> essence, the preference obtained for his
> personal benefit by a corporate controller-
> dominator is a species of fraud.   As a
> fiduciary, he has violated his duty to the
> beneficiaries of his trust.   As a guilty
> fiduciary, he is liable in quasi contract to
> the extent that he has unjustly enriched
> himself by his breach.

35 Cal.App.3d at 144-145.  *Vaccarella* involved an action by the United States to collect unpaid federal income taxes due and owing from a corporation.  The District Court held that the lender, rather than the CEO or treasurer, was the "responsible person" liable for unpaid withholding taxes due from the corporation, where the lender had complete control over the corporation finances and directed payments be made to other creditors in preference to paying the United States:

> [I]n the present case only Security Pacific can be deemed a 'responsible person' within the ambit of [26 U.S.C.] section 6672, because only Security Pacific had significant control over Mystik's finances.  By late May of 1983, neither Vaccarella nor Zintgraff effectively had any power to control the decision-making process with respect to allocating funds among creditors ... Security Pacific had complete control over Mystik's finances through the lock-box system and its veto power over funding requests.  It was Security Pacific, not Zintgraff or Vaccarella, who directed payments to be made to other creditors in preference to paying the United States government.  Moreover, Security Pacific choices of which creditors to pay reflected priorities calculated to protect its own collateral position with Mystik; often these choices ran counter to the best interests of Mystik itself.

735 F.Supp. at 1429.

Relying on these decisions, Starlite argues "it is clear that Textron stepped into a fiduciary duty and relationship as to [Turner Company] and Starlite as one of its creditors."

Textron argues that none of these decisions impose a duty on Textron, a secured creditor of Turner Company, to Starlite, an unsecured creditor of Turner Company.  Textron contends that

27

1 | *Commons* and *Pension Trust Fund* involved insiders, not an arms-
2 | length secured creditor, and that *Credit Managers* did not involve
3 | a secured creditor of a company operated by a court-appointed
4 | officer.  Textron contends that "to impose on [Textron] a
5 | fiduciary duty to Starlite, with whom it had no relationship,
6 | would eviscerate Article 9 of the UCC."

7 | Starlite overstates the duty and relationship Textron
8 | allowed.  The cases hold that a creditor who dominates and
9 | controls an insolvent corporation occupies a fiduciary duty to
10 | creditors for any preference obtained for its benefit to the
11 | creditor's discharge.  Textron also owed a fiduciary duty to
12 | Turner Company as result of its position of dominance and
13 | control.  The same principles do not apply to a court-appointed
14 | managing agent (quasi-receiver).

15 | Textron's motion to dismiss on this ground is GRANTED WITH
16 | LEAVE TO AMEND.

17 | **3.   Fifth, Sixth and Seventh Causes of Action**.

18 | Textron moves to dismiss the Fifth, Sixth and Seventh Causes
19 | of Action on several grounds.

20 | **a.   Starlite Cannot Allege that Textron Caused any**
21 | **Actionable Interference**.

22 | Textron argues that dismissal of these causes of action is
23 | required because the FAC does not allege that Textron proximately
24 | caused any interference with any contractual or economic
25 | relationship between Starlite and the "nearly insolvent" Turner
26 | Company.

28

The elements of a cause of action for intentional interference with contractual relations are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

Textron relies on *Dryden v. Tri-Valley Growers*, 65 Cal.App.3d 990, 997 (1977) and cases citing *Dryden*: "It has been repeatedly held that a plaintiff, seeking to hold one liable for unjustifiably inducing another to breach a contract, must allege that the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof." *See also Wynn v. National Broadcasting Co., Inc.*, 234 F.Supp.2d 1067, 1121 (C.D.Cal.2002)("Plaintiffs have failed to allege facts sufficient to allow an inference that the Employer Defendants otherwise would have performed had the Agency Defendants not interfered, which is an element to establish causation."); *see also Eltolad Music, Inc. v. April Music, Inc.*, 139 Cal.App.3d 697, 708 (1983):

> The trial court was incorrect in instructing the jury that plaintiff had the obligation to prove that defendant CBS was 'a' moving cause of the contract breach. The defendant's requested instruction that plaintiff had the obligation to prove that defendant was 'the' moving cause was improperly refused.

29

Textron contends that, because the FAC alleges that Turner Company was "nearly insolvent," Starlite cannot show that Turner Company would have paid Starlite if not for Textron's conduct. Textron notes that Starlite's contract with Turner Company at issue in this litigation was entered into approximately one month before Textron filed the Federal Actions against the Turner Defendants.

Starlite argues that Textron's reliance on *Dryden* and cases premised on *Dryden* is misplaced because the language in *Dryden* related to that court's discussion of the tort of inducement to breach a contract, not to intentional interference causes of action as alleged in the FAC.  Starlite cites *Shamblin v. Berge*, 166 Cal.App.3d 118, 122-123 (1985):

> Inducement to breach a contract, interference with a contractual relationship, and interference with prospective economic advantage are separate theories upon which the tort of interference with economic relations may be based ... The first theory protects against intentional acts designed to produce an actual breach and requires that a plaintiff prove: '(1) he had a valid and existing contract [with a third party]; (2) ... defendant had knowledge of the contract and intended to induce its breach; (3) the contract was in fact breached by the contracting party; (4) the breach was caused by ... defendant's unjustified or wrongful conduct; and (5) ... damage[s] [were suffered as a result].' *Dryden v. Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 995 ... The second theory is slightly broader in that it protects against intentional acts not necessarily resulting in a breach.

Textron replies that, whether or not the claim in *Dryden* was for inducing breach of contract as opposing to intentional

30

interference with contract is immaterial to the "'moving cause' issue." Even though the tort of interference with contract is "slightly broader" than inducing a breach of contract, Textron argues, "[t]his 'slight' distinction has nothing to do with causation, *i.e.*, whether the defendant was the moving cause of the breach or 'disruption' of the contract.

Starlite further argues that, even if Textron's legal position is correct, the FAC sufficiently alleges that, but for Textron's conduct with the "secret lockbox arrangement" and its domination and control of Turner Company, Turner Company would have performed on the contract and that Textron was the moving cause of Turner Company's breach:

> Starlite alleges that 'the receivables collected from the sale of the Starlite product constituted 'funds available' to pay Starlite. FAC, ¶ 29. It is also evident from the pleadings and declarations filed in this Court with regard to the Textron Receivership Motion, that *but for* Textron's exertion of dominion and control over [Turner Company], [Turner Company] would have continued to pay Starlite pursuant to their contract.

Starlite refers to the Declaration of John F. Turner in Opposition to Plaintiff's [Textron] Motion for Appointment of a Receiver filed in the consolidated actions on March 6, 2006:

> 5. ... [I]n December, 2005, we made the decision to apply collected accounts receivables to outstanding license fees and other trade payables in order to maintain the very existence of our Company. As Company President, I was informed and believe that we were both authorized and in fact required to do so by the language of our loan agreement with [Textron] ... Had we not made such

31

> payments we would have been in default of our obligation to Textron and would undoubtedly have forfeited our licenses, all of which are non-exclusive. Without the licenses, I believe that our company would go out of business ... Our continued operation benefits Textron and increases the likelihood of repayment. Our continued production and sales will generate additional accounts receivable, which will increase Textron's collateral.

Starlite also refers to Textron's memorandum of points and authorities in support of its Motion for Appointment of Receiver filed on February 16, 2006:

> On December 20, 2005, John F. Turner, on behalf of Turner Company, sent Textron a letter, which Textron received on January 3, 2006, in which Turner Company admitted that it diverted $1,997,703.33 in Diverted Collections. Until Textron received the December 30, 2005 letter, Turner Company had concealed, and had not disclosed to Textron, and Textron had not been aware of, Turner Company's diversion of the Diverted Collections ....
>
> ...
>
> ... In the course of the January 2006 Examination, Textron discovered that, in addition to the nearly $2 million in Diverted Collections admitted in the December 30, 2005 letter, Turner Company retained an additional $463,116.53 in Diverted Collections that were not remitted to Textron. ....

Textron replies that Starlite's reliance on John Turner's declaration does not establish that Textron's conduct was the moving cause in Turner Company's failure to pay Starlite pursuant to the Starlite contract:

> Mr. Turner admitted that (i) he caused Turner Company to divert collections of accounts receivable rather than remitting them to its

1
2
3
4
5
6

> secured creditor, [Textron], as it was
> contractually bound to do and (ii) due to its
> financial distress, and its apparent
> inability to perform all of its contractual
> obligations, Turner Company was prepared to
> file for bankruptcy.  Thus, it is undisputed
> that Turner Company could not have performed
> all of its obligations and that [Textron]
> could not have been the moving cause of
> Turner Company's failure to pay Starlite.

It appears that Turner Company was already insolvent when Turner Company entered into the contract with Starlite and that Turner Company was in substantial arrears to its secured creditor, Textron.  Although proximate causation is a question of fact, Starlite has not adequately alleged that Turner Company could have completed its contractual obligations to Starlite absent the alleged interference by Textron.

Textron's motion to dismiss on this issue is GRANTED WITH LEAVE TO AMEND.

### b.  Privileged Conduct.

Textron also moves for dismissal of Starlite's interference claims on the ground that its exercise of its rights to collection of Turner Company's accounts receivable was privileged.

Justification or privilege is an affirmative defense and the question of whether there has been sufficient justification to avoid liability for interference with contract or prospective economic advantage is ordinarily for the jury.  Cal.Jur.3d, Interference with Economic Advantage, § 29.

Textron cites *Quelimane Co. v. Stewart Title Guar. Co.*, 19

33

Cal.4th 26 (1998).   In *Quelimane*, the California Supreme Court

cited Restatement Second of Torts, § 766, comment j:

> 'The fact that this interference with the
> other's contract was not desired and was
> purely incidental in character is, however, a
> factor to be considered in determining
> whether the interference is improper.  If the
> actor is not acting criminally nor with fraud
> or violence of other means wrongful in
> themselves but is endeavoring to advance some
> interest of his own, the fact that he is
> aware that he will cause interference with
> the plaintiff's contract may be regarded as
> such a minor and incidental consequence and
> so far removed from the defendant's objective
> that as against the plaintiff the
> interference may be found to be not improper.

19 Cal.4th at 56.

     Textron also cites *Weststeyn Dairy 2 v. Eades Commodities

Co.*, 280 F.Supp.2d 1044, 1089 (E.D.Cal.2003), an opinion

involving summary judgment, not a motion to dismiss:

> That Diversified was a competing creditor,
> seeking to enforce its security interest in
> Eades' accounts gave Diversified a privilege
> to protect its economic interests, that
> validates intentional acts designed to
> disrupt Plaintiffs' relationship with Eades.
> *See Webber v. Inland Empire Investments*, 74
> Cal.App.4th 884, 902 ... (1999)(creditor
> entitled to take all legal steps to obtain
> payment of debt owed to it).  While the
> evidence supports Plaintiffs' contention that
> Diversified knew of the contracts between
> Eades and Plaintiffs, evidence that
> Diversified lawfully demanded Eades pay-over
> accounts, which were collateral under the
> security agreement to enforce its security
> interests, such conduct, authorized by the
> security agreement, negates the argument
> Diversified wrongfully intended to disrupt
> and did disrupt Eades' relationship with
> Plaintiffs.  The defense of economic
> privilege or justification applies.
> Diversified was entitled to seek and obtain

34

1        the prepayments under the terms of the
       Security Agreement.  The fact that
2        Diversified knew such seizure would interfere
       with Plaintiffs' contracts 'may be regarded
3        as such a minor and incidental consequence
       and so far removed from defendant's objective
4        that as against the plaintiff the
       interference may be found not be improper.'
5        *Quelimane Co. v. Stewart Title Guaranty Co.,*
       19 Cal.4th 26, 56 ... (1998).  Diversified's
6        motion for summary judgment as to the
       intentional inference with contractual
7        relations claim is GRANTED.

8     Starlite contends that *Weststeyn* is not controlling because

9 the FAC alleges that Textron aided and abetted Turner Company's

10 commission of fraud to advance its secured interest and entered

11 into a secret agreement with Turner Company to keep its dominion

12 and control over Turner Company secret in order to ensure that

13 Starlite would produce and ship the calendars to Turner Company,

14 creating the perception of Turner Company's ability to pay.

15     Because Textron obtained court approval for the CRO and

16 endeavored to keep the business running to generate income to buy

17 itself and the creditors time, this does not amount to

18 interference that caused Starlite harm.  Here, Textron acted to

19 protect its economic interests by seeking court intervention.

20 Such legal justification, as a matter of law, is a complete,

21 affirmative defense to an alleged tortious interference claim

22 absent additional allegations.  Starlite's argument ignores that

23 the interference claims are not saved by claiming fraud or aiding

24 and abetting, when the creditor is acting to enforce valid and

25 subsisting debts owed to Textron.

26     Textron's motion to dismiss on this ground is GRANTED WITH

**LEAVE TO AMEND.**

        **c.**   **Fifth Cause of Action for Intentional Interference with Economic Advantage**.

     The elements of the tort of intentional interference with prospective economic advantage are: "'(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.'" *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153 (2003). "[A] plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.'" *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 375, 392-393 (1995). "After *Della Penna* the elements of the tort of interference with prospective economic advantage remain the same, except that the third element also requires a plaintiff to plead intentional *wrongful* acts on the part of the defendant designed to disrupt the relationship." *Korea Supply Co., id.* As explained in *LiMandri v. Judkins*, *supra*, 51 Cal.App.4th at 340-341:

> *Della Penna* did not specify what sort of
> conduct would qualify as 'wrongful' apart
> from the interference itself. Justice Mosk's

36

concurring opinion in *Della Penna* suggested
the wrongfulness requirement would be
satisfied by conduct that is independently
tortious or a restraint of trade.  (*Della
Penna, supra*, 11 Cal.4th at pp. 408-409.)
The Oregon Supreme Court suggested the
requirement of wrongful conduct would be
satisfied by conduct that violates a statute,
regulation or recognized rule of common law.
(*Top Serv. Body Shop, Inc. v. Allstate Ins.
Co.* (1978) 283 Or. 201 ..., cited in *Arntz
Contracting Co. v. St. Paul Fire & Marine
Ins. Co.* (1996) 47 Cal.App.4th 464, 472 ...
In *Willard v. Caterpillar, Inc.* (1995) 40
Cal.App.4th 892 ..., the court tested the
defendant's alleged intentional spoilation of
evidence, an offshoot of intentional
interference with prospective economic
advantage, for 'wrongfulness' under *Della
Penna* in light of the suggestion in the
Restatement Second of Torts that 'conduct
which is "illegal or unfair or immoral
according to the common understanding of
society" may subject one to tort liability
...'  (*Id.* at p. 920.)

"It is insufficient to allege the defendant engaged in tortious

conduct distinct from or only tangentially related to the conduct

constituting the actual interference."  *LiMandri v. Judkins*,

*supra,* 52 Cal.App.4th at 342.

Textron argues that, even if Starlite could properly allege

that Textron acted to cause Turner Company not to pay Starlite,

Starlite cannot show that Textron's acts were otherwise wrongful.

Textron cites *Weststeyn Dairy 2 v. Eades Commodities Co.*,

280 F.Supp.2d 1044 (E.D.Cal.2003), a case involving summary

judgment, not a motion to dismiss.  In *Weststeyn*, it was held"

Diversified argues the exercise of its
contractual rights does not constitute
wrongful conduct under both the intentional
and negligent interference claims, citing
*Arntz Contracting Co. v. St. Paul Fire &*

> *Marine Ins. Co.*, 47 Cal.App.4th 464, 475 ...
> (1996) and *Lange*, 68 Cal.App.4th at 1188-89
> ...   In opposition, Weststeyn Plaintiffs
> contend Diversified engaged in conduct
> independently wrongful of its interference
> with Plaintiffs' economic relationship with
> Eades and other vendors by converting the
> funds meant to further these relationships.
> Weststeyn Plaintiffs argue that Diversified's
> exertion of control and dominion over, and
> ultimate conversion of, Plaintiffs' funds
> held in trust was wrongful and not an
> exercise of rights given to them by any
> contract or security agreement.  As to their
> negligent interference claim, Weststeyn
> Plaintiffs assert Diversified had a duty of
> care to Plaintiffs because it engaged in acts
> of conversion that were independently
> wrongful and grounds for liability
> notwithstanding the actual interference ....
>
> The evidence does not support Plaintiffs'
> claim that Diversified wrongfully took
> prepayment funds held in trust by Eades for
> Plaintiffs' benefits.  As discussed above,
> the Security Agreement applied to the
> prepayments, which were collateral in the
> form of accounts to which Diversified
> perfected security interest attached.
> Diversified had an express contractual right
> to enforce against Eades its security
> interest in the prepayments.  Diversified's
> motion for summary judgment as to the
> intentional and negligent interference with
> prospective economic advantage claims are
> GRANTED.

As in *Weststeyn*, Textron argues, this Court must reject
Starlite's effort to state an interference claim based on
Textron's exercise of its right to the collection of Turner
Company's accounts receivable.

    Starlite argues that the Fifth Cause of Action states a
claim upon which relief can be granted:

> Starlite had pled Textron's <u>knowledge</u> of
> Starlite's economic relationship with [Turner

38

> Company] and the terms of the 3.25 million-calendar order (indeed it funded the estimated 10% pre-payment) Textron's <u>intentional actions</u> to disrupt that contract by failing to authorize and provide funds to pay for the calendars per the agreement once the calendars had shipped and instead using those proceeds to benefit itself is also alleged in the FAC.  Starlite has further alleged that Textron's wrongful conduct in helping to induce Starlite to produce and ship the calendars resulted in actual damages to Starlite of over $2 million.

> Moreover, contrary to Textron's assertions, Starlite has satisfied the 'independently wrongful' element of its Fifth Cause of Action ... Starlite has pled sufficient facts to sustain its cause of action against Textron for aiding and abetting fraud.

Starlite further argues that *Weststeyn* is not controlling "because in this case, Textron was not merely exercising its rights as a secured creditor": "Textron's exercise of undue dominion and control over [Turner Company] and the fact that it furthered [Turner Company's] fraud over Starlite sets it apart from the lender in <u>Weststeyn Dairy</u>."  Even if this is true *arguendo*, it does not alter that as to the interference claims, the economic privilege applies to this conduct.

Textron's motion to dismiss on this ground is GRANTED WITH LEAVE TO AMEND.

> d.   <u>Seventh Cause of Action for Negligent Interference with Contract and Economic Relationship</u>.

Textron moves to dismiss the Seventh Cause of Action to the extent it alleges negligent interference with contract on the ground that no such claim exists under California law.  Textron

cites *LiMandri, supra*, 52 Cal.App.4th at 349:

> [T]he Complaint also fails to state a cause
> of action for negligent interference with
> *contractual relations* (as opposed to
> prospective economic advantage).  In *Fifeld*
> [sic] *Manor v. Finston* (1960) 54 Cal.2d 632
> ..., the California Supreme Court noted:
> '[W]ith the exception of an action by the
> master for tortious injuries to his servant,
> thus depriving the master of his servant's
> services, which traces back to medieval
> English law ..., the courts have consistently
> refused to recognize a cause of action based
> on negligent, as opposed to intentional,
> conduct which interferes with the performance
> of a contract between third parties or
> renders its performance more expensive or
> burdensome ... (*Id.* at p. 636).  Although the
> continuing validity of the so-called '*Fifel*
> [sic] rule' is questionable in light of the
> California Supreme Court's recognition in
> *J'Aire, supra*, 24 Cal.3d 799 of a cause of
> action for negligent interference with
> prospective economic advantage, the Supreme
> Court has yet to disapprove *Fifel*.  In any
> event, LiMandri's inability to plead a duty
> of care on the part of Judkins precludes his
> maintenance of a cause of action on any
> negligence theory.

*See also Rachford v. Air Line Pilots Ass'n.*, 2006 WL 1699578
(N.D.Cal.2006) at * 7 n.4:

> ... [T]he California Supreme Court has
> previously rejected a cause of action for
> negligent interference with contract.  *See*
> *Fifield Manor v. Finston*, 54 Cal.2d 632, 634-
> 37 ... (1960).  In *Fifield*, the court stated
> that courts have generally refused to
> recognize a cause of action based on
> negligent, as opposed to intentional, conduct
> that interferes with the performance of a
> contract between third parties or renders its
> performance more expensive or burdensome,
> because to do so 'would constitute an
> unwarranted extension of liability for
> negligence.'  *Id.* at 636-37 ... The
> California Supreme Court has never overruled
> the holding of *Fifield Manor*.  *See LiMandri*

40

> *v. Judkins*, 52 Cal.App.4th 326, 349 ...
> (1997).  The court notes in addition that
> while *California Civil Jury Instructions
> (BAJI)* provides instructions for intentional
> interference with prospective economic
> advantage (BAJI 7.82) and negligent
> interference with prospective economic
> advantage (BAJI 7.82.1), it provides but a
> single instruction for interference with
> contractual relations (BAJI 7.81), which
> includes an intent/knowledge element.

Starlite contends that California courts recognize a claim

for negligent interference with an existing contract, citing

*Woods v. Fox Broadcasting Sub., Inc.*, 129 Cal.App.4th 344, 350

(2005):

> Our courts recognize four types of claims for
> interference with contractual rights or
> expectations: Intentional or negligent
> interference with an existing contract and
> intentional or negligent interference with
> prospective economic advantage.

*Woods* cites *SCEcorp v. Superior Court*, 3 Cal.App.4th 673, 677

(1992) as authority that a cause of action for negligent

interference with contract exists:

> For purposes of this opinion, we consider
> this cause of action to be included within
> the broad cause of action of negligent
> interference with prospective economic
> advantage which was discussed and recognized
> by the Supreme Court in *J'Aire Corp. v.
> Gregory* (1979) 24 Cal.3d 799 ... Since
> neither party has specifically addressed this
> cause of action, we will refrain from
> discussing the elements of this claim as
> established in *J'Aire*.

*See also Greenly v. Sara Lee Corp.*, 2006 WL 3716769

(E.D.Cal.2006) at * 4, where Judge Shubb ruled:

> Claims sixteen and seventeen are for
> negligent and/or intentional interference

41

                    with existing contractual relationships and
                    negligent and/or intentional interference
                    with prospective economic advantage,
                    respectively.  Both of these theories are
                    state common law causes of action based on
                    protecting 'contractual rights or
                    expectancies.'  *Woods v. Fox Broadcasting
                    Sub., Inc.*, 129 Cal.App.4th 344, 350 ...
                    (2005).

     Starlite's authority is not persuasive, especially since the

case *Woods* relies on did not even address the issue.   The

California Supreme Court has not directly revisited the issue

since *Fifield Manor*.  However, in *J'Aire Corp. v. Gregory*, 24

Cal.3d 799, 803 (1979), where the plaintiff sued a general

contractor for damages resulting from the delay in completion of

a construction project contracted for by a county from whom

plaintiff leased premises for the operation of a restaurant, the

Supreme Court stated:

                    Even when only injury to prospective economic
                    advantage is claimed, recovery is not
                    foreclosed.  Where a special relationship
                    exists between the parties, a plaintiff may
                    recover for loss of expected economic
                    advantage through the negligent performance
                    of a contract although the parties were not
                    in contractual privity.

In *Torrance National Bank v. The Aetna Casualty & Surety Company*,

251 F.2d 666, 669 n.5 (9th Cir.1958), the Ninth Circuit noted:

                    This Court does not overlook that in some
                    situations a federal court, in a diversity
                    suit, may refuse to follow a state supreme
                    court decision.  It is not necessary that a
                    case be expressly overruled in order to lose
                    its persuasive force.  *Cf. Mason v. American
                    Emery Wheelworks,* 1 Cir., 1957, 241 F.2d 906.
                    the law is in part an evolutionary process of
                    judicial reasoning.  If convinced that the
                    California Supreme Court would no longer

                                    42

1

2

3

> follow the *Bendit* case, then, under the *Erie*
> *Railroad Co. v. Tompkins* decision ..., this
> Court should apply the same standards which
> it believes the highest court of this State
> would use.

4   The allegations in the FAC do not permit an inference that

5   Textron acted negligently; the entire focus of Starlite's

6   position is that Textron acted intentionally.  California Courts

7   of Appeal are divided on whether a claim for negligent

8   interference with contract lies; the Supreme Court's ruling in

9   *Fifield* has not been overruled.

10   Textron moves to dismiss this cause of action to the extent

11   it alleges negligent interference with contract on the ground

12   that Starlite has not alleged that Textron had any relationship

13   with Starlite or that Textron owed Starlite any duty of care.

14   "[N]egligent interference may be asserted only where the

15   defendant owes the plaintiff a duty of care."  *Weststeyn*, *supra*,

16   280 F.Supp.2d at 1090, citing *Lange v. TIG Ins. Co.*, 68

17   Cal.App.4th 1179, 1187 (1998).

18   Starlite responds by reciting the criteria for determining a

19   duty of care set forth in *J'Aire, supra*, 24 Cal.3d at 804:

20

21

22

23

24

25

> Those criteria are (1) the extent to which
> the transaction was intended to affect the
> plaintiff, (2) the foreseeability of harm to
> the plaintiff, (3) the degree of certainty
> that the plaintiff suffered injury, (4) the
> closeness of the connection between the
> defendant's conduct and the injury suffered,
> (5) the moral blame attached to the
> defendant's conduct, and (6) the policy of
> preventing future harm.

Starlite argues that the allegations of the FAC suffice to impose

26

43

a duty of care on Textron:

> Starlite has alleged that Textron secretly took control over [Turner Company], prevented [Turner Company] from paying Starlite except when necessary to fraudulently induce Starlite to produce and ship calendars, knowing it did not intend to authorize payment for the calendars once they had shipped, and knowing that Starlite would thereby be injured in amount of the 90% payment that remained unpaid, in excess of $2 million.  In addition, Textron's conduct in aiding and abetting fraud against Starlite is morally wrong.  Finally, the burden on Textron would be minimal as it would merely require that Textron notify suppliers that are essential to preserving its collateral that Textron does not intend to pay for the goods once they are received.

Textron's motion to dismiss the Seventh Cause of Action to the extent it alleges negligent interference with contract is GRANTED.

> e.   Eighth Cause of Action for Unjust Enrichment and Constructive Trust.

The Eighth Cause of Action for unjust enrichment and constructive trust incorporates Paragraphs 1-30 and further alleges:

> 79.   Turner Company breached its contractual relationship with Starlite for the sale and purchase of calendars.  Starlite is informed and believes that Turner Company was and is now insolvent, yet Turner Company continued to order and sell, by and through MCA and Aaron as the Chief Restructuring Officer of Turner Company, and with Textron's knowledge and consent, the calendars manufactured and shipped to it by Starlite, and continues to remit said receivables into a Lockbox for the benefit of Turner Company and Textron only.

> 80.   The conduct of Turner Company as

44

described above amounts to fraud in that Turner Company actively concealed its insolvency as well as the Lockbox credit arrangement it entered into with Textron, which was then fraudulently concealed by Turner Company and Textron by their conduct in executing stipulation and orders sealing the entire court record in the two litigation matters between them.  In reliance on Turner Company's misrepresentations of solvency and as a result of Defendants' concealment of material facts, Starlite continued to manufacture and ship calendars to Turner Company.  Had Starlite been aware of Turner Company's insolvency and said Lockbox credit arrangement between Turner Company and Textron, it would not have continued to manufacture and ship calendars to Turner Company.  Starlite has suffered substantial economic loss as a result in the amount of approximately $2,693,989.

81.  It is undisputed that the current payable balance on the books of Turner Company is at least $2,193,123.96 (although the correct amount owed is closer to $2,693,989.79 as shown on Starlite's books). Starlite is therefore entitled to repayment of said amount from Turner Company from the proceeds of its sales of calendars and any other products provided by Starlite.

82.  Defendants have wrongfully detained and retained for the benefit of Turner Company and Textron proceeds from the sale of product by Turner Company that rightfully belong to Starlite, by depositing any and all receivables of Turner Company into a Lockbox for the benefit of Turner Company and Textron while failing to repay Turner Company's debt to Starlite.  Turner Company and Textron have been unjustly enriched by benefitting from the sale of calendars ordered and shipped by Starlite to Turner Company without payment to Starlite for said calendars.

83.  Defendants, including Turner Company, MCA and Aaron have failed and refused and continue to fail and refuse to remit any funds to Starlite.

> 84. Starlite has repeatedly requested from
> Turner Company, MCA and Aaron information
> pertaining to Turner Company's ability and
> efforts to pay all or some of said debt.
>
> 85. Turner Company, MCA, and Aaron company
> [sic] refused, and continue to refuse,
> Starlite's requests for information, and
> Starlite was prohibited from obtaining
> additional information through public sources
> as a direct result of the stipulation and
> orders sealing all court records in the
> aforementioned federal litigation matters
> between Textron and the Turner Company and
> various Turner individuals as described
> above.
>
> 86. Starlite has no way to know the amounts
> of receivables collected by Aaron and
> remitted to the Lockbox from March 2006 to
> the present, but the amount is believed to be
> substantial.
>
> 87. By virtue of their fraudulent, unlawful,
> and unfair acts and practices, Defendants
> hold the funds described above as
> constructive trustees for Starlite's benefit.

Textron moves to dismiss the Eighth Cause of Action on the ground that it cannot exist as a matter of law because it contravenes the UCC.

Resolution of the motion to dismiss requires consideration of three decisions, two from California and one from Colorado.

In *Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal.App.3d 638 (1988), Producers held a security interest in the farm crops of its debtor. Amstar bought the crops and paid to have them harvested. Amstar knew of Producers' security interest, but neglected to obtain Producers' agreement to subordinate that security interest. Amstar deducted the harvesting costs before remitting the sale proceeds of the crops to Producers. Producers

46

sued Amstar and obtained a judgment on the theory that the deduction constituted conversion of its secured collateral.  On appeal, Amstar argued that California Uniform Commercial Code article 9 governing secured transaction left room for the equitable principle of restitution.  Amstar relied on Section 1103: "Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."  The Court of Appeal agreed with Amstar's position: "We agree with the position of Amstar and hold that when a party possessing a security interest in a crop and its proceeds has knowledge of and acquiesces in expenditures made which are necessary to the development of the crop, and ultimately benefits from the expenditure, a party who, through mistake, pays such costs without first obtaining subordination, is entitled to recover."  197 Cal.App.3d at 660.

    In *Ninth Dist. Prod. Credit v. Ed Duggan*, 821 P.2d 788 (Colo.1991), Duggan furnished feed grain to a livestock company whose accounts receivable and personal property were the subject of a perfected security interest held by a credit association. In accordance with its standard practice, the association financed the livestock company's operations by paying sight drafts given creditors by the livestock company.  Duggan continued deliveries while an unsuccessful effort to sell the

1   livestock company was overseen by the credit association.  Cattle

2   fed with Duggan's grain were sold and the proceeds paid to the

3   credit association, which also received payment for feedlot

4   services given cattle awaiting slaughter.  When the livestock

5   company became financially unable to pay Duggan, suit was brought

6   against the association.  The Colorado Supreme Court upheld te

7   lower courts' determination that Duggan could obtain restitution

8   from the credit association notwithstanding the latter's superior

9   statutory priority as a secured creditor.  The Colorado Supreme

10  Court noted that the central issue "whether a creditor that holds

11  a perfected security interest in collateral can be held liable to

12  an unsecured creditor based on a theory of unjust enrichment for

13  benefits that enhance the value of the collateral ... cannot be

14  answered categorically."  *Id.* at 793.  Acknowledging that the

15  Uniform Commercial Code's priority system "reflects the

16  legislative judgment that the value of a predictable system of

17  priorities ordinarily outweighs the disadvantage of the system's

18  occasional inequities,", the Colorado Supreme Court formulated

19  this rule: "In a situation where a secured creditor initiates or

20  encourages transaction between the debtor and suppliers of goods

21  or services, and benefits from the goods or services supplied to

22  produce such debts, equitable principles require that the secured

23  creditor compensate even an unsecured creditor to avoid being

24  unjustly enriched.  The equitable claim is at its strongest when

25  the goods or services are necessary to preserve the security, as

26  in *Producers Cotton Oil*."  *Id.* at 797-798.

In *Knox v. Phoenix Leasing Inc.*, 29 Cal.App.4th 1357 (1994), Knox, a seller of wine barrels brought an action for restitution against a leasing company, Phoenix, that financed the purchase of the wine barrels by a winery, Domaine, which defaulted, after which the financing company took possession of the barrels pursuant to a security agreement.  The *Knox* court noted that "a decided majority of jurisdictions have disallowed the equitable remedy of restitution (whether termed unjust enrichment, quantum meriut, contract implied in law, etc.)" in favor of "preserving the integrity of the Uniform Commercial Code's scheme for secured transactions, encouraging compliance with the code, and thereby ensuring a predictable system of creditor priorities."  29 Cal.App.4th at 1360-1361.  The *Knox* court then noted that *Producers Cotton Oil Co. v. Amstar Corp.*, *supra,* 197 Cal.App.3d 638 and *Ninth Dist. Prod. Credit v. Ed Duggan*, *supra,* 821 P.2d 788, while conceding considerable soundness of the majority position, allowed restitution from a secured creditor.  *Id.* at 1361.  *Knox* concluded that "[r]ecovery is clearly the exception, not the norm, and is subject to stern limitation."  *Id.*  *Knox* acknowledged that *Producers Cotton* and *Duggan* have been "subjected to critical comment, some of which is unusually hostile."  *Id.* at 1363.  *Knox* stated:

> Were we the first California court to consider the issue, we might well agree with the strict position that allowing restitution claims would be incompatible with the code's priority system.  The primary purpose and chief benefit of article 9 is the stability and certainty provided by those rules ...

> There are significant policy considerations which should not be disregarded lightly.  So weighty is their value that most courts and commentators agree that it is better to accept the occasional 'harsh application of the law than to disrupt thousands of other transactions by injecting uncertainty and by encouraging swarms of potential litigants and their lawyers to challenge what would otherwise be clear and fair rules.' ... Any other approach threatens to 'render the secured creditor status useless' ... and thus badly impair the utility of the article 9 framework.
>
> But we do not come to this subject with a blank screen.  As evidenced by *Producers Cotton*, California has opted to allow restitution claims against a secured creditor.  When properly restricted to a very limited class of cases, this principle is sound.

*Id.* at 1361-1362.  *Knox* ruled:

> A secured creditor who has complied with all relevant code requirements to perfect its security interest, should therefore start with something like a presumption in its favor.  The whole point of article 9 is to establish a comprehensive scheme affording maximum protection to the secured creditor who has followed its provisions ... This does not, of course, guarantee payment in full ... But, having taken the trouble to satisfy all statutory requirements for protecting its interest, a secured creditor is entitled to a rebuttable preference for payment against a creditor who has not demonstrated a similar compliance.
>
> This preference would be reinforced by the failure to the unsecured creditor to use various nonstatutory protections.  As courts and commentators have noted, the unsecured creditor could have (1) demanded cash payment on delivery, (2) perfected a purchase money security interest ..., (3) checked with the appropriate governmental office to determine if the debtor had already granted a security interest posing a possible threat to

50

repayment, or (4) obtained a secured creditor's agreement to subordinate its priority ....

But victory for a secured creditor is not an immutable law of nature.  Fraud, for example, is expressly beyond the pale ... A code may strive for comprehensiveness, but exceptional situations will arise.  Equity is ordinarily meant to operate in these situations ..., but its operation is subject to the principle that 'equity follows the law.' ... This deference requires that equitable exceptions to statutory law be carefully limited to reduce any possible conflict with an express statutory command ... *Producers Cotton* and *Duggan* show how this may be accomplished.

Those decisions begin with the premise that simply pointing to benefit realized by the secured creditor will not suffice.  As *Duggan* notes, gain to the creditor is almost universally present ... Something more is required to displace the creditor's favored position.  That something is either conduct by the secured creditor or the nature of the unsecured creditor's contribution to the collateral.

What the *Duggan* court termed 'the extent to which the secured creditor was involved in the transaction by which the unsecured creditor supplied goods or services' ... can take many forms.  At one end of the scale is fraud ... The California Uniform Commercial Code gives it no sanction (§ 1103) and courts applying the Uniform Commercial Code are equally stern ....

Harder to resolve are the less egregious situations 'where a secured creditor initiates or encourages transactions between the debtor and suppliers of goods and services, and benefits from the goods or services supplied to produce such debts.' ... These situations produce a fertile opportunity for trapping the unwary.  If what the secured creditor did or failed to do can be reached by the doctrines of estoppel, misrepresentation not amounting to fraud, or mistake, the code allows redress to an

innocent supplier (§ 1103).  Just as contribution among tortfeasors is proportioned by fault ..., commercial loss allocation responds to the same impulse.  If it had an active hand in promoting a transaction that goes bad, a secured creditor should not escape with a victimized supplier left hold an empty bag alone.  In simple terms, the creditor should not be allowed to profit from the wrong of its own bad faith.  (Cf. § 1203; Civ. Code § 3517.)

The most difficult factor is the secured creditor's acquiescence when an unsecured creditor provides goods or services to their common debtor.  First raised in *Producers Cotton*, it was given a restrictive gloss by *Duggan*: 'In *Producers Cotton Oil* the court held that the secured creditor's act of acquiescing in the harvesting of the secured collateral (crops) was a sufficient basis for holding the secured creditor liable on the theory of unjust enrichment.  However, in that case, the harvesting was necessary to the actual *preservation* of the secured collateral ... Here, the delivery of corn was not essential to preserve the secured collateral, but instead served to augment or enhance its value.  In such a case, more than mere acquiescence is required to hold a secured creditor liable on the basis of unjust enrichment.' ... Subject to two reservations, we agree with this reasoning, which is sound and reflective of commercial realities.

When an unsecured creditor provides goods or services that are necessary to preserve the collateral, this is an expense the secured creditor would ordinarily incur as part of the duty to use 'reasonable care in the custody and preservation of collateral in his possession' (§ 9207, subd. (1))).  This would especially be true in situations like *Producers Cotton* and *Duggan*, where the collateral is perishable.  In such a case the unsecured status of the creditor appears less important than the fact that the secured creditor directly benefits from expenditures the creditor is spared from having to make on its own behalf.  Matters become less clear

52

when the unsecured creditor's expenditures
are not essential but merely useful, in the
sense that the collateral available for
liquidation is being increased.

One of the notable features of article 9 is
its approval of the concept of the so-called
'floating lien' generated by security
interests extending to after-acquired
property.  This measure of creditor
protection is vital to the feasability of
long-term procedures such as inventory,
accounts receivable, or agricultural crop
financing ... Risk to other creditors is
inherent in the operation of this mechanism
..., whose utility would be severely impaired
if unsecured additions to the protected
collateral could be excluded from its reach.
Virtually every addition will augment or
enhance the value of the pool of collateral
already pledged to the secured creditor.
Unless the unsecured creditor uses one of the
means the code permits to ensure payment, the
risk of loss must be deemed a cost of doing
business ... This is the defining
characteristic of a perfected security
interest - 'the degree to which it insulates
the secured party from the claims of the
debtor's other creditors.' ... The mere fact
of augmenting or enhancing the collateral's
value is by itself insufficiently notable to
justify equitable protection from article 9's
priority structure.  If allowed, this
exception would swallow the rule.

The same is true concerning a secured
creditor's acquiescence to such collateral
pool augmentation.  If acquiescence is to
carry the risk of restitution liability, the
secured creditor cannot afford silence.  The
creditor would be compelled to advise those
who might deal with the debtor of the
security arrangement and to disclaim
responsibility for any obligation incurred by
the debtor.[9] In order to know to whom these
warnings must be given, the creditor would
have to keep close tabs on the debtor's
business dealings.  Regardless of whether
such a monitoring regime could overcome
objections of cost, intrusiveness, and
ineffectiveness, its conclusive flaw is that

53

it would negate the utility of article 9's notice-filing system.  One of the primary benefits of that system is that filing a financing statement relieves the now-secured creditor from the necessity of taking further action to protect its security interest; thereafter prospective creditors must watch out for themselves by checking the filings. Basing unjust enrichment liability on acquiescence would turn the filing system on its head, destroying existing creditors' reliance on that system and substituting a prospective creditor's duty to check with a new duty to warn and disclaim imposed on existing creditors.  It would in plan effect reward ignorance and establish an incentive for ignoring the filing system.  Acquiescence liability, because it would upend article 9's interlocking notice-filing and priority provisions, cannot be accepted.

How does the evidence in this case measure up according to this legal template?  Nothing in Phoenix's conduct amounted to fraud, actual or virtual ..., and Knox does not contend otherwise.

The transaction between Knox and Domaine owned nothing to Phoenix in its inception. The contract for the barrels makes no reference to Phoenix, and was executed prior to Domain's agreement with Phoenix.  The barrels were ordered by Domaine, they were shipped to Domaine, and Knox initially looked to Domaine for payment.  In light of Knox's testimony that he had no knowledge of Phoenix at the time he made the contract with Domaine, he could not have had any expectation of payment from Phoenix.  The transaction between Knox and Domaine being in place and under way before Phoenix made any appearance, it is impossible to say that Phoenix initiated it.  Similarly, the sole circumstance that Knox was paid for the first shipment with a check from Phoenix does not establish that Phoenix encouraged the deal; the course of performance under the Knox-Domaine contract owed nothing to anything said or done by Phoenix, or to the fact that Phoenix would be the true source of Domaine's payment to Knox.  Phoenix never asked Knox to

54

1          provide anything ....

2          We have already determined that any
           acquiescence by Phoenix will not support
3          restitution liability.  Phoenix had no duty
           to overcome the failure of Knox, a merchant
4          knowledgeable about article 9 procedures, to
           acquaint himself with public information
5          concerning the Phoenix-Domaine relationship.

6          The barrels provided by Knox were not
           necessary to preserve the collateral covered
7          by Phoenix's security interest in Domain's
           'after acquired' property.  The mere fact
8          that the secured collateral was enhanced by
           the addition of the barrels does not support
9          liability in these circumstances.

10         The trial court's conclusion has an
           undeniable common sense allure - Knox
11         provided barrels; Phoenix ended up with the
           barrels; Phoenix should therefore pay Knox
12         for their value.  Ordinarily this would be
           sound reasoning supporting an equitable
13         result.  Article 9, however, compels a
           different conclusion.  Phoenix complied with
14         statutory provisions intended to immunize
           secured creditors from such claims in all but
15         the rarest of cases.  As this is not that
           sort of case, the equitable impulse for
16         restitution must yield to the Legislature's
           command.

17
           ...
18
           [9]The *Duggan* court appears to have endorsed a
19         creditor's need to 'inform[] ... the proper
           parties of its intent not to pay for debts
20         incurred in maintaining, enhancing, or making
           additions to secured collateral' in order to
21         'protect itself from unjust enrichment
           claims.' ... For the reasons stated in the
22         text, we do not agree with this part of
           *Duggan*.
23
    *Id.* at 1364-1368.
24
           Textron argues that *Knox* is controlling her.  Starlite does
25
    not allege that Textron initiated any transaction between
26

                                    55

Starlite and Turner Company, asked Starlite to provide goods or anything else to Textron or Turner Company, arranged any sales by Starlite to Turner Company, introduced Starlite to Turner Company, or dictated the terms of Starlite's transactions with Turner Company.  Textron contends that Starlite is simply an unpaid seller of goods whose claim is subordinate to Textron's prior perfected security interest.

Starlite responds that the allegations of the FAC assert Textron's active participation in the wrongful/fraudulent conduct at issue in encouraging Turner Company's debt to Starlite. Starlite contends that the FAC alleges:

(a) Textron knew of the existence of [Turner Company's] obligation to Starlite because it had an agent on site at [Turner Company] as early as January 2006 to closely monitor [Turner Company's] finances and Textron had the CRO imposed in March of 2006, and approved and funded the prepayment of the calendars from Starlite (FAC, ¶¶ 18, 24-25, 27); (b) Textron exercised complete dominion and control over [Turner Company] following appointment of the CRO pursuant to the Stipulation and Order, (FAC ¶¶ 18-20); (c) Textron knew the sale of Starlite's calendars would comprise a major source of [Turner Company's] receivables, (FAC, ¶¶ 26, 28); (d) Textron knew of [Turner Company's] deepening insolvency when it assisted [Turner Company] to pay for the 3.25 million-calendar order and knew [Turner Company] had no funds to pay Starlite without Textron's approval, (FAC, ¶¶ 22, 27, 28); (e) Textron 'allowed' and then 'funded and paid' several required and not required pre-shipment payments for the 3.25 million-calendar order, thereby assisting [Turner Company] to falsely claim to have 'extra cash flow' available to make the payments, (FAC, ¶¶ 24, 25); (f) such payments were made to 'to insure a sense of confidence in [Turner Company] by Starlite,' and for the

purpose of inducing Starlite to produce and
ship the calendars with the knowledge that
'without this prepayment, Starlite would not
ship the calendars,' (FAC ¶¶ 24, 25); (g) all
defendants knew Textron had no intent to
continue paying Starlite once the calendars
had been produced and shipped, (FAC, ¶ 22);
(h) yet, 'Textron wanted to ensure the
calendars were shipped so [Textron] could
control and usurp the proceeds of the
calendars and utilize said proceeds to pay
down [Turner Company's] debt to Textron,'
(FAC, ¶ 24); (i) following shipment, receipt
and use of the 2007 calendars by [Turner
Company], and receipt by Textron of the
receivables generated by the Starlite
calendars, 'Defendants made no payment on the
accounts payable owed to Starlite,' (FAC, ¶
29; and (j) while the CRO, on behalf of
Textron, continued to falsely assert that
payment to Starlite 'was in the budget' or
was otherwise forthcoming, when these
defendants knew that Textron only intended to
use the [Turner Company's] receivable for its
own benefit, (FAC, ¶¶ 19, 22, 29).

Starlite argues that, like *Producers Cotton Oil*, the
expenditures of the unsecured creditor were necessary to the
development of the secured creditor's collateral.  It is not
disputed that Starlite was the main supplier of calendars to
Turner Company and that Turner Company had the revenues to pay
Textron because of the Starlite-produced calendars.  Starlite
further argues that the seasonal nature of the calendars, like
the crops in *Producers Cotton Oil*, made it imperative to Textron
that the 2007 calendars be delivered and sold in a timely manner.
Further, Starlite contends, like the secured creditor in *Duggan*,
Textron had complete control over Turner Company following
execution of the Stipulation and Order:

The CRO, on behalf of Textron, collected all

> [Turner Company] receivables and deposited
> them into the lockbox that <u>only</u> Textron could
> control, Textron had to provide authorization
> for all expenditures for [Turner Company].
> Further, the CRO (while still concealing its
> involvement) was certainly aware of the
> exchanges between Mark Turner and Starlite
> whereby false assertions of 'extra cash flow'
> and notification of early payments were made
> to Starlite, as well as confirmation of 3.25
> million-calender order.

Textron replies that neither *Producers Cotton Oil* or *Duggan* have any application here: "Starlite did not provide any goods or services necessary to 'preserve' collateral; rather, what Starlite provided was the collateral itself (<u>i.e.</u>, calendar inventory that Turner Company later sold)."  Textron asserts that it "did no more than resort to remedies permitted by the UCC and this Court, [and] cannot be subject to any equitable claim by Starlite without turning the UCC's priority scheme on its head."

Textron's contentions involve issues of fact which cannot be decided on a motion to dismiss.  Textron's motion to dismiss the Eighth Cause of Action on this ground is DENIED.

f.  *Noerr-Pennington* <u>Doctrine and Litigation Privilege</u>.

Textron argues that Starlite's claims are barred by the *Noerr-Pennington* Doctrine and the litigation privilege set forth in California Civil Code § 47(b)(2).

i.  *Noerr-Pennington* <u>Doctrine</u>.

The *Noerr-Pennington* doctrine protects the right to petition the government for redress of grievances.  *See Eastern R.R. Conf. v. Noerr Motor*, 365 U.S. 127 (1961); *United Mine Workers v.*

*Pennington*, 381 U.S. 657 (1965).  As explained in *Empress LLC v. City and County of San Francisco*, 419 F.3d 1052, 1056-1057 (9th Cir.2005):

> Under the *Noerr-Pennington* doctrine, those who petition all departments of the government for redress are generally immune from liability ... *Noerr-Pennington* is a label for a form of First Amendment protection; to say that one does not have *Noerr-Pennington* immunity is to conclude that one's petitioning activity is unprotected by the First Amendment.

Lawsuits are protected by the doctrine because they are essentially petitions to the courts for redress of grievances. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

     Starlite argues that the *Noerr-Pennington* doctrine does not apply to bar its claims.  Starlite relies on *Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir.2003), *cert.denied*, 543 U.S. 813 (2004).

     *Theofel* involved an action alleging that a subpoena served upon an internet service provider resulted in improper disclosure of e-mails, in violation of several federal statutes.  In pertinent part, Defendants argued that they were immune from liability under the *Noerr-Pennington* doctrine.  The Ninth Circuit noted:

> The doctrine is typically invoked to immunize the act of petitioning itself - i.e., the filing of the lawsuit.  But it has been extended to certain conduct 'incidental to the prosecution of the suit,' for example, deciding whether to settle a claim.  *See Columbia Pictures Indus., Inc. v. Prof'l Real*

*Estate Investors, Inc.,* 944 F.2d 1525, 1528-29 (9th Cir.1991), *aff'd,* 508 U.S. 49 ... (1993).  Defendants seize on this language from *Columbia Pictures* and argue that, because the subpoena was incidental to their litigation, they are entitled to immunity.

We are skeptical that *Noerr-Pennington* applies at all to the type of conduct at issue.  Subpoenaing private parties in connection with private commercial litigation bears little resemblance to the sort of governmental petitioning the doctrine is designed to protect.  Nevertheless, assuming *arguendo* the defense is available, it fails.  *Noerr-Pennington* does not protect 'objectively baseless' sham litigation.  *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60 ... (1993).  The magistrate judge found that the subpoena was 'transparently and egregiously' overbroad and that defendants acted with gross negligence and in bad faith.  This is tantamount to a finding that the subpoena was objectively baseless.

Defendants urge us to look only at the merits of the underlying litigation, not at the subpoena.  They apparently think a litigant should have immunity for any and all discovery abuses so long as his lawsuit has some merit.  Not surprisingly, they offer no authority for that implausible proposition.  Assuming *Noerr-Pennington* applies at all, we hold that it is no bar where the challenged discovery conduct itself is objectively baseless.

*Id.* at 1078-1079.

Starlite argues that *Noerr-Pennington* does not apply "because Textron's actions in assisting [Turner Company] to defraud Starlite as outlined above are not themselves authorized by the Stipulation and Order."  Starlite contends:

In other words, Textron cannot immunize itself from the allegations in the FAC merely by saying that it was *entitled* to engage in

60

1    such conduct pursuant to order of this Court.
2    If that were the case, every litigant
     desiring to defraud or interfere with the
3    business relations of another would simply
     lodge documents with the court in an attempt
4    to later claim immunity for any wrongful
     activities *related* to the document filed.

5    Starlite further contends that, even if the Court concludes

6    that the *Noerr-Pennington* doctrine applies to the proceedings in

7    Textron's actions against Turner Company, Textron's act of filing

8    the sealing order in the Stipulation and Order was objectively

9    baseless.  Starlite cites *Kamakana v. City and County of*

10   *Honolulu*, 447 F.3d 1172 (9th Cir.2006).

11   In *Kamakana*, following settlement of a civil rights suit

12   brought by a Honolulu police detective against the City alleging

13   retaliation for his whistleblowing activities, a newspaper moved

14   to intervene and for an order to release documents filed under

15   seal pursuant to a protective order.  The Ninth Circuit affirmed

16   the District Court's grant of the newspaper's motion:

17   Historically, courts have recognized a
     'general right to inspect and copy public
18   records and documents, including judicial
     records and documents.' *Nixon v. Warner*
19   *Commc'ns, Inc.*, 435 U.S. 589, 597 & n.7 ...
     (1978).  This right is justified by the
20   interest of citizens in 'keep[ing] a watchful
     eye on the workings of public agencies.' *Id.*
21   at 598 ... Such vigilance is aided by the
     efforts of newspapers to 'publish information
22   concerning the operation of government.' *Id.*

23   Nonetheless, access to judicial records is
     not absolute.  A narrow range of documents is
24   not subject to the right of public access at
     all because the records have 'traditionally
25   been kept secret for important policy
     reasons.'  *Times Mirror Co. v. United States*,
26   873 F.2d 1210, 1219 (9th Cir.1989).  Our case

61

law has identified two categories of
documents that fall in the category: grand
jury transcripts and warrant materials in the
midst of a pre-indictment investigation.  *Id.*

Unless a particular court record is one
'traditionally kept secret,' a 'strong
presumption in favor of access' is the
starting point.  *Foltz*, 331 F.3d at 1135
(citing *Hagestad v. Tragesser*, 49 F.3d 1430,
1434 (9th Cir.1995)).  A party seeking to
seal a judicial record then bears the burden
of overcoming this strong presumption by
meeting the 'compelling reasons' standard.
*Foltz*, 331 F.3d at 1135.  That is, the party
'must articulate[] compelling reasons
supported by specific factual findings,' *id.*
(citing *San Jose Mercury News, Inc. v. U.S.
Dist. Ct.*, 187 F.3d 1096, 1102-03 (9th
Cir.1999)), that outweigh the general history
of access and the public policies favoring
disclosure, such as the '"public interest in
understanding the judicial process."'
*Hagestad*, 49 F.3d at 1434 (quoting *EEOC v.
Erection Co.,* 900 F.2d 168, 170 (9th
Cir.1990)).  In turn, the court must
'conscientiously balance[] the competing
interests' of the public and the party who
seeks to keep certain judicial records
secret.  *Foltz*, 331 F.3d at 1135.  After
considering these interests, if the court
decides th seal certain judicial records, it
must 'base its decision on a compelling
reason and articulate the factual basis for
its ruling, without relying on hypothesis or
conjecture.  *Hagestad*, 49 F.3d at 1434
(citing *Valley Broadcasting Co. v. U.S. Dist.
Ct.*, 798 F.2d 1289, 1295 (9th Cir.1986)).

In general, 'compelling reasons' sufficient
to outweigh the public's interest in
disclosure and justify sealing court records
exist when such 'court files might have
become a vehicle for improper purposes,' such
as the use of records to gratify private
spite, promote public scandal, circulate
libelous statements, or release trade
secrets.  *Nixon*, 435 U.S. at 598 ...; *accord
Valley Broadcasting Co.*, 798 F.2d at 1294.
The mere fact that the production of records
may lead to a litigant's embarrassment,

incrimination, or exposure to further litigation will not, without more, compel the court to seal its records. *Foltz*, 331 F.3d at 1136.

We acknowledged explicitly in *San Jose Mercury News*, 187 F.3d at 1102, and later confirmed in *Foltz*, 331 F.3d at 1136, that the strong presumption of access to judicial records applies fully to dispositive pleadings, including motions for summary judgment and related attachments.  We adopted this principle of disclosure because the resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the 'public's understanding of the judicial process and significant public events.' *Valley Broadcasting*, 798 F.2d at 1294; *accord Foltz*, 331 F.3d at 1135-36 ... Thus, 'compelling reasons' must be shown to seal judicial records attached to a dispositive motion, *Foltz*, 331 F.3d at 1136.  The 'compelling reasons' standard is invoked even if the dispositive motion, or its attachments, were previously filed under seal or protective order.  *Id.* ('[T]he presumption of access is not rebutted where ... documents subject to a protective order are filed under seal as attachments to a dispositive motion. The ... "compelling reasons' standard continues to apply.') ....

We have, however, 'carved out an exception to the presumption of access' to judicial records, *Foltz,* 331 F.3d at 1135, for a '*sealed discovery document* [attached] to a *non-dispositive* motion,' such that 'the usual presumption of the public's right of access is rebutted.' *Phillips v. General Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir.2002) ... There are, as we explained in *Foltz*, 'good reasons to distinguish between the dispositive and non-dispositive motions.'  331 F.3d at 1135.  Specifically, the public has less of a need for access to court records attached only to non-dispositive motions because those documents are often '"unrelated, or only tangentially related, to the underlying cause of action."' *Id.* (quoting *Seattle Times Co. v. Rhinehart*, 467

63

U.S. 20, 33 ... (1984)).

The public policies that support the right of access to dispositive motions, and related materials, do not apply with equal force to non-dispositive materials. *Phillips*, 307 F.3d at 1213.  We reasoned in *Phillips* that when a district court grants a protective order to seal documents during discovery, 'it already has determined that "good cause" exists to protect this information from being disclosed to the public by balancing the needs for discovery against the need for confidentiality.'  *Id.*  Thus a 'particularized showing,' *Foltz*, 331 F.3d at 1138, under the 'good cause' standard of Rule 26(c) will 'suffice[] to warrant preserving the secrecy of sealed discovery material attached to non-dispositive motions.'  *Id.* at 1135.

...

It is important to emphasize the difference between the 'compelling reasons' standard and the 'good cause' standard ... A 'good cause' showing will suffice to seal documents produced in discovery.  Fed.R.Civ.P 26(c) (stating that if 'good cause' is shown in discovery, a district court may issue 'any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense,').  Rule 26(c) gives the district court much flexibility in balancing and protecting the interests of private parties. *Id.*

A 'good cause' showing will not, without more, satisfy a 'compelling reasons' test ... Different interests are at stake with the rights of access than with Rule 26(c); with the former, the private interests of the litigants are not the only weights on the scale.  Unlike private materials unearthed during discovery, judicial records are public documents almost by definition, and the public is entitled to access by default.  *See Nixon*, 435 U.S. at 597 ... This fact sharply tips the balance in favor of production when a document, formerly sealed for good cause

64

> under Rule 26(c), becomes part of a judicial record.  Thus a 'good cause' showing alone will not suffice to fulfill the 'compelling reasons' standard that a party must meet to rebut the presumption of access to dispositive pleadings and attachments.

447 F.3d at 1178-1180.

Starlite argues that Textron had no grounds to seek the sealing aspect of the Stipulation and Order, thereby rendering the sealing aspect objectively baseless and not subject to the *Noerr-Pennington* doctrine.

Textron replies that the "sealing of records pursuant to the CRO Order is not actionable, since Starlite cannot show that it had any effect on its conduct, much less that it has any right to challenge this Court's exercise of its 'inherent supervisory power' in sealing the records", citing *Hagestad v. Tragesser*, 49 F.3d 1430, 1433-1434 (9th Cir.1995).

The Stipulation and Order does not state the reasons for the sealing aspect.  *Hagestad* remanded the action to the District Court to make the findings because, otherwise appellate review was impossible.

Given the Ninth Circuit's indication in *Theofel* that the *Noerr-Pennington* doctrine is limited to the filing of the action, the motion to dismiss on this ground is DENIED.  Because of this conclusion, it is not necessary to address whether the sealing aspect of the Stipulation and Order was "objectively baseless."

ii.  California Civil Code § 47(b)(2).

Section 47(b) bars a civil action for damages based on

65

statements made in any judicial proceeding, in any official proceeding authorized by law, or in the initiation or course of any mandate-reviewable proceedings authorized by law.  The litigation privilege provided in Section 47(b)  applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.  *A.F. Brown Elec. Contractor, Inc. v. Rhino Elec.*, 137 Cal.App.4th 1118, 1126 (2006).  The litigation privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards."  *Rusheen v. Cohen*, 37 Cal.4th 1048, 1057 (2006).  In *Rusheen*, the California Supreme Court concluded:

> [I]f the gravamen of the action is communicative, the litigation privilege extends to noncommunicative acts that are necessarily related to the communicative conduct, which in this case included acts necessary to enforce the judgment and carry out the directive of the writ ... Stated another way, unless it is demonstrated that an independent, noncommunicative, wrongful act was the gravamen of the action, the litigation privilege applies.

*Id.* at 1065.  Section 47(b) establishes an absolute privilege for such statements and bars all tort causes of action based on them except a cause of action for malicious prosecution.  *Hagberg v. California Federal Bank*, 32 Cal.4th 350, 360 (2004).

Starlite argues that the litigation privilege does not apply because "Textron's *conduct* of helping [Turner Company] to

66

1 fraudulent [sic] induce Starlite to act to its detriment is <u>not</u> a
2 communicative act."

3    Textron was acting pursuant to the Stipulation and Order.
4 "'If there is no dispute as to the operative facts, the
5 applicability of the litigation privilege is a question of law
6 ... Any doubt about whether the privilege applies is resolved in
7 favor of the person apply it ....'" *American Products Co., Inc.*
8 *v. Law Offices of Geller, Stewart & Foley, LLP,* 134 Cal.App.4th
9 1332, 1343 (2005).  Here, the facts are undeveloped, precluding
10 dismissal as a matter of law on this ground.

11    Starlite further cites *Home Ins. Co. v. Zurich Ins. Co.*, 96
12 Cal.App.4th 17, 26 (2002) as establishing that the litigation
13 privilege does not apply to equitable actions.

14    In *Home Ins. Co.*, an insurer brought an action against
15 another insurance company alleging fraud and seeking declaratory
16 relief and subrogation or indemnity.  Defendant's policy, with a
17 $500,000 limit, covered a permissive automobile driver who had
18 negligently injured Plaintiff's insured.  However, during the
19 underlying litigation, Defendant was alleged to have
20 misrepresented the statutory limitations on coverage for
21 permissive users as having restricted its policy limits to
22 $15,000.  Relying on these representations, Plaintiff's insured
23 had settled the underlying case for $15,000 and executed a
24 release and then obtained an underinsured motorist arbitration
25 award from Plaintiff.  *Home Ins. Co.* affirmed the demurrer
26 without leave to amend, holding that Defendant's representation,

which was made during a lawsuit to induce settlement, was absolutely privileged under the litigation privilege in Section 47(b).   96 Cal.App.4th at 22-26.   The Court of Appeal stated that "[t]he litigation privilege does not apply to an equitable action to set aside a settlement agreement for extrinsic fraud", citing *Silberg v. Anderson,* 50 Cal.3d 205, 214 (19 )("Where a civil judgment is procured by extrinsic fraud, the normal remedy is to seek equitable relief from the judgment, not to sue in tort.").   However, the Court of Appeal ruled that the release executed by Plaintiff's insured could not be set aside on that basis since the alleged fraud was not extrinsic.   *Id.* at 26-27.

Starlite cites no authority that the litigation privilege does not apply to a claim for unjust enrichment.   *Home Ins. Co.* is not persuasive authority for Starlite's contention.

Textron's motion to dismiss on the ground of the litigation privilege is DENIED WITHOUT PREJUDICE.

C.   <u>MOTION TO STRIKE</u>.

1.   <u>Governing Standards</u>.

Rule 12(f) provides in pertinent part that the Court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are disfavored and infrequently granted.   *Neveu v. City of Fresno,* 392 F.Supp.2d 1159, 1170 (E.D.Cal.2005).   A motion to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.   *Id.*   The function of a Rule

12(f) motion to strike is to avoid the expenditure of time and money that might arise from litigating spurious issues by dispensing with those issues prior to trial. *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993), *rev'd on other grounds*, 510 U.S. 517 (1994).

Textron moves to strike the allegations in the FAC that it "acted willfully and fraudulently so as to justify the award of exemplary and punitive damages" and the prayer for punitive damages. Textron argues that there are no allegations in the FAC which support any claim for punitive damages. Starlite argues to the contrary. *See discussion supra.*

Textron's motion to strike the allegations and prayer supporting a claim for punitive damages is DENIED.

<u>CONCLUSION</u>

For the reasons stated:

1. Textron's motion to dismiss the First Amended Complaint is GRANTED IN PART WITH LEAVE TO AMEND AND DENIED IN PART;

2. Textron's motion to strike is DENIED;

3. Starlite shall file a Second Amended Complaint in accordance with the rulings herein within 30 days of the filing date of this Memorandum Decision and Order.

IT IS SO ORDERED.

Dated:   July 7, 2008          /s/ Oliver W. Wanger
                              UNITED STATES DISTRICT JUDGE