1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT FOR THE

7                  EASTERN DISTRICT OF CALIFORNIA

8

9  STARLITE DEVELOPMENT (CHINA)  )     No. CV-F-07-1767 OWW/DLB
   LTD.,                         )
10                               )     MEMORANDUM DECISION AND
                                 )     ORDER DENYING IN PART AND
11                               )     GRANTING IN PART WITH LEAVE
                Plaintiff,        )     TO AMEND TEXTRON FINANCIAL
12                               )     CORPORATION'S MOTION TO
            vs.                  )     DISMISS AND DENYING
13                               )     TEXTRON'S MOTION TO STRIKE
                                 )     (Docs. 20 & 21)
14  TEXTRON FINANCIAL            )
   CORPORATION, et al.,          )
15                               )
                                 )
16              Defendants.      )
                                 )
17  _____)

18      Before the Court is Defendant Textron Financial

19  Corporation's (Textron) motion to dismiss the First Amended

20  Complaint pursuant to Rule 12(b)(6), Federal Rules of Civil

21  Procedure, and motion to strike pursuant to Rule 12(f), Federal

22  Rules of Civil Procedure.[1]

23      Plaintiff Starlite Development (China) Ltd. (hereafter

24  _____

25      [1]Defendants MCA Financial Group, Ltd. and Morris C. Aaron
   also move to dismiss the First Amended Complaint.  That motion is
26  resolved by separate Memorandum Decision.

                                1

referred to as Starlite) filed an action in the Stanislaus County Superior Court.  Starlite filed a First Amended Complaint (FAC) on November 27, 2007 against Textron Financial Corporation (Textron); MCA Financial Group, Ltd. (MCA); Morris C. Aaron (Aaron); and John F. Turner & Co., Inc. and JFTC, Inc. (collectively, Turner Company) and Does 1-20.[2]  The action was removed to this Court on December 5, 2007.

The FAC alleges:

> 13.  Beginning in or about 2002, Starlite entered into an ongoing business relationship with Turner Company, pursuant to which Starlite sold box calendars to Turner Company.  During the years 2002 through 2004, Starlite's sales to Turner Company were between $400,000-$600,000 annually.

> 14.  In 2005 Turner Company ordered both wall calendars and box calendars from Starlite.  Accordingly, Starlite's financial year 2005 sales to Turner Company increased by approximately 240% to $1.46 million.

> 15.  In 2006, Turner Company increased its orders for box calendars and wall calendars and added desk calendars, which increased Starlite's sales to Turner by approximately 180% over 2005.  On January 19, 2006, Turner Company submitted a written purchase order for 3.25 million calendars (plus additional box calendars), on the following payment terms: 10% to be paid before the first shipment, and the remaining balance to be paid 30% in each of the months of October, November, and December 2006.

> 16.  Beginning in or about January 2006 and ending in or about August 2006, Turner Company submitted purchase orders to Starlite

---

[2]The FAC also named Mark Turner, John F. Turner and Kathleen A. Turner as Defendants.  By Order filed on December 20, 2007, these defendants were dismissed without prejudice (Doc. 9).

for calendars, which Starlite produced, shipped and invoiced.  Starlite's last shipment of calendars to Turner Company occurred in October 2006.  Other than a $195,575 and a $62,118 payment made in April and June 2006, respectively, Turner Company and Defendants have not paid anything for Starlite's 2006 calendars.  The total unpaid debt owing from Turner Company to Starlite according to Starlite's books is $2,693,989.

17.  In October 2006, when Turner Company's first 30% partial payment became due and went unpaid, Starlite attempted to make contact with Turner Company on numerous occasions, however, Starlite's calls and e-mail messages went unanswered, until November 10, 2007 when Aaron finally contacted Starlite via e-mail correspondence and introduced himself to Starlite as the 'court appointed Restructuring Officer for [the Turner Company'.'

18.  After having made contact with Aaron, Starlite was informed that Turner Company was nearly insolvent and under the control of Aaron and Turner Company's primary lender, Textron.  Starlite was informed that Aaron had been appointed as the Chief Restructuring Officer over Turner Company in March 2006, after Textron sued Turner Company and its principals after their insolvency became known to Textron in two separate actions (*Textron v. John F. Turner, et al.*, 1:06-CV-00160-OWW-LJO; and *Textron v. John F. Turner Company*, 1:06-cv-00162-OWW-LJO) filed in the United States District Court for the Eastern District of California (collectively, the 'Federal Actions').  Textron filed a motion to appoint a receiver in the federal action against the Turner Company on or about February 16, 2006.  Turner Company stated in its opposition that it intended on filing bankruptcy pursuant to Chapter 11.  Textron and Turner Company then stipulated that Textron would withdraw its motion for a receiver on the condition that Turner Company allow MCA and Aaron to take over the management of Turner Company as 'Chief Restructuring Officer' and, among other things, ensure that all receivables directed

to Turner Company were actually shuttled to a lockbox controlled by Textron.

19.   During November and December of 2006, Aaron repeatedly told Richard Lim, Senior Vice President of Marketing and sales for Starlite, that Aaron was working with Textron to come up with a payment plan to pay Starlite and that Starlite's payment had always been 'in the budget.'  Plaintiff is informed and believes, and thereon alleges that at the time Aaron made these representations to Richard Lim, such representations were false, in that the truth was that Textron had no intention to pay Starlite the balance due for the calendars and Aaron knew this.

20.   At the same time MCA and Aaron were placed in management control of the Turner Company in March 2006, in order to ensure that no other creditors of Turner Company would be notified of Turner Company's insolvency and the lockbox credit arrangement established by Textron, Textron and Turner Company stipulated that the entire file contents of two separate Federal Actions would be sealed from public view.  In or around December of 2006, Aaron finally provided Starlite, and thereafter Starlite's counsel in or around later April, 2007, a copy of the Stipulation and Order Appointing Chief Restructuring Officer, for Preliminary Injunction, and for Sealing of Documents, filed in the matter of *Textron v. John F. Turner Company*, 1:06-CV-00162-OWW-LJO (the 'Personal Action') on or around March 27, 2006.  Until Starlite intervened to unseal the records in the above-entitled case, however, neither Turner Company, Textron, MCA nor Aaron provided Starlite any further information regarding the two cases, despite Starlite's repeated requests for information.

21.   As a result of the concealment of the two legal actions, Starlite was not advised of the insolvency of Turner Company, or of the fact that Turner Company was no longer in charge of its business operations.  Based on such lack of knowledge, Starlite continued to accept purchase orders from Turner Company

4

and continued to manufacture and ship calendars to Turner Company throughout the Spring and Summer of 2006, with no information or reason to believe that Turner Company would not be able or willing to pay the balance due of over $2 million that remains unpaid to this date.

22. In sharp contrast to the lack of knowledge about the insolvency of Turner Company, Textron, MCA, Aaron and all defendants were well aware of the state of insolvency of Turner Company, Turner Company's inability to pay Starlite, and/or Textron's intent not to approve funding to pay for the calendars that Starlite was delivering to Turner Company throughout the Spring and Summer of 2006.  With full knowledge, Defendants, including Turner Company, Textron, MCA, and Aaron and allowed [sic] Turner Company to receive and sell the calendars to its customers and knowingly received all payments to Turner Company from those customers.  Defendants knowingly reaped the benefits of Turner Company being able to sell the Starlite produced calendars knowing full well that Turner Company could not pay for them and/or that Textron never intended to authorize payment for them.

23. To assure that no payments could be made by Turner Company to its creditors without Textron's prior approval, in February 2006 a 'lockbox' arrangement was established so that all funds received by Turner Company were paid directly to the control of Textron.  Recently, it was discovered that Textron asserted as early as February 2006 that over $600,000.00 had been wrongfully diverted from Textron by Turner Company to pay Starlite for 2005 shipments of Starlite produced 2006 calendars to Turner Company.  However, neither Textron nor any of the defendants ever informed Starlite of such alleged misappropriated payment (until during the discovery process in this action) because such information would have alerted Starlite to the insolvency and situation of Turner Company.

24. Instead, in continuance of the

subterfuge, on or about April 1, 2006,
Textron funded and paid what Defendants
estimated the 10% pre-shipment payment would
be for 2007 box calendars and wall calendars
that had been ordered by directly wiring
funds to Starlite's bank account in the
amount of $195,575.23. At that time,
Starlite had not yet sent Turner Company a
statement for the 10% pre-shipment payment on
the wall and box calendars, but only for the
10% due on two particular orders which
totaled $63,249.98. Textron funded and
Defendants, and each of them allowed, and
paid this additional early payment of over
$130,000 to insure a sense of confidence in
Turner Company by Starlite. Defendants, and
each of them knew that without this pre-
payment, Starlite would not ship the
calendars and Textron wanted to ensure the
calendars were shipped so they could control
and usurp the proceeds of the calendars and
utilize said proceeds to pay down Turner
Company's debt to Textron.

25. On or about June 16, 2007, Textron
approved the funding and allowed the use of
$62,117.59 to make yet another early payment
to Starlite (again in excess of the 10% pre-
shipment payment that Starlite had not yet
sent Turner Company a statement for).
Textron funded and allowed, and Defendants
paid this additional payment in excess of
over $17,500.00 to Starlite with Turner
Company stating that the company had 'extra
cash flow available' (a false statement) to
insure a continued sense of confidence in
Turner Company by Starlite. Defendants, and
each of them knew that without this pre-
payment, Starlite would not ship the
calendars and Textron wanted to ensure the
calendars were shipped so they could control
and usurp the proceeds of the calendars and
utilize said proceeds to pay down Turner
Company's debt to Textron.

26. At all relevant times, Defendants and
each of them knew that the Starlite produced
calendars would constitute Turner Company's
major source of account receivables since
Starlite was Turner Company's principal
supplier of calendars.

27.    Textron closely monitored the finances and business operations of Turner Company by placing a Textron agent on site at Turner Company's offices in January 2006 and later through the imposition of MCA and Aaron as CRO of Turner Company in March 2006, and Textron knew of the deepening insolvency of Turner Company.

28.    Textron knew how much revenue was being produced by the Starlite product because all calendar purchasers paid for the calendars by remitting their funds to the 'lock box' account over which Textron had exclusive control.   Textron knew that Turner Company had no funds available with which to pay Starlite for the Starlite produced calendars without Textron's approval because the only way Turner Company would have any funds available was from its accounts receivable which were all in Textron's control via the 'lock box.'   Textron was simultaneously expropriating the revenues from the Starlite produced calendar sales to pay off Turner Company's outstanding debt to Textron.

29.    Following shipment of the 2007 calendars by Starlite, receipt and use of the 2007 calendars by Turner Company to fill its customers' orders for the Starlite produced 2007 calendars, and receipt by Textron (via the Lockbox) of the Starlite product generated receivables, Defendants made no payment on the accounts owed to Starlite for its product.   No payment was made by MCA, Aaron or Textron even though by receipt and use of the Starlite calendars the debt to Starlite was a 'bona-fide obligation' and the receivables collected from the sale of the Starlite product constituted 'funds available,' and thus, should have been paid pursuant to the Stipulation and Order Appointing Chief Restructuring Officer, for Preliminary Injunction, and for Sealing of Documents described above.   Instead, Textron converted the funds to itself, and Aaron, MCA and Turner Company substantially assisted Textron in doing so.

30.    Starlite has demanded payment from Defendants to no avail.   According to

7

                    Starlite's books, the sum of $2,693,989
                    remains owed and unpaid.  Although Aaron,
                    after counsel for Starlite repeatedly
                    requested an acknowledgment of Turner
                    Company's debt to Starlite, finally supplied
                    Starlite's counsel with a spreadsheet
                    regarding Turner Company's account with
                    Starlite claiming offsets of over $400,000
                    for charges allegedly 'historically not
                    charged' and other smaller offsets for
                    product related issues, such offsets have not
                    yet been confirmed.  However, it is
                    undisputed that Turner Company owes Starlite
                    at least $2,193,123.96.

     The FAC alleges five causes of action against Textron: the

Third Cause of Action for aiding and abetting fraud; the Fifth

Cause of Action for intentional interference with economic

advantage; the Sixth Cause of Action for intentional interference

with contract; the Seventh Cause of Action for negligent

interference with contract and economic relationship; and the

Eighth Cause of Action for unjust enrichment and imposition of

constructive trust.

     A.   BACKGROUND.

     As alleged in the FAC, Textron was Turner Company's "primary

lender."  On April 25, 2000, Textron filed a UCC-1 Financing

Statement with the California Secretary of State giving Textron a

security interest in "[a]ll accounts, chattel paper, general

intangibles, documents, inventory, equipment and fixtures in

which Debtor [the Turner Company] now or hereafter has rights,

wherever located, including but not limited to, deposit accounts,

copyrights, patents, trademarks, trade names and trade secrets;

the books and records pertaining thereto, in whatever medium

(including computerized data); and the products and proceeds of the foregoing."  (Textron's Request for Judicial Notice, Exhibit B).

On February 14, 2006, Textron filed a Complaint for judicial foreclosure of deed of trust, for money due under written guaranty, for intentional and negligent misrepresentation, and conversion against John F. Turner and Kathleen A. Turner. *Textron Financial Corporation v. John F. Turner, et al.*, No. CV-F-06-160 OWW.  On February 14, 2006, Textron filed a Complaint for breach of contract, conversion, fraud, and appointment of receiver against John F. Turner Company.  *Textron Financial Corporation v. John F. Turner Company*, No. CV-F-06-162 OWW. These actions were consolidated by Order filed on July 26, 2006 (Doc. 19) and are referred to in this Memorandum Decision as the "Textron Federal Actions."

On February 16, 2006, Textron moved for a temporary restraining order pending appointment of a receiver (Doc. 7) and moved for appointment of a receiver (Doc. 9).  A hearing on the motion for temporary restraining order was held on March 6, 2006. A Temporary Restraining Order was issued on March 8, 2006 (Doc. 22), setting forth the following findings of fact:

> 1.  Turner Company has entered into a Loan and Security Agreement ('Agreement') with Textron whereby Textron made loans to Turner Company, and Turner Company granted Textron a security interest in essentially all assets of Turner Company ('Collateral').
>
> 2.  Pursuant to the terms of the Agreement, Turner Company is required to remit to

Textron, among other things, all proceeds of Turner Company's accounts receivable ('Proceeds').

3.   Pursuant to the terms of the Agreement, on or about February 7, 2006, a lockbox ('Lockbox') had been established, and all proceeds were to be deposited into the Lockbox.

4.   Pursuant to the terms of the Agreement, Turner Company was required to submit to Textron, on a weekly basis, borrowing base certificates setting forth, among other things, the amounts of Turner Company's accounts receivable and inventory, and the amount (if any) of loans and advances that Turner Company was eligible to receive under the formula set forth in the Agreement.

5.   Turner Company was required to make payments to Textron as required by the Agreement.

6.   In or about December 2005, Turner Company failed to remit Proceeds to Textron in the amount of approximately $2.5 million and Turner Company has subsequently failed to remit additional Proceeds to Textron.

7.   Turner Company failed timely to submit borrowing base certificates to Textron, including without limitation the borrowing base certificate for the last week of December 2005.

8.   The borrowing base certificate that Turner Company submitted in January and February 2006 show an Overadvance exceeding $2,000,000.

9.   Turner Company has failed to make payments to Textron as required under the Agreement.

10.  Turner Company has wrongfully acted to deprive Textron of access to its online bank account information.

11.  Pursuant to the terms of the Agreement, Textron has issued to Turner Company notice

1             of default and has demanded payment of the
           Overadvance.

2

3             12.   Notwithstanding Textron's demand, Turner
           Company has continued to collect Proceeds
           without remitting them to Textron or the

4             Lockbox.

5             13. There is no adequate remedy at law
           because, among other things, Textron is

6             entitled to the Collateral, and Turner
           Company's financial conditions suggest that

7             Turner Company will not be able to respond in
           damages if the Proceeds are diverted and

8             dissipated.

9             14.   There is immediate danger of grave and
           irreparable injury to Textron in that Turner

10             Company will continue to collect, divert
           and/or dissipate Proceeds and other

11             Collateral and thereby deprive Textron of the
           ability to recover its claims against Turner

12             Company.

13  The Temporary Restraining Order restrained Turner Company from

14  disposing of any cashier's checks or certified checks related to

15  the business of Turner Company, from directing any account

16  debtors of Turner Company to remit payments to Turner Company

17  rather than to the established Lockbox, and otherwise interfering

18  with Textron's efforts to collect Turner Company's accounts

19  receivable; restrained Turner Company from diverting, depositing

20  or transferring accounts receivable proceeds anywhere except for

21  the Lockbox; and restrained Turner Company from preventing

22  Textron's online access to Turner Company's bank account

23  information.   A hearing on the motion for preliminary injunction

24  and the motion for appointment of a receiver were set for March

25  20, 2006 (Doc. 22).

26      At the March 20, 2006 hearing, the Court issued a tentative

1  ruling and ordered counsel to submit a proposed order issuing the

2  preliminary injunction and appointment of a receiver (Doc. 29).

3      On March 24, 2006, the Stipulation and Order Appointing

4  Chief Restructuring Officer, For Preliminary Injunction, and For

5  Sealing of Documents (March 24 Stipulation and Order) was filed:

6          IT IS HEREBY STIPULATED AND AGREED by and
           between plaintiff Textron Financial
7          Corporation ('Textron') and Defendant John F.
           Turner and Company ('Turner Company'),
8          through their respective counsel of record,
           as follows:
9
           A.  Disposition of Pending Motions.
10
           1.  Textron's Motion for Appointment of
11         Receiver is hereby withdrawn without
           prejudice.
12
           2.  Textron's Motion for Preliminary
13         Injunction is hereby granted on the terms set
           forth in Part C below.
14
           B.  Appointment of Chief Restructuring
15         Officer.

16         1.  Morris C. Aaron of MCA Financial Group,
           Ltd. is hereby appointed immediately as the
17         Chief Restructuring Officer ('CRO') of Turner
           Company on the following terms and
18         conditions.

19         2.  The CRO shall:

20             (a) Take possession of and
           safeguard all of the books and records
21         (including computer records) of Turner
           Company, wherever located, and Turner Company
22         shall immediately provide the CRO with all
           necessary passwords for accessing Turner
23         Company's computers and related software,
           including Turner Company's web site;
24
               (b) Collect all of Turner Company's
25         accounts receivable, existing or future, by
           directing payment thereof to the Lockbox that
26         had been established on or about February 7,

12

2006 pursuant to the Loan and Security Agreement, as amended ('Agreement') between Textron and Turner Company ('Lockbox');

(c) Remit to Textron via deposit to the Lockbox, any and all collections of Turner Company's accounts receivable that may come directly into the possession of the CRO, promptly upon receipt;

(d) Take possession of and safeguard all assets of Turner Company, including without limitation all inventory, equipment, cash, checks, bank accounts and license agreements;

(e) At the discretion of the CRO, obtain advances from Textron pursuant to the Agreement as currently in effect or as further amended, supplemented and/or modified by the CRO and Textron in their discretion (nothing herein shall constitute an order for Textron to make advances except to the extent, if any, required by the Agreement as currently in effect), solicit and maintain relationships with suppliers and licensors, create inventory and finished goods, solicit and obtain orders from customers, sell goods to customers, hire or terminate or make changes to the terms and conditions of employment of Turner Company's officers and employees (nothing herein shall constitute an order permitting the CRO to abrogate existing employment contracts, if any), pay the bona fide obligations of Turner Company in the ordinary course of business (with all officers and employees of Turner Company being subject to the authority of the CRO); and

(f) At the discretion of the CRO, sell any or all assets of Turner Company in a commercially reasonable manner for the maximum possible value or, if unable to do so and the CRO determines that it shall be unable to do so, liquidate the business through an orderly wind-down of its operations.

3.   The CRO shall have, use, operate, manage, and control all books, financial records,

other records and writings of Turner Company regarding Turner Company's business.

4.   The CRO is authorized and empowered to enter and gain access to any premises from where Turner Company conducts its business, maintains its books and records or stores its inventory, including but not limited to 1911 Yosemite Boulevard, Modesto, California 95354 (collectively, the 'Business Premises'), for the purpose of performing the CRO's duties and obligations under this Stipulation.

5.   The CRO is authorized and empowered to receive and collect Turner Company's mail, whether at the United States Post Office, from a courier or delivery service, at any Business Premises, or elsewhere, whether or not such mail was sent by U.S. Mail or by courier or delivery services, and the CRO is authorized to open such mail and to take possession of all checks, money orders, and other payments constituting or evidencing payment on accounts receivable of Turner Company or for sales of inventory or equipment by Turner Company.

7.   The CRO shall have the power to execute documents and do acts necessary, convenient and incidental to the foregoing.

8.   The CRO shall bear no personal liability for any actions or omissions which the CRO in his or its good faith business judgment believes to be in conformity with the provisions of this Stipulation.

9.   Turner Company shall immediately turn over to the CRO all of Turner Company's books and records with respect to its bank accounts, inventory, accounts receivable and the proceeds thereof, and shall immediately provide the CRO with online access to all of Turner Company's bank accounts.

C.   Preliminary Injunction.

1.   Turner Company and its officers, employees, agents and anyone acting on behalf of Turner Company are hereby restrained and enjoined, during the pendency of the above-

14

captioned action, from (a) disposing of any cashier's checks or certified checks related to the business of Turner Company, whether payable to cash, John F. Turner, Kathleen A. Turner, or anyone else, (b) collecting any accounts receivable of Turner Company, except at the direction of the CRO, (c) directing any account debtors of Turner Company to remit payments to Turner Company rather than to the Lockbox, and (d) otherwise interfering with the CRO's efforts to collect Turner Company's accounts receivable.

2.   Turner Company and its officers, employees, agents, and anyone acting on behalf of Turner Company shall not, during the pendency of the above-captioned action, divert, deposit or transfer accounts receivable proceeds of Turner Company, anywhere except for the Lockbox.

3.   Turner Company and its officers, employees, agents, and anyone acting on behalf of Turner Company shall not, during the pendency of the above-captioned action, prevent in any way Textron's full online access to Turner Company bank account information (for all accounts in the name of, or for the benefit of, Turner Company), and are hereby restrained and enjoined from hereafter, during the pendency of the above-captioned action, taking any actions to deprive Textron to full online access to such bank account information.

4.   Turner Company, its officers, directors, shareholders, general partners, limited partners, agents, managers and employees, and all other persons with actual or constructive knowledge of this Order and each of them, shall not, during the pendency of the above-captioned action:

     (a) Directly or indirectly interfere in any manner with the discharge of the duties of the CRO or the CRO's possession of and operation or management of Turner Company's business, the books and records thereof, bank accounts, the collection of accounts receivable, or the performance of license agreements and the right to use

15

licensed material;

     (b) Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage, create a security interest in, encumber, conceal, or in any manner whatsoever deal in or dispose of the whole or any part of the books and records, inventory, equipment, accounts receivable, bank accounts, or other assets of Turner Company, or any proceeds of the foregoing, except at the direction of the CRO; or

     (c) Do any act which will, or which will tend to, impair, defeat, divert, prevent or prejudice the preservation of Turner Company's business, the books and records, inventory, equipment, accounts receivable, bank accounts, license agreements, or other assets of Turner Company, or proceeds of the foregoing.  Nothing in this paragraph shall be construed to prohibit any employee of Turner Company from voluntarily terminating his or her employment.

D.   Sealing of Documents.

1.  All documents currently on file with the Court in the above-captioned action shall forthwith be placed under seal pursuant to Local Rule 39-141.

2.  All documents hereafter filed with the Court in the above-captioned action shall be filed under seal pursuant to Local Rule 39-141.

3.  All documents sealed or filed under seal pursuant to this Stipulation shall remain under seal unless and until otherwise ordered by the Court.

(Doc. 31).

    Until the Stipulation and Order Appointing Chief Restructuring Officer, For Preliminary Injunction, and For Sealing of Documents was filed on March 26, 2006, the Textron Federal Actions were available to the public.

16

**B.   MOTION TO DISMISS.**

**1.   Governing Standards.**

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.   *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001).   "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.,* 523 F.3d 934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombley*, ___ U.S. ___, 127 S.Ct. 1955, 1974 (2007).   "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.*   "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, *id.* at 1964-1965.   Dismissal of a claim under Rule 12(b)(6) is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).   Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory.   *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).   In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of

17

all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002).  However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).

Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint.  *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)  When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice.  *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-706 (9th Cir.1988).[3]

2.   Third Cause of Action for Aiding and Abetting Fraud.

The Third Cause of Action is against Textron for aiding and abetting fraud.  The Third Cause of Action incorporates by reference all preceding allegations, including the Second Cause of Action against the Turner Defendants for fraud (which has been voluntarily dismissed by Starlite).  The Second Cause of Action against the Turner Defendants alleges:

---

[3]Both parties have filed requests for judicial notice of various documents.  No party has objected to the other's request.

18

39.   The Turner Defendants entered into the foregoing contractual relationship [with Starlite for the sale and purchase of calendars] knowing full that the Turner Company was insolvent.  Despite such knowledge, the Turner Defendants made numerous purchase orders for additional product from Starlite with the knowledge that they would be unable to pay Starlite for the goods delivered.  The Turner Defendants made the purchase orders having no intention to pay for the goods delivered.  In addition, the Turner Defendants made early, additional, and excess payments as alleged above for the purpose of insuring a false sense of confidence in Turner Company by Starlite.

40.   The affirmative representations made by the Turner Defendants were in fact false, and were demonstrated to be false when, instead of increasing their business with Starlite, the Turner Defendants actually terminated all further business between the two entities.

41.   In addition to the affirmative misrepresentations noted above, the Turner Defendants knew and concealed the true facts, and despite repeated statements by Starlite regarding its understanding of the Turner Company's position, the Turner Defendants failed to advise Starlite of their true motivations and intentions.  The Turner Defendants made such misrepresentations of fact and concealed material facts, with the knowledge and intent that Starlite would rely upon them.

42.   Had the material misrepresentations not been made, and had the concealed facts been disclosed, such that Starlite was aware of the Turner Defendants's [sic] motivations and intentions, Starlite would not have continued to manufacture and ship any more calendars to Turner Defendants, and would not have suffered the loss of approximately $2.6 million as a result.

43.   The Turner Defendants made the affirmative misrepresentations and concealed material facts from Starlite with the intent to deceive and defraud Starlite.

19

44. As a direct, legal and proximate result of the fraudulent misrepresentations and concealment made by the Turner Defendants as herein alleged, Starlite has been damaged in any amount according to proof at trial.

The Third Cause of Action then alleges:

47. At all relevant times, Textron controlled Turner Company's working capital which Turner Company required to make payments to vendors in order to continue in business.

48. At all relevant times, Textron had exclusive control over and access to all funds paid to Turner Company for the Starlite produced calendars purchased through the 'lock box' arrangement.

49. At all relevant times, Textron could and did influence, direct and control the business decisions of the CRO and the principal officers of Turner Company through its exclusive control of funding operating expenses.

50. Textron placed an agent, representative or employee at Turner Company's business offices to monitor and audit Turner Company's business operations in January 2006 and imposed MCA and Aaron as CRO of Turner Company in March 2006.

51. Textron continued to make advances to Turner Company for specific operating expenses despite Turner Company's deepening insolvency in order to allow Turner Company to continue to operate so that Starlite produced calendars could be received and sold by Turner Company.

52. Textron had knowledge of all of the fraudulent acts of Turner Company and of the CRO with regard to Starlite alleged above.

53. Textron knew that its actions and inactions as alleged herein would assist Turner Company in the commission of a fraud, and Textron's actions and inactions did substantially assist Turner Company in the

20

commission of a fraud.

Textron moves to dismiss the Third Cause of Action on the ground that it was entitled to enforce its rights as a secured creditor, including the collection of proceeds of goods Starlite sold to Turner Company, without subjecting itself to liability for aiding and abetting any alleged fraud by Turner Company. Textron further contends that Starlite has not properly pleaded a claim for aiding and abetting fraud.

In *Casey v. U.S. Bank National Assn.,* 127 Cal.App.4th 1138, 1144, 1145-1146 (2005), the Court of Appeals explained:

> California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort.  'Liability may ... be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.' ....
>
> ...
>
> California courts have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted.

Textron argues that, because Starlite's aiding and abetting claim is based on fraud, it must be plead with the specificity required by Rule 9(b), Federal Rules of Civil Procedure.

As Starlite contends, Textron's assertion that the aiding and abetting cause of action must satisfy Rule 9(b) is without

merit.   The case upon which Textron relies, *Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1119 (C.D.Cal.2003), does not so hold.   *Neilson* ruled:

> Under Rule 9(b) of the Federal Rules of Civil Procedure, while fraud must be pled with specificity, '[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally.' ... Although this obviates the necessity of pleading detailed facts supporting the allegations of knowledge, it does not relieve a pleader of the burden of alleging the nature of the knowledge a defendant purportedly possessed. In the case of an aider and abettor under California law, there must be actual knowledge of the primary violation.

Textron argues that Starlite's "generic" allegations of knowledge do not suffice to state a claim upon which relief can be granted:

> Starlite admits that (a) [Textron] sued Turner Company and sought appointment of a receiver for Turner Company in February 2006 and (b) a month later, this Court issued the CRO Order appointing the CRO to 'take over the management of Turner Company' [Amended Complaint, ¶ 18]; this negates any potential allegation (not expressly made by Starlite in any event) that [Textron] was aiding or abetting any fraud by Turner Company as of January 19, 2006, when Turner Company submitted its purchase order to Starlite for the calendars for which Starlite has not been paid [Amended Complaint, ¶ 15].  By the time [Textron] directly wired funds to Starlite's bank account on or about April 1, 2006 [Amended Complaint, ¶ 24], this Court had already appointed the CRO to take control fo Turner Company, thereby precluding any fraud by Turner Company that [Textron] could have aided or abetted.
>
> ....

Starlite responds that the FAC adequately alleges Textron's

22

actual knowledge of Turner Company's fraud:

> The allegations in the FAC ... allege Textron's *knowledge* of [Turner Company's] obligation to Starlite, that Textron actively assisted [Turner Company] to give Starlite the false *perception* of [Turner Company's] solvency by authorizing and providing the funds for [Turner Company's] 'early payments' to Starlite, and that Textron *intended* to induce Starlite to produce and ship the 3.25 million calendar order in a timely manner so that Textron could benefit from the sale thereof.  Starlite has also alleged that the CRO, as Textron's agent, falsely assured Starlite that payment to Starlite was 'in the budget,' despite the fact it knew Textron intended to keep all further receivables for its own benefit.

Textron further moves for dismissal of the Third Cause of Action to the extent the Third Cause of Action is based on any allegation that Textron failed to disclose information concerning Turner Company's financial situation to Starlite.  Textron asserts that such allegation "ignores [Textron's] obligation not to disclose confidential information regarding its borrower." Further, because it had no relationship with Starlite, and did not enter into any transaction with Starlite, Textron cannot be held liable for concealing or failing to disclose any fact(s) to Starlite.

In *LiMandri v. Judkins*, 52 Cal.App.4th 326, 336-337 (1997), the Court of Appeals held:

> There are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the

23

defendant actively conceals a material fact
from the plaintiff; and (4) when the
defendant makes partial representations but
also suppresses some material facts ...' ...
None of these circumstances apply in the
instant case.

Clearly, there was no fiduciary relationship
between Judkins as counsel for Security and
LiMandri as counsel for the Deddehs.  Each of
the other three circumstances in which
nondisclosure may be actionable presupposes
the existence of some other relationship
between the plaintiff and defendant in which
a duty to disclose can arise.  As set forth
in BAJI No. 12.36 (8th ed. 1994), 'where
material facts are known to one party and not
to the other, failure to disclose them is not
actionable fraud unless there is some
*relationship* between the parties which gives
rise to a duty to disclose such known facts.'
....

As a matter of common sense, such a
relationship can only come into being as a
result of some sort of *transaction* between
the parties.

     Starlite argues that dismissal under Rule 12(b)(6) on this

ground is not warranted:

Textron also argues that it could not have
engaged in a scheme with [Turner Company]
with regard to [Turner Company's] placement
of the 3.25 million-calendar order while it
was itself engaged in contested litigation
against [Turner Company] at that time.
However, whether or not evidence exists that
can counter the allegations in Starlite's FAC
is not to be considered in ruling on a Rule
12(b)(6) motion to dismiss.  Regardless,
Textron is not innocent here merely because
it was also engaged in litigation against
[Turner Company].  Textron itself admits that
it began examining [Turner Company's]
operations and finances in late 2005, and in
early January of 2006, having placed one of
its agents at [Turner Company's] headquarters
for said purpose [sic] ... Moreover, the
allegations sufficiently alleged ...

24

1          Textron's active involvement in the fraud at
           issue.  Textron secretly gained complete
2          control of [Turner Company's] finances, then
           secretly authorized and funded early payments
3          to induce Starlite to produce and ship the
           calendars, never intending to pay for the
4          calendars once they were received.

5      Starlite argues that Textron's alleged dominion and control

6  over Turner Company created a duty to Turner Company and to

7  Turner Company's other creditors, including Starlite.

8      Starlite cites *Credit Managers Association v. Superior*

9  *Court*, 51 Cal.App.3d 353 (1975), *Commons v. Schine*, 35 Cal.App.3d

10 141 (1974), *Pension Trust Fund for Operating Engineers v. Federal*

11 *Ins. Co.*, 307 F.3d 944 (9th Cir.2002), and *United States v.*

12 *Vaccarella*, 735 F.Supp. 1421 (S.D.Ind.1990).

13     *Credit Managers Association* involved an action by an

14 assignee for the benefit of creditors of a corporation against a

15 bank, an investment company, and a business consultant.  The

16 plaintiff alleged that the bank, as a creditor of the assignor

17 corporation, had coerced it into employing the consultant to

18 manage it, that the defendants owed the corporation a fiduciary

19 duty which they had breached, and that, as a proximate result of

20 the defendants' actions, the corporation's assets were grossly

21 mismanaged and wasted, rendering the corporation insolvent.  The

22 Court of Appeals held that the complaint stated a cause of action

23 against a general demurrer:

24         Credit Managers' first amended complaint
           directly or indirectly alleged, in effect,
25         that Jer Meraj, against its will, was
           compelled by Bank to employ Mordy as business
26         consultant and that it was compelled to

> surrender to Mordy complete management
> control of Jer Meraj to such an extent that
> Mordy was able to overrule and supplant the
> board of directors and shareholders in its
> operation of the business.  Under such
> circumstances in our view a trial court could
> properly conclude that Mordy had the same
> fiduciary obligation to Jer Meraj and its
> creditors and to the stockholders of Jer
> Meraj that the officers and directors of Jer
> Meraj would have had to such creditors and
> such shareholders ... Directors of a
> corporation are trustees of the stockholders
> and indirectly for the creditors.

51 Cal.App.3d at 359-360.  The Ninth Circuit cited *Credit*

*Managers* in *Pension Trust Fund for Operating Engineers,* when it

held that "a lender, such as PTF, owes a fiduciary duty to a

borrower when it excessively controls or dominates the borrower."

307 F.3d at 955.  *Commons* involved an action by the trustee in

bankruptcy of a limited partnership against an individual and a

corporation, seeking damages arising out of a preference.

*Commons* held in pertinent part:

> One who dominates and controls an insolvent
> corporation may not ... assert the general
> immunity of creditor preferences from attack.
> He may not use his power to secure for
> himself an advantage over other creditors of
> the corporation ... The corporate controller-
> dominator is treated in the same manner as a
> director of an insolvent corporation and thus
> occupies a fiduciary relationship to its
> creditors ... He is liable to those creditors
> for any preference he has taken for his
> benefit and to their disadvantage.  In
> essence, the preference obtained for his
> personal benefit by a corporate controller-
> dominator is a species of fraud.  As a
> fiduciary, he has violated his duty to the
> beneficiaries of his trust.  As a guilty
> fiduciary, he is liable in quasi contract to
> the extent that he has unjustly enriched
> himself by his breach.

35 Cal.App.3d at 144-145.  *Vaccarella* involved an action by the United States to collect unpaid federal income taxes due and owing from a corporation.  The District Court held that the lender, rather than the CEO or treasurer, was the "responsible person" liable for unpaid withholding taxes due from the corporation, where the lender had complete control over the corporation finances and directed payments be made to other creditors in preference to paying the United States:

> [I]n the present case only Security Pacific can be deemed a 'responsible person' within the ambit of [26 U.S.C.] section 6672, because only Security Pacific had significant control over Mystik's finances.  By late May of 1983, neither Vaccarella nor Zintgraff effectively had any power to control the decision-making process with respect to allocating funds among creditors ... Security Pacific had complete control over Mystik's finances through the lock-box system and its veto power over funding requests.  It was Security Pacific, not Zintgraff or Vaccarella, who directed payments to be made to other creditors in preference to paying the United States government.  Moreover, Security Pacific choices of which creditors to pay reflected priorities calculated to protect its own collateral position with Mystik; often these choices ran counter to the best interests of Mystik itself.

735 F.Supp. at 1429.

Relying on these decisions, Starlite argues "it is clear that Textron stepped into a fiduciary duty and relationship as to [Turner Company] and Starlite as one of its creditors."

Textron argues that none of these decisions impose a duty on Textron, a secured creditor of Turner Company, to Starlite, an unsecured creditor of Turner Company.  Textron contends that

27

*Commons* and *Pension Trust Fund* involved insiders, not an arms-length secured creditor, and that *Credit Managers* did not involve a secured creditor of a company operated by a court-appointed officer.  Textron contends that "to impose on [Textron] a fiduciary duty to Starlite, with whom it had no relationship, would eviscerate Article 9 of the UCC."

Starlite overstates the duty and relationship Textron allowed.  The cases hold that a creditor who dominates and controls an insolvent corporation occupies a fiduciary duty to creditors for any preference obtained for its benefit to the creditor's discharge.  Textron also owed a fiduciary duty to Turner Company as result of its position of dominance and control.  The same principles do not apply to a court-appointed managing agent (quasi-receiver).

Textron's motion to dismiss on this ground is GRANTED WITH LEAVE TO AMEND.

### 3.   Fifth, Sixth and Seventh Causes of Action.

Textron moves to dismiss the Fifth, Sixth and Seventh Causes of Action on several grounds.

#### a.   Starlite Cannot Allege that Textron Caused any Actionable Interference.

Textron argues that dismissal of these causes of action is required because the FAC does not allege that Textron proximately caused any interference with any contractual or economic relationship between Starlite and the "nearly insolvent" Turner Company.

28

The elements of a cause of action for intentional interference with contractual relations are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

Textron relies on *Dryden v. Tri-Valley Growers*, 65 Cal.App.3d 990, 997 (1977) and cases citing *Dryden*: "It has been repeatedly held that a plaintiff, seeking to hold one liable for unjustifiably inducing another to breach a contract, must allege that the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof." *See also Wynn v. National Broadcasting Co., Inc.*, 234 F.Supp.2d 1067, 1121 (C.D.Cal.2002)("Plaintiffs have failed to allege facts sufficient to allow an inference that the Employer Defendants otherwise would have performed had the Agency Defendants not interfered, which is an element to establish causation."); *see also Eltolad Music, Inc. v. April Music, Inc.*, 139 Cal.App.3d 697, 708 (1983):

> The trial court was incorrect in instructing the jury that plaintiff had the obligation to prove that defendant CBS was 'a' moving cause of the contract breach. The defendant's requested instruction that plaintiff had the obligation to prove that defendant was 'the' moving cause was improperly refused.

29

1      Textron contends that, because the FAC alleges that Turner

2  Company was "nearly insolvent," Starlite cannot show that Turner

3  Company would have paid Starlite if not for Textron's conduct.

4  Textron notes that Starlite's contract with Turner Company at

5  issue in this litigation was entered into approximately one month

6  before Textron filed the Federal Actions against the Turner

7  Defendants.

8      Starlite argues that Textron's reliance on *Dryden* and cases

9  premised on *Dryden* is misplaced because the language in *Dryden*

10 related to that court's discussion of the tort of inducement to

11 breach a contract, not to intentional interference causes of

12 action as alleged in the FAC.  Starlite cites *Shamblin v. Berge*,

13 166 Cal.App.3d 118, 122-123 (1985):

> Inducement to breach a contract, interference
> with a contractual relationship, and
> interference with prospective economic
> advantage are separate theories upon which
> the tort of interference with economic
> relations may be based ... The first theory
> protects against intentional acts designed to
> produce an actual breach and requires that a
> plaintiff prove: '(1) he had a valid and
> existing contract [with a third party]; (2)
> ... defendant had knowledge of the contract
> and intended to induce its breach; (3) the
> contract was in fact breached by the
> contracting party; (4) the breach was caused
> by ... defendant's unjustified or wrongful
> conduct; and (5) ... damage[s] [were suffered
> as a result].'  *Dryden v. Tri-Valley Growers*
> (1977) 65 Cal.App.3d 990, 995 ... The second
> theory is slightly broader in that it
> protects against intentional acts not
> necessarily resulting in a breach.

25     Textron replies that, whether or not the claim in *Dryden* was

26 for inducing breach of contract as opposing to intentional

interference with contract is immaterial to the "'moving cause'

issue."  Even though the tort of interference with contract is

"slightly broader" than inducing a breach of contract, Textron

argues, "[t]his 'slight' distinction has nothing to do with

causation, *i.e.*, whether the defendant was the moving cause of

the breach or 'disruption' of the contract.

Starlite further argues that, even if Textron's legal

position is correct, the FAC sufficiently alleges that, but for

Textron's conduct with the "secret lockbox arrangement" and its

domination and control of Turner Company, Turner Company would

have performed on the contract and that Textron was the moving

cause of Turner Company's breach:

> Starlite alleges that 'the receivables
> collected from the sale of the Starlite
> product constituted 'funds available' to pay
> Starlite.  FAC, ¶ 29.  It is also evident
> from the pleadings and declarations filed in
> this Court with regard to the Textron
> Receivership Motion, that *but for* Textron's
> exertion of dominion and control over [Turner
> Company], [Turner Company] would have
> continued to pay Starlite pursuant to their
> contract.

Starlite refers to the Declaration of John F. Turner in

Opposition to Plaintiff's [Textron] Motion for Appointment of a

Receiver filed in the consolidated actions on March 6, 2006:

> 5. ... [I]n December, 2005, we made the
> decision to apply collected accounts
> receivables to outstanding license fees and
> other trade payables in order to maintain the
> very existence of our Company.  As Company
> President, I was informed and believe that we
> were both authorized and in fact required to
> do so by the language of our loan agreement
> with [Textron] ... Had we not made such

> payments we would have been in default of our
> obligation to Textron and would undoubtedly
> have forfeited our licenses, all of which are
> non-exclusive.  Without the licenses, I
> believe that our company would go out of
> business ... Our continued operation benefits
> Textron and increases the likelihood of
> repayment.  Our continued production and
> sales will generate additional accounts
> receivable, which will increase Textron's
> collateral.

Starlite also refers to Textron's memorandum of points and

authorities in support of its Motion for Appointment of Receiver

filed on February 16, 2006:

> On December 20, 2005, John F. Turner, on
> behalf of Turner Company, sent Textron a
> letter, which Textron received on January 3,
> 2006, in which Turner Company admitted that
> it diverted $1,997,703.33 in Diverted
> Collections.  Until Textron received the
> December 30, 2005 letter, Turner Company had
> concealed, and had not disclosed to Textron,
> and Textron had not been aware of, Turner
> Company's diversion of the Diverted
> Collections ....
>
> ...
>
> ... In the course of the January 2006
> Examination, Textron discovered that, in
> addition to the nearly $2 million in Diverted
> Collections admitted in the December 30, 2005
> letter, Turner Company retained an additional
> $463,116.53 in Diverted Collections that were
> not remitted to Textron. ....

Textron replies that Starlite's reliance on John Turner's

declaration does not establish that Textron's conduct was the

moving cause in Turner Company's failure to pay Starlite pursuant

to the Starlite contract:

> Mr. Turner admitted that (i) he caused Turner
> Company to divert collections of accounts
> receivable rather than remitting them to its

32

> secured creditor, [Textron], as it was
> contractually bound to do and (ii) due to its
> financial distress, and its apparent
> inability to perform all of its contractual
> obligations, Turner Company was prepared to
> file for bankruptcy.  Thus, it is undisputed
> that Turner Company could not have performed
> all of its obligations and that [Textron]
> could not have been the moving cause of
> Turner Company's failure to pay Starlite.

It appears that Turner Company was already insolvent when Turner Company entered into the contract with Starlite and that Turner Company was in substantial arrears to its secured creditor, Textron.  Although proximate causation is a question of fact, Starlite has not adequately alleged that Turner Company could have completed its contractual obligations to Starlite absent the alleged interference by Textron.

Textron's motion to dismiss on this issue is GRANTED WITH LEAVE TO AMEND.

b. <u>Privileged Conduct</u>.

Textron also moves for dismissal of Starlite's interference claims on the ground that its exercise of its rights to collection of Turner Company's accounts receivable was privileged.

Justification or privilege is an affirmative defense and the question of whether there has been sufficient justification to avoid liability for interference with contract or prospective economic advantage is ordinarily for the jury.  Cal.Jur.3d, Interference with Economic Advantage, § 29.

Textron cites *Quelimane Co. v. Stewart Title Guar. Co.*, 19

33

Cal.4th 26 (1998).   In *Quelimane*, the California Supreme Court

cited Restatement Second of Torts, § 766, comment j:

> 'The fact that this interference with the
> other's contract was not desired and was
> purely incidental in character is, however, a
> factor to be considered in determining
> whether the interference is improper.  If the
> actor is not acting criminally nor with fraud
> or violence of other means wrongful in
> themselves but is endeavoring to advance some
> interest of his own, the fact that he is
> aware that he will cause interference with
> the plaintiff's contract may be regarded as
> such a minor and incidental consequence and
> so far removed from the defendant's objective
> that as against the plaintiff the
> interference may be found to be not improper.

19 Cal.4th at 56.

Textron also cites *Weststeyn Dairy 2 v. Eades Commodities
Co.*, 280 F.Supp.2d 1044, 1089 (E.D.Cal.2003), an opinion

involving summary judgment, not a motion to dismiss:

> That Diversified was a competing creditor,
> seeking to enforce its security interest in
> Eades' accounts gave Diversified a privilege
> to protect its economic interests, that
> validates intentional acts designed to
> disrupt Plaintiffs' relationship with Eades.
> *See Webber v. Inland Empire Investments*, 74
> Cal.App.4th 884, 902 ... (1999)(creditor
> entitled to take all legal steps to obtain
> payment of debt owed to it).  While the
> evidence supports Plaintiffs' contention that
> Diversified knew of the contracts between
> Eades and Plaintiffs, evidence that
> Diversified lawfully demanded Eades pay-over
> accounts, which were collateral under the
> security agreement to enforce its security
> interests, such conduct, authorized by the
> security agreement, negates the argument
> Diversified wrongfully intended to disrupt
> and did disrupt Eades' relationship with
> Plaintiffs.  The defense of economic
> privilege or justification applies.
> Diversified was entitled to seek and obtain

34

> the prepayments under the terms of the
> Security Agreement.  The fact that
> Diversified knew such seizure would interfere
> with Plaintiffs' contracts 'may be regarded
> as such a minor and incidental consequence
> and so far removed from defendant's objective
> that as against the plaintiff the
> interference may be found not be improper.'
> *Quelimane Co. v. Stewart Title Guaranty Co.,*
> 19 Cal.4th 26, 56 ... (1998).  Diversified's
> motion for summary judgment as to the
> intentional inference with contractual
> relations claim is GRANTED.

Starlite contends that *Weststeyn* is not controlling because the FAC alleges that Textron aided and abetted Turner Company's commission of fraud to advance its secured interest and entered into a secret agreement with Turner Company to keep its dominion and control over Turner Company secret in order to ensure that Starlite would produce and ship the calendars to Turner Company, creating the perception of Turner Company's ability to pay.

Because Textron obtained court approval for the CRO and endeavored to keep the business running to generate income to buy itself and the creditors time, this does not amount to interference that caused Starlite harm.  Here, Textron acted to protect its economic interests by seeking court intervention. Such legal justification, as a matter of law, is a complete, affirmative defense to an alleged tortious interference claim absent additional allegations.  Starlite's argument ignores that the interference claims are not saved by claiming fraud or aiding and abetting, when the creditor is acting to enforce valid and subsisting debts owed to Textron.

Textron's motion to dismiss on this ground is GRANTED WITH

35

1  LEAVE TO AMEND.

2          c.  Fifth Cause of Action for Intentional

3  Interference with Economic Advantage.

4          The elements of the tort of intentional interference with

5  prospective economic advantage are: "'(1) an economic

6  relationship between the plaintiff and some third party, with the

7  probability of future economic benefit to the plaintiff; (2) the

8  defendant's knowledge of the relationship; (3) intentional acts

9  on the part of the defendant designed to disrupt the

10 relationship; (4) actual disruption of the relationship; and (5)

11 economic harm to the plaintiff proximately caused by the acts of

12 the defendant.'" *Korea Supply Co. v. Lockheed Martin Corp.*, 29

13 Cal.4th 1134, 1153 (2003).  "[A] plaintiff seeking to recover

14 for alleged interference with prospective economic relations has

15 the burden of pleading and proving that the defendant's

16 interference was wrongful 'by some measure beyond the fact of the

17 interference itself.'" *Della Penna v. Toyota Motor Sales, U.S.A.,*

18 *Inc.*, 11 Cal.4th 375, 392-393 (1995).  "After *Della Penna* the

19 elements of the tort of interference with prospective economic

20 advantage remain the same, except that the third element also

21 requires a plaintiff to plead intentional *wrongful* acts on the

22 part of the defendant designed to disrupt the relationship."

23 *Korea Supply Co., id.*  As explained in *LiMandri v. Judkins*,

24 *supra*, 51 Cal.App.4th at 340-341:

25          *Della Penna* did not specify what sort of
           conduct would qualify as 'wrongful' apart
26          from the interference itself.  Justice Mosk's

concurring opinion in *Della Penna* suggested the wrongfulness requirement would be satisfied by conduct that is independently tortious or a restraint of trade.  (*Della Penna, supra*, 11 Cal.4th at pp. 408-409.) The Oregon Supreme Court suggested the requirement of wrongful conduct would be satisfied by conduct that violates a statute, regulation or recognized rule of common law. (*Top Serv. Body Shop, Inc. v. Allstate Ins. Co.* (1978) 283 Or. 201 ..., cited in *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 472 ... In *Willard v. Caterpillar, Inc.* (1995) 40 Cal.App.4th 892 ..., the court tested the defendant's alleged intentional spoilation of evidence, an offshoot of intentional interference with prospective economic advantage, for 'wrongfulness' under *Della Penna* in light of the suggestion in the Restatement Second of Torts that 'conduct which is "illegal or unfair or immoral according to the common understanding of society" may subject one to tort liability ...'  (*Id.* at p. 920.)

"It is insufficient to allege the defendant engaged in tortious conduct distinct from or only tangentially related to the conduct constituting the actual interference."  *LiMandri v. Judkins*, *supra,* 52 Cal.App.4th at 342.

Textron argues that, even if Starlite could properly allege that Textron acted to cause Turner Company not to pay Starlite, Starlite cannot show that Textron's acts were otherwise wrongful.

Textron cites *Weststeyn Dairy 2 v. Eades Commodities Co.*, 280 F.Supp.2d 1044 (E.D.Cal.2003), a case involving summary judgment, not a motion to dismiss.  In *Weststeyn*, it was held"

Diversified argues the exercise of its contractual rights does not constitute wrongful conduct under both the intentional and negligent interference claims, citing *Arntz Contracting Co. v. St. Paul Fire &*

37

> *Marine Ins. Co.*, 47 Cal.App.4th 464, 475 ...
> (1996) and *Lange*, 68 Cal.App.4th at 1188-89
> ...   In opposition, Weststeyn Plaintiffs
> contend Diversified engaged in conduct
> independently wrongful of its interference
> with Plaintiffs' economic relationship with
> Eades and other vendors by converting the
> funds meant to further these relationships.
> Weststeyn Plaintiffs argue that Diversified's
> exertion of control and dominion over, and
> ultimate conversion of, Plaintiffs' funds
> held in trust was wrongful and not an
> exercise of rights given to them by any
> contract or security agreement.  As to their
> negligent interference claim, Weststeyn
> Plaintiffs assert Diversified had a duty of
> care to Plaintiffs because it engaged in acts
> of conversion that were independently
> wrongful and grounds for liability
> notwithstanding the actual interference ....
>
> The evidence does not support Plaintiffs'
> claim that Diversified wrongfully took
> prepayment funds held in trust by Eades for
> Plaintiffs' benefits.  As discussed above,
> the Security Agreement applied to the
> prepayments, which were collateral in the
> form of accounts to which Diversified
> perfected security interest attached.
> Diversified had an express contractual right
> to enforce against Eades its security
> interest in the prepayments.  Diversified's
> motion for summary judgment as to the
> intentional and negligent interference with
> prospective economic advantage claims are
> GRANTED.

As in *Weststeyn*, Textron argues, this Court must reject

Starlite's effort to state an interference claim based on

Textron's exercise of its right to the collection of Turner

Company's accounts receivable.

   Starlite argues that the Fifth Cause of Action states a

claim upon which relief can be granted:

> Starlite had pled Textron's <u>knowledge</u> of
> Starlite's economic relationship with [Turner

38

Company] and the terms of the 3.25 million-calendar order (indeed it funded the estimated 10% pre-payment) Textron's <u>intentional actions</u> to disrupt that contract by failing to authorize and provide funds to pay for the calendars per the agreement once the calendars had shipped and instead using those proceeds to benefit itself is also alleged in the FAC.  Starlite has further alleged that Textron's wrongful conduct in helping to induce Starlite to produce and ship the calendars resulted in actual damages to Starlite of over $2 million.

Moreover, contrary to Textron's assertions, Starlite has satisfied the 'independently wrongful' element of its Fifth Cause of Action ... Starlite has pled sufficient facts to sustain its cause of action against Textron for aiding and abetting fraud.

Starlite further argues that *Weststeyn* is not controlling "because in this case, Textron was not merely exercising its rights as a secured creditor": "Textron's exercise of undue dominion and control over [Turner Company] and the fact that it furthered [Turner Company's] fraud over Starlite sets it apart from the lender in <u>Weststeyn Dairy</u>."  Even if this is true *arguendo*, it does not alter that as to the interference claims, the economic privilege applies to this conduct.

Textron's motion to dismiss on this ground is GRANTED WITH LEAVE TO AMEND.

d.   <u>Seventh Cause of Action for Negligent Interference with Contract and Economic Relationship</u>.

Textron moves to dismiss the Seventh Cause of Action to the extent it alleges negligent interference with contract on the ground that no such claim exists under California law.  Textron

39

cites *LiMandri, supra*, 52 Cal.App.4th at 349:

> [T]he Complaint also fails to state a cause of action for negligent interference with *contractual relations* (as opposed to prospective economic advantage).  In *Fifeld* [sic] *Manor v. Finston* (1960) 54 Cal.2d 632 ..., the California Supreme Court noted: '[W]ith the exception of an action by the master for tortious injuries to his servant, thus depriving the master of his servant's services, which traces back to medieval English law ..., the courts have consistently refused to recognize a cause of action based on negligent, as opposed to intentional, conduct which interferes with the performance of a contract between third parties or renders its performance more expensive or burdensome ... (*Id.* at p. 636).  Although the continuing validity of the so-called '*Fifel* [sic] rule' is questionable in light of the California Supreme Court's recognition in *J'Aire, supra*, 24 Cal.3d 799 of a cause of action for negligent interference with prospective economic advantage, the Supreme Court has yet to disapprove *Fifel*.  In any event, LiMandri's inability to plead a duty of care on the part of Judkins precludes his maintenance of a cause of action on any negligence theory.

*See also Rachford v. Air Line Pilots Ass'n.*, 2006 WL 1699578 (N.D.Cal.2006) at * 7 n.4:

> ... [T]he California Supreme Court has previously rejected a cause of action for negligent interference with contract.  *See Fifield Manor v. Finston*, 54 Cal.2d 632, 634-37 ... (1960).  In *Fifield*, the court stated that courts have generally refused to recognize a cause of action based on negligent, as opposed to intentional, conduct that interferes with the performance of a contract between third parties or renders its performance more expensive or burdensome, because to do so 'would constitute an unwarranted extension of liability for negligence.'  *Id.* at 636-37 ... The California Supreme Court has never overruled the holding of *Fifield Manor.  See LiMandri*

1          *v. Judkins*, 52 Cal.App.4th 326, 349 ...
           (1997).  The court notes in addition that
2          while *California Civil Jury Instructions
           (BAJI)* provides instructions for intentional
3          interference with prospective economic
           advantage (BAJI 7.82) and negligent
4          interference with prospective economic
           advantage (BAJI 7.82.1), it provides but a
5          single instruction for interference with
           contractual relations (BAJI 7.81), which
6          includes an intent/knowledge element.

7      Starlite contends that California courts recognize a claim

8  for negligent interference with an existing contract, citing

9  *Woods v. Fox Broadcasting Sub., Inc.*, 129 Cal.App.4th 344, 350

10  (2005):

11          Our courts recognize four types of claims for
            interference with contractual rights or
12          expectations: Intentional or negligent
            interference with an existing contract and
13          intentional or negligent interference with
            prospective economic advantage.

14  *Woods* cites *SCEcorp v. Superior Court*, 3 Cal.App.4th 673, 677

15  (1992) as authority that a cause of action for negligent

16  interference with contract exists:

17          For purposes of this opinion, we consider
            this cause of action to be included within
18          the broad cause of action of negligent
            interference with prospective economic
19          advantage which was discussed and recognized
            by the Supreme Court in *J'Aire Corp. v.
20          Gregory* (1979) 24 Cal.3d 799 ... Since
            neither party has specifically addressed this
21          cause of action, we will refrain from
            discussing the elements of this claim as
22          established in *J'Aire*.

23  *See also Greenly v. Sara Lee Corp.*, 2006 WL 3716769

24  (E.D.Cal.2006) at * 4, where Judge Shubb ruled:

25          Claims sixteen and seventeen are for
26          negligent and/or intentional interference

41

            with existing contractual relationships and
            negligent and/or intentional interference
            with prospective economic advantage,
            respectively.  Both of these theories are
            state common law causes of action based on
            protecting 'contractual rights or
            expectancies.'  *Woods v. Fox Broadcasting
            Sub., Inc.*, 129 Cal.App.4th 344, 350 ...
            (2005).

     Starlite's authority is not persuasive, especially since the

case *Woods* relies on did not even address the issue.  The

California Supreme Court has not directly revisited the issue

since *Fifield Manor*.  However, in *J'Aire Corp. v. Gregory*, 24

Cal.3d 799, 803 (1979), where the plaintiff sued a general

contractor for damages resulting from the delay in completion of

a construction project contracted for by a county from whom

plaintiff leased premises for the operation of a restaurant, the

Supreme Court stated:

            Even when only injury to prospective economic
            advantage is claimed, recovery is not
            foreclosed.  Where a special relationship
            exists between the parties, a plaintiff may
            recover for loss of expected economic
            advantage through the negligent performance
            of a contract although the parties were not
            in contractual privity.

In *Torrance National Bank v. The Aetna Casualty & Surety Company*,

251 F.2d 666, 669 n.5 (9th Cir.1958), the Ninth Circuit noted:

            This Court does not overlook that in some
            situations a federal court, in a diversity
            suit, may refuse to follow a state supreme
            court decision.  It is not necessary that a
            case be expressly overruled in order to lose
            its persuasive force.  *Cf. Mason v. American
            Emery Wheelworks,* 1 Cir., 1957, 241 F.2d 906.
            the law is in part an evolutionary process of
            judicial reasoning.  If convinced that the
            California Supreme Court would no longer

42

1
2
3

> follow the *Bendit* case, then, under the *Erie
> Railroad Co. v. Tompkins* decision ..., this
> Court should apply the same standards which
> it believes the highest court of this State
> would use.

4   The allegations in the FAC do not permit an inference that

5  Textron acted negligently; the entire focus of Starlite's

6  position is that Textron acted intentionally.  California Courts

7  of Appeal are divided on whether a claim for negligent

8  interference with contract lies; the Supreme Court's ruling in

9  *Fifield* has not been overruled.

10   Textron moves to dismiss this cause of action to the extent

11  it alleges negligent interference with contract on the ground

12  that Starlite has not alleged that Textron had any relationship

13  with Starlite or that Textron owed Starlite any duty of care.

14  "[N]egligent interference may be asserted only where the

15  defendant owes the plaintiff a duty of care."  *Weststeyn*, *supra*,

16  280 F.Supp.2d at 1090, citing *Lange v. TIG Ins. Co.*, 68

17  Cal.App.4th 1179, 1187 (1998).

18   Starlite responds by reciting the criteria for determining a

19  duty of care set forth in *J'Aire, supra*, 24 Cal.3d at 804:

20
21
22
23
24
25

> Those criteria are (1) the extent to which
> the transaction was intended to affect the
> plaintiff, (2) the foreseeability of harm to
> the plaintiff, (3) the degree of certainty
> that the plaintiff suffered injury, (4) the
> closeness of the connection between the
> defendant's conduct and the injury suffered,
> (5) the moral blame attached to the
> defendant's conduct, and (6) the policy of
> preventing future harm.

Starlite argues that the allegations of the FAC suffice to impose

26

43

a duty of care on Textron:

> Starlite has alleged that Textron secretly took control over [Turner Company], prevented [Turner Company] from paying Starlite except when necessary to fraudulently induce Starlite to produce and ship calendars, knowing it did not intend to authorize payment for the calendars once they had shipped, and knowing that Starlite would thereby be injured in amount of the 90% payment that remained unpaid, in excess of $2 million.  In addition, Textron's conduct in aiding and abetting fraud against Starlite is morally wrong.  Finally, the burden on Textron would be minimal as it would merely require that Textron notify suppliers that are essential to preserving its collateral that Textron does not intend to pay for the goods once they are received.

Textron's motion to dismiss the Seventh Cause of Action to the extent it alleges negligent interference with contract is GRANTED.

     e.   Eighth Cause of Action for Unjust Enrichment and Constructive Trust.

     The Eighth Cause of Action for unjust enrichment and constructive trust incorporates Paragraphs 1-30 and further alleges:

> 79.   Turner Company breached its contractual relationship with Starlite for the sale and purchase of calendars.  Starlite is informed and believes that Turner Company was and is now insolvent, yet Turner Company continued to order and sell, by and through MCA and Aaron as the Chief Restructuring Officer of Turner Company, and with Textron's knowledge and consent, the calendars manufactured and shipped to it by Starlite, and continues to remit said receivables into a Lockbox for the benefit of Turner Company and Textron only.

> 80.   The conduct of Turner Company as

44

described above amounts to fraud in that
Turner Company actively concealed its
insolvency as well as the Lockbox credit
arrangement it entered into with Textron,
which was then fraudulently concealed by
Turner Company and Textron by their conduct
in executing stipulation and orders sealing
the entire court record in the two litigation
matters between them.  In reliance on Turner
Company's misrepresentations of solvency and
as a result of Defendants' concealment of
material facts, Starlite continued to
manufacture and ship calendars to Turner
Company.  Had Starlite been aware of Turner
Company's insolvency and said Lockbox credit
arrangement between Turner Company and
Textron, it would not have continued to
manufacture and ship calendars to Turner
Company.  Starlite has suffered substantial
economic loss as a result in the amount of
approximately $2,693,989.

81.  It is undisputed that the current
payable balance on the books of Turner
Company is at least $2,193,123.96 (although
the correct amount owed is closer to
$2,693,989.79 as shown on Starlite's books).
Starlite is therefore entitled to repayment
of said amount from Turner Company from the
proceeds of its sales of calendars and any
other products provided by Starlite.

82.  Defendants have wrongfully detained and
retained for the benefit of Turner Company
and Textron proceeds from the sale of product
by Turner Company that rightfully belong to
Starlite, by depositing any and all
receivables of Turner Company into a Lockbox
for the benefit of Turner Company and Textron
while failing to repay Turner Company's debt
to Starlite.  Turner Company and Textron have
been unjustly enriched by benefitting from
the sale of calendars ordered and shipped by
Starlite to Turner Company without payment to
Starlite for said calendars.

83.  Defendants, including Turner Company,
MCA and Aaron have failed and refused and
continue to fail and refuse to remit any
funds to Starlite.

> 84.   Starlite has repeatedly requested from
> Turner Company, MCA and Aaron information
> pertaining to Turner Company's ability and
> efforts to pay all or some of said debt.
>
> 85.   Turner Company, MCA, and Aaron company
> [sic] refused, and continue to refuse,
> Starlite's requests for information, and
> Starlite was prohibited from obtaining
> additional information through public sources
> as a direct result of the stipulation and
> orders sealing all court records in the
> aforementioned federal litigation matters
> between Textron and the Turner Company and
> various Turner individuals as described
> above.
>
> 86.   Starlite has no way to know the amounts
> of receivables collected by Aaron and
> remitted to the Lockbox from March 2006 to
> the present, but the amount is believed to be
> substantial.
>
> 87.   By virtue of their fraudulent, unlawful,
> and unfair acts and practices, Defendants
> hold the funds described above as
> constructive trustees for Starlite's benefit.

Textron moves to dismiss the Eighth Cause of Action on the ground that it cannot exist as a matter of law because it contravenes the UCC.

Resolution of the motion to dismiss requires consideration of three decisions, two from California and one from Colorado.

In *Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal.App.3d 638 (1988), Producers held a security interest in the farm crops of its debtor.  Amstar bought the crops and paid to have them harvested.  Amstar knew of Producers' security interest, but neglected to obtain Producers' agreement to subordinate that security interest.  Amstar deducted the harvesting costs before remitting the sale proceeds of the crops to Producers.  Producers

sued Amstar and obtained a judgment on the theory that the

deduction constituted conversion of its secured collateral.  On

appeal, Amstar argued that California Uniform Commercial Code

article 9 governing secured transaction left room for the

equitable principle of restitution.  Amstar relied on Section

1103: "Unless displaced by the particular provisions of this

code, the principles of law and equity, including the law

merchant and the law relative to capacity to contract, principal

and agent, estoppel, fraud, misrepresentation, duress, coercion,

mistake, bankruptcy, or other validating or invalidating cause

shall supplement its provisions."  The Court of Appeal agreed

with Amstar's position: "We agree with the position of Amstar and

hold that when a party possessing a security interest in a crop

and its proceeds has knowledge of and acquiesces in expenditures

made which are necessary to the development of the crop, and

ultimately benefits from the expenditure, a party who, through

mistake, pays such costs without first obtaining subordination,

is entitled to recover."  197 Cal.App.3d at 660.

In *Ninth Dist. Prod. Credit v. Ed Duggan*, 821 P.2d 788

(Colo.1991), Duggan furnished feed grain to a livestock company

whose accounts receivable and personal property were the subject

of a perfected security interest held by a credit association.

In accordance with its standard practice, the association

financed the livestock company's operations by paying sight

drafts given creditors by the livestock company.  Duggan

continued deliveries while an unsuccessful effort to sell the

47

1    livestock company was overseen by the credit association.  Cattle

2    fed with Duggan's grain were sold and the proceeds paid to the

3    credit association, which also received payment for feedlot

4    services given cattle awaiting slaughter.  When the livestock

5    company became financially unable to pay Duggan, suit was brought

6    against the association.  The Colorado Supreme Court upheld te

7    lower courts' determination that Duggan could obtain restitution

8    from the credit association notwithstanding the latter's superior

9    statutory priority as a secured creditor.  The Colorado Supreme

10   Court noted that the central issue "whether a creditor that holds

11   a perfected security interest in collateral can be held liable to

12   an unsecured creditor based on a theory of unjust enrichment for

13   benefits that enhance the value of the collateral ... cannot be

14   answered categorically."  *Id.* at 793.  Acknowledging that the

15   Uniform Commercial Code's priority system "reflects the

16   legislative judgment that the value of a predictable system of

17   priorities ordinarily outweighs the disadvantage of the system's

18   occasional inequities,", the Colorado Supreme Court formulated

19   this rule: "In a situation where a secured creditor initiates or

20   encourages transaction between the debtor and suppliers of goods

21   or services, and benefits from the goods or services supplied to

22   produce such debts, equitable principles require that the secured

23   creditor compensate even an unsecured creditor to avoid being

24   unjustly enriched.  The equitable claim is at its strongest when

25   the goods or services are necessary to preserve the security, as

26   in *Producers Cotton Oil*."  *Id.* at 797-798.

In *Knox v. Phoenix Leasing Inc.*, 29 Cal.App.4th 1357 (1994), Knox, a seller of wine barrels brought an action for restitution against a leasing company, Phoenix, that financed the purchase of the wine barrels by a winery, Domaine, which defaulted, after which the financing company took possession of the barrels pursuant to a security agreement.  The *Knox* court noted that "a decided majority of jurisdictions have disallowed the equitable remedy of restitution (whether termed unjust enrichment, quantum meriut, contract implied in law, etc.)" in favor of "preserving the integrity of the Uniform Commercial Code's scheme for secured transactions, encouraging compliance with the code, and thereby ensuring a predictable system of creditor priorities."  29 Cal.App.4th at 1360-1361.  The *Knox* court then noted that *Producers Cotton Oil Co. v. Amstar Corp.*, *supra,* 197 Cal.App.3d 638 and *Ninth Dist. Prod. Credit v. Ed Duggan*, *supra,* 821 P.2d 788, while conceding considerable soundness of the majority position, allowed restitution from a secured creditor.  *Id.* at 1361.  *Knox* concluded that "[r]ecovery is clearly the exception, not the norm, and is subject to stern limitation."  *Id.*  *Knox* acknowledged that *Producers Cotton* and *Duggan* have been "subjected to critical comment, some of which is unusually hostile."  *Id.* at 1363.  *Knox* stated:

> Were we the first California court to
> consider the issue, we might well agree with
> the strict position that allowing restitution
> claims would be incompatible with the code's
> priority system.  The primary purpose and
> chief benefit of article 9 is the stability
> and certainty provided by those rules ...

49

> There are significant policy considerations which should not be disregarded lightly. So weighty is their value that most courts and commentators agree that it is better to accept the occasional 'harsh application of the law than to disrupt thousands of other transactions by injecting uncertainty and by encouraging swarms of potential litigants and their lawyers to challenge what would otherwise be clear and fair rules.' ... Any other approach threatens to 'render the secured creditor status useless' ... and thus badly impair the utility of the article 9 framework.
>
> But we do not come to this subject with a blank screen. As evidenced by *Producers Cotton*, California has opted to allow restitution claims against a secured creditor. When properly restricted to a very limited class of cases, this principle is sound.

*Id.* at 1361-1362. *Knox* ruled:

> A secured creditor who has complied with all relevant code requirements to perfect its security interest, should therefore start with something like a presumption in its favor. The whole point of article 9 is to establish a comprehensive scheme affording maximum protection to the secured creditor who has followed its provisions ... This does not, of course, guarantee payment in full ... But, having taken the trouble to satisfy all statutory requirements for protecting its interest, a secured creditor is entitled to a rebuttable preference for payment against a creditor who has not demonstrated a similar compliance.
>
> This preference would be reinforced by the failure to the unsecured creditor to use various nonstatutory protections. As courts and commentators have noted, the unsecured creditor could have (1) demanded cash payment on delivery, (2) perfected a purchase money security interest ..., (3) checked with the appropriate governmental office to determine if the debtor had already granted a security interest posing a possible threat to

50

repayment, or (4) obtained a secured
creditor's agreement to subordinate its
priority ....

But victory for a secured creditor is not an
immutable law of nature.  Fraud, for example,
is expressly beyond the pale ... A code may
strive for comprehensiveness, but exceptional
situations will arise.  Equity is ordinarily
meant to operate in these situations ..., but
its operation is subject to the principle
that 'equity follows the law.' ... This
deference requires that equitable exceptions
to statutory law be carefully limited to
reduce any possible conflict with an express
statutory command ... *Producers Cotton* and
*Duggan* show how this may be accomplished.

Those decisions begin with the premise that
simply pointing to benefit realized by the
secured creditor will not suffice.  As *Duggan*
notes, gain to the creditor is almost
universally present ... Something more is
required to displace the creditor's favored
position.  That something is either conduct
by the secured creditor or the nature of the
unsecured creditor's contribution to the
collateral.

What the *Duggan* court termed 'the extent to
which the secured creditor was involved in
the transaction by which the unsecured
creditor supplied goods or services' ... can
take many forms.  At one end of the scale is
fraud ... The California Uniform Commercial
Code gives it no sanction (§ 1103) and courts
applying the Uniform Commercial Code are
equally stern ....

Harder to resolve are the less egregious
situations 'where a secured creditor
initiates or encourages transactions between
the debtor and suppliers of goods and
services, and benefits from the goods or
services supplied to produce such debts.' ...
These situations produce a fertile
opportunity for trapping the unwary.  If what
the secured creditor did or failed to do can
be reached by the doctrines of estoppel,
misrepresentation not amounting to fraud, or
mistake, the code allows redress to an

51

innocent supplier (§ 1103).  Just as contribution among tortfeasors is proportioned by fault ..., commercial loss allocation responds to the same impulse.  If it had an active hand in promoting a transaction that goes bad, a secured creditor should not escape with a victimized supplier left hold an empty bag alone.  In simple terms, the creditor should not be allowed to profit from the wrong of its own bad faith. (Cf. § 1203; Civ. Code § 3517.)

The most difficult factor is the secured creditor's acquiescence when an unsecured creditor provides goods or services to their common debtor.  First raised in *Producers Cotton*, it was given a restrictive gloss by *Duggan*: 'In *Producers Cotton Oil* the court held that the secured creditor's act of acquiescing in the harvesting of the secured collateral (crops) was a sufficient basis for holding the secured creditor liable on the theory of unjust enrichment.  However, in that case, the harvesting was necessary to the actual *preservation* of the secured collateral ... Here, the delivery of corn was not essential to preserve the secured collateral, but instead served to augment or enhance its value.  In such a case, more than mere acquiescence is required to hold a secured creditor liable on the basis of unjust enrichment.' ... Subject to two reservations, we agree with this reasoning, which is sound and reflective of commercial realities.

When an unsecured creditor provides goods or services that are necessary to preserve the collateral, this is an expense the secured creditor would ordinarily incur as part of the duty to use 'reasonable care in the custody and preservation of collateral in his possession' (§ 9207, subd. (1))).  This would especially be true in situations like *Producers Cotton* and *Duggan*, where the collateral is perishable.  In such a case the unsecured status of the creditor appears less important than the fact that the secured creditor directly benefits from expenditures the creditor is spared from having to make on its own behalf.  Matters become less clear

52

when the unsecured creditor's expenditures
are not essential but merely useful, in the
sense that the collateral available for
liquidation is being increased.

One of the notable features of article 9 is
its approval of the concept of the so-called
'floating lien' generated by security
interests extending to after-acquired
property.  This measure of creditor
protection is vital to the feasability of
long-term procedures such as inventory,
accounts receivable, or agricultural crop
financing ... Risk to other creditors is
inherent in the operation of this mechanism
..., whose utility would be severely impaired
if unsecured additions to the protected
collateral could be excluded from its reach.
Virtually every addition will augment or
enhance the value of the pool of collateral
already pledged to the secured creditor.
Unless the unsecured creditor uses one of the
means the code permits to ensure payment, the
risk of loss must be deemed a cost of doing
business ... This is the defining
characteristic of a perfected security
interest - 'the degree to which it insulates
the secured party from the claims of the
debtor's other creditors.' ... The mere fact
of augmenting or enhancing the collateral's
value is by itself insufficiently notable to
justify equitable protection from article 9's
priority structure.  If allowed, this
exception would swallow the rule.

The same is true concerning a secured
creditor's acquiescence to such collateral
pool augmentation.  If acquiescence is to
carry the risk of restitution liability, the
secured creditor cannot afford silence.  The
creditor would be compelled to advise those
who might deal with the debtor of the
security arrangement and to disclaim
responsibility for any obligation incurred by
the debtor.[9] In order to know to whom these
warnings must be given, the creditor would
have to keep close tabs on the debtor's
business dealings.  Regardless of whether
such a monitoring regime could overcome
objections of cost, intrusiveness, and
ineffectiveness, its conclusive flaw is that

53

it would negate the utility of article 9's
notice-filing system.  One of the primary
benefits of that system is that filing a
financing statement relieves the now-secured
creditor from the necessity of taking further
action to protect its security interest;
thereafter prospective creditors must watch
out for themselves by checking the filings.
Basing unjust enrichment liability on
acquiescence would turn the filing system on
its head, destroying existing creditors'
reliance on that system and substituting a
prospective creditor's duty to check with a
new duty to warn and disclaim imposed on
existing creditors.  It would in plan effect
reward ignorance and establish an incentive
for ignoring the filing system.  Acquiescence
liability, because it would upend article 9's
interlocking notice-filing and priority
provisions, cannot be accepted.

How does the evidence in this case measure up
according to this legal template?  Nothing in
Phoenix's conduct amounted to fraud, actual
or virtual ..., and Knox does not contend
otherwise.

The transaction between Knox and Domaine
owned nothing to Phoenix in its inception.
The contract for the barrels makes no
reference to Phoenix, and was executed prior
to Domain's agreement with Phoenix.  The
barrels were ordered by Domaine, they were
shipped to Domaine, and Knox initially looked
to Domaine for payment.  In light of Knox's
testimony that he had no knowledge of Phoenix
at the time he made the contract with
Domaine, he could not have had any
expectation of payment from Phoenix.  The
transaction between Knox and Domaine being in
place and under way before Phoenix made any
appearance, it is impossible to say that
Phoenix initiated it.  Similarly, the sole
circumstance that Knox was paid for the first
shipment with a check from Phoenix does not
establish that Phoenix encouraged the deal;
the course of performance under the Knox-
Domaine contract owed nothing to anything
said or done by Phoenix, or to the fact that
Phoenix would be the true source of Domaine's
payment to Knox.  Phoenix never asked Knox to

54

1        provide anything ....

2        We have already determined that any
         acquiescence by Phoenix will not support
3        restitution liability.  Phoenix had no duty
         to overcome the failure of Knox, a merchant
4        knowledgeable about article 9 procedures, to
         acquaint himself with public information
5        concerning the Phoenix-Domaine relationship.

6        The barrels provided by Knox were not
         necessary to preserve the collateral covered
7        by Phoenix's security interest in Domain's
         'after acquired' property.  The mere fact
8        that the secured collateral was enhanced by
         the addition of the barrels does not support
9        liability in these circumstances.

10       The trial court's conclusion has an
         undeniable common sense allure - Knox
11       provided barrels; Phoenix ended up with the
         barrels; Phoenix should therefore pay Knox
12       for their value.  Ordinarily this would be
         sound reasoning supporting an equitable
13       result.  Article 9, however, compels a
         different conclusion.  Phoenix complied with
14       statutory provisions intended to immunize
         secured creditors from such claims in all but
15       the rarest of cases.  As this is not that
         sort of case, the equitable impulse for
16       restitution must yield to the Legislature's
         command.

17
         ...
18
         [9]The *Duggan* court appears to have endorsed a
19       creditor's need to 'inform[] ... the proper
         parties of its intent not to pay for debts
20       incurred in maintaining, enhancing, or making
         additions to secured collateral' in order to
21       'protect itself from unjust enrichment
         claims.' ... For the reasons stated in the
22       text, we do not agree with this part of
         *Duggan*.
23
*Id.* at 1364-1368.
24
         Textron argues that *Knox* is controlling her.  Starlite does
25
not allege that Textron initiated any transaction between
26

                                    55

Starlite and Turner Company, asked Starlite to provide goods or anything else to Textron or Turner Company, arranged any sales by Starlite to Turner Company, introduced Starlite to Turner Company, or dictated the terms of Starlite's transactions with Turner Company.  Textron contends that Starlite is simply an unpaid seller of goods whose claim is subordinate to Textron's prior perfected security interest.

Starlite responds that the allegations of the FAC assert Textron's active participation in the wrongful/fraudulent conduct at issue in encouraging Turner Company's debt to Starlite. Starlite contends that the FAC alleges:

> (a) Textron knew of the existence of [Turner Company's] obligation to Starlite because it had an agent on site at [Turner Company] as early as January 2006 to closely monitor [Turner Company's] finances and Textron had the CRO imposed in March of 2006, and approved and funded the prepayment of the calendars from Starlite (FAC, ¶¶ 18, 24-25, 27); (b) Textron exercised complete dominion and control over [Turner Company] following appointment of the CRO pursuant to the Stipulation and Order, (FAC ¶¶ 18-20); (c) Textron knew the sale of Starlite's calendars would comprise a major source of [Turner Company's] receivables, (FAC, ¶¶ 26, 28); (d) Textron knew of [Turner Company's] deepening insolvency when it assisted [Turner Company] to pay for the 3.25 million-calendar order and knew [Turner Company] had no funds to pay Starlite without Textron's approval, (FAC, ¶¶ 22, 27, 28); (e) Textron 'allowed' and then 'funded and paid' several required and not required pre-shipment payments for the 3.25 million-calendar order, thereby assisting [Turner Company] to falsely claim to have 'extra cash flow' available to make the payments, (FAC, ¶¶ 24, 25); (f) such payments were made to 'to insure a sense of confidence in [Turner Company] by Starlite,' and for the

56

purpose of inducing Starlite to produce and ship the calendars with the knowledge that 'without this prepayment, Starlite would not ship the calendars,' (FAC ¶¶ 24, 25); (g) all defendants knew Textron had no intent to continue paying Starlite once the calendars had been produced and shipped, (FAC, ¶ 22); (h) yet, 'Textron wanted to ensure the calendars were shipped so [Textron] could control and usurp the proceeds of the calendars and utilize said proceeds to pay down [Turner Company's] debt to Textron,' (FAC, ¶ 24); (i) following shipment, receipt and use of the 2007 calendars by [Turner Company], and receipt by Textron of the receivables generated by the Starlite calendars, 'Defendants made no payment on the accounts payable owed to Starlite,' (FAC, ¶ 29; and (j) while the CRO, on behalf of Textron, continued to falsely assert that payment to Starlite 'was in the budget' or was otherwise forthcoming, when these defendants knew that Textron only intended to use the [Turner Company's] receivable for its own benefit, (FAC, ¶¶ 19, 22, 29).

Starlite argues that, like *Producers Cotton Oil*, the expenditures of the unsecured creditor were necessary to the development of the secured creditor's collateral.  It is not disputed that Starlite was the main supplier of calendars to Turner Company and that Turner Company had the revenues to pay Textron because of the Starlite-produced calendars.  Starlite further argues that the seasonal nature of the calendars, like the crops in *Producers Cotton Oil*, made it imperative to Textron that the 2007 calendars be delivered and sold in a timely manner. Further, Starlite contends, like the secured creditor in *Duggan*, Textron had complete control over Turner Company following execution of the Stipulation and Order:

The CRO, on behalf of Textron, collected all

1
2
3
4
5
6

> [Turner Company] receivables and deposited
> them into the lockbox that _only_ Textron could
> control, Textron had to provide authorization
> for all expenditures for [Turner Company].
> Further, the CRO (while still concealing its
> involvement) was certainly aware of the
> exchanges between Mark Turner and Starlite
> whereby false assertions of 'extra cash flow'
> and notification of early payments were made
> to Starlite, as well as confirmation of 3.25
> million-calender order.

7    Textron replies that neither *Producers Cotton Oil* or *Duggan*

8  have any application here: "Starlite did not provide any goods or

9  services necessary to 'preserve' collateral; rather, what

10 Starlite provided was the collateral itself (_i.e._, calendar

11 inventory that Turner Company later sold)."  Textron asserts that

12 it "did no more than resort to remedies permitted by the UCC and

13 this Court, [and] cannot be subject to any equitable claim by

14 Starlite without turning the UCC's priority scheme on its head."

15    Textron's contentions involve issues of fact which cannot be

16 decided on a motion to dismiss.  Textron's motion to dismiss the

17 Eighth Cause of Action on this ground is DENIED.

18         f.  _Noerr-Pennington_ Doctrine and Litigation

19 Privilege.

20    Textron argues that Starlite's claims are barred by the

21 _Noerr-Pennington_ Doctrine and the litigation privilege set forth

22 in California Civil Code § 47(b)(2).

23              i.  _Noerr-Pennington_ Doctrine.

24    The _Noerr-Pennington_ doctrine protects the right to petition

25 the government for redress of grievances.  *See Eastern R.R. Conf.*

26 *v. Noerr Motor*, 365 U.S. 127 (1961); *United Mine Workers v.*

58

1  *Pennington*, 381 U.S. 657 (1965).  As explained in *Empress LLC v.*

2  *City and County of San Francisco*, 419 F.3d 1052, 1056-1057 (9th

3  Cir.2005):

4            Under the *Noerr-Pennington* doctrine, those
             who petition all departments of the
5            government for redress are generally immune
             from liability ... *Noerr-Pennington* is a
6            label for a form of First Amendment
             protection; to say that one does not have
7            *Noerr-Pennington* immunity is to conclude that
             one's petitioning activity is unprotected by
8            the First Amendment.

9  Lawsuits are protected by the doctrine because they are

10 essentially petitions to the courts for redress of grievances.

11 *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508,

12 510 (1972).

13      Starlite argues that the *Noerr-Pennington* doctrine does not

14 apply to bar its claims.  Starlite relies on *Theofel v. Farey-*

15 *Jones*, 359 F.3d 1066 (9th Cir.2003), *cert.denied*, 543 U.S. 813

16 (2004).

17      *Theofel* involved an action alleging that a subpoena served

18 upon an internet service provider resulted in improper disclosure

19 of e-mails, in violation of several federal statutes.  In

20 pertinent part, Defendants argued that they were immune from

21 liability under the *Noerr-Pennington* doctrine.  The Ninth Circuit

22 noted:

23            The doctrine is typically invoked to immunize
             the act of petitioning itself - i.e., the
24            filing of the lawsuit.  But it has been
             extended to certain conduct 'incidental to
25            the prosecution of the suit,' for example,
             deciding whether to settle a claim.  *See*
26            *Columbia Pictures Indus., Inc. v. Prof'l Real*

*Estate Investors, Inc.,* 944 F.2d 1525, 1528-29 (9th Cir.1991), *aff'd,* 508 U.S. 49 ... (1993).  Defendants seize on this language from *Columbia Pictures* and argue that, because the subpoena was incidental to their litigation, they are entitled to immunity.

We are skeptical that *Noerr-Pennington* applies at all to the type of conduct at issue.  Subpoenaing private parties in connection with private commercial litigation bears little resemblance to the sort of governmental petitioning the doctrine is designed to protect.  Nevertheless, assuming *arguendo* the defense is available, it fails. *Noerr-Pennington* does not protect 'objectively baseless' sham litigation.  *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60 ... (1993).  The magistrate judge found that the subpoena was 'transparently and egregiously' overbroad and that defendants acted with gross negligence and in bad faith. This is tantamount to a finding that the subpoena was objectively baseless.

Defendants urge us to look only at the merits of the underlying litigation, not at the subpoena.  They apparently think a litigant should have immunity for any and all discovery abuses so long as his lawsuit has some merit.  Not surprisingly, they offer no authority for that implausible proposition. Assuming *Noerr-Pennington* applies at all, we hold that it is no bar where the challenged discovery conduct itself is objectively baseless.

*Id.* at 1078-1079.

Starlite argues that *Noerr-Pennington* does not apply "because Textron's actions in assisting [Turner Company] to defraud Starlite as outlined above are not themselves authorized by the Stipulation and Order."  Starlite contends:

In other words, Textron cannot immunize itself from the allegations in the FAC merely by saying that it was *entitled* to engage in

60

1          such conduct pursuant to order of this Court.
           If that were the case, every litigant
2          desiring to defraud or interfere with the
           business relations of another would simply
3          lodge documents with the court in an attempt
           to later claim immunity for any wrongful
4          activities *related* to the document filed.

5     Starlite further contends that, even if the Court concludes

6  that the *Noerr-Pennington* doctrine applies to the proceedings in

7  Textron's actions against Turner Company, Textron's act of filing

8  the sealing order in the Stipulation and Order was objectively

9  baseless.  Starlite cites *Kamakana v. City and County of*

10 *Honolulu*, 447 F.3d 1172 (9th Cir.2006).

11     In *Kamakana*, following settlement of a civil rights suit

12 brought by a Honolulu police detective against the City alleging

13 retaliation for his whistleblowing activities, a newspaper moved

14 to intervene and for an order to release documents filed under

15 seal pursuant to a protective order.  The Ninth Circuit affirmed

16 the District Court's grant of the newspaper's motion:

17          Historically, courts have recognized a
           'general right to inspect and copy public
18          records and documents, including judicial
           records and documents.' *Nixon v. Warner*
19          *Commc'ns, Inc.*, 435 U.S. 589, 597 & n.7 ...
           (1978).  This right is justified by the
20          interest of citizens in 'keep[ing] a watchful
           eye on the workings of public agencies.' *Id.*
21          at 598 ... Such vigilance is aided by the
           efforts of newspapers to 'publish information
22          concerning the operation of government.' *Id.*

23          Nonetheless, access to judicial records is
           not absolute.  A narrow range of documents is
24          not subject to the right of public access at
           all because the records have 'traditionally
25          been kept secret for important policy
           reasons.'  *Times Mirror Co. v. United States*,
26          873 F.2d 1210, 1219 (9th Cir.1989).  Our case

61

law has identified two categories of
documents that fall in the category: grand
jury transcripts and warrant materials in the
midst of a pre-indictment investigation.  *Id.*

Unless a particular court record is one
'traditionally kept secret,' a 'strong
presumption in favor of access' is the
starting point.  *Foltz*, 331 F.3d at 1135
(citing *Hagestad v. Tragesser*, 49 F.3d 1430,
1434 (9th Cir.1995)).  A party seeking to
seal a judicial record then bears the burden
of overcoming this strong presumption by
meeting the 'compelling reasons' standard.
*Foltz*, 331 F.3d at 1135.  That is, the party
'must articulate[] compelling reasons
supported by specific factual findings,' *id.*
(citing *San Jose Mercury News, Inc. v. U.S.
Dist. Ct.*, 187 F.3d 1096, 1102-03 (9th
Cir.1999)), that outweigh the general history
of access and the public policies favoring
disclosure, such as the '"public interest in
understanding the judicial process."'
*Hagestad*, 49 F.3d at 1434 (quoting *EEOC v.
Erection Co.*, 900 F.2d 168, 170 (9th
Cir.1990)).  In turn, the court must
'conscientiously balance[] the competing
interests' of the public and the party who
seeks to keep certain judicial records
secret.  *Foltz*, 331 F.3d at 1135.  After
considering these interests, if the court
decides th seal certain judicial records, it
must 'base its decision on a compelling
reason and articulate the factual basis for
its ruling, without relying on hypothesis or
conjecture.  *Hagestad*, 49 F.3d at 1434
(citing *Valley Broadcasting Co. v. U.S. Dist.
Ct.*, 798 F.2d 1289, 1295 (9th Cir.1986)).

In general, 'compelling reasons' sufficient
to outweigh the public's interest in
disclosure and justify sealing court records
exist when such 'court files might have
become a vehicle for improper purposes,' such
as the use of records to gratify private
spite, promote public scandal, circulate
libelous statements, or release trade
secrets.  *Nixon*, 435 U.S. at 598 ...; *accord
Valley Broadcasting Co.*, 798 F.2d at 1294.
The mere fact that the production of records
may lead to a litigant's embarrassment,

62

incrimination, or exposure to further litigation will not, without more, compel the court to seal its records. *Foltz*, 331 F.3d at 1136.

We acknowledged explicitly in *San Jose Mercury News*, 187 F.3d at 1102, and later confirmed in *Foltz*, 331 F.3d at 1136, that the strong presumption of access to judicial records applies fully to dispositive pleadings, including motions for summary judgment and related attachments. We adopted this principle of disclosure because the resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the 'public's understanding of the judicial process and significant public events.' *Valley Broadcasting*, 798 F.2d at 1294; *accord Foltz*, 331 F.3d at 1135-36 ... Thus, 'compelling reasons' must be shown to seal judicial records attached to a dispositive motion, *Foltz*, 331 F.3d at 1136. The 'compelling reasons' standard is invoked even if the dispositive motion, or its attachments, were previously filed under seal or protective order. *Id.* ('[T]he presumption of access is not rebutted where ... documents subject to a protective order are filed under seal as attachments to a dispositive motion. The ... "compelling reasons' standard continues to apply.') ....

We have, however, 'carved out an exception to the presumption of access' to judicial records, *Foltz,* 331 F.3d at 1135, for a '*sealed discovery document* [attached] to a *non-dispositive* motion,' such that 'the usual presumption of the public's right of access is rebutted.' *Phillips v. General Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir.2002) ... There are, as we explained in *Foltz*, 'good reasons to distinguish between the dispositive and non-dispositive motions.' 331 F.3d at 1135. Specifically, the public has less of a need for access to court records attached only to non-dispositive motions because those documents are often '"unrelated, or only tangentially related, to the underlying cause of action."' *Id.* (quoting *Seattle Times Co. v. Rhinehart*, 467

63

U.S. 20, 33 ... (1984)).

The public policies that support the right of access to dispositive motions, and related materials, do not apply with equal force to non-dispositive materials. *Phillips*, 307 F.3d at 1213.  We reasoned in *Phillips* that when a district court grants a protective order to seal documents during discovery, 'it already has determined that "good cause" exists to protect this information from being disclosed to the public by balancing the needs for discovery against the need for confidentiality.'  *Id.*  Thus a 'particularized showing,' *Foltz*, 331 F.3d at 1138, under the 'good cause' standard of Rule 26(c) will 'suffice[] to warrant preserving the secrecy of sealed discovery material attached to non-dispositive motions.'  *Id.* at 1135.

...

It is important to emphasize the difference between the 'compelling reasons' standard and the 'good cause' standard ... A 'good cause' showing will suffice to seal documents produced in discovery.  Fed.R.Civ.P 26(c) (stating that if 'good cause' is shown in discovery, a district court may issue 'any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense,').  Rule 26(c) gives the district court much flexibility in balancing and protecting the interests of private parties. *Id.*

A 'good cause' showing will not, without more, satisfy a 'compelling reasons' test ... Different interests are at stake with the rights of access than with Rule 26(c); with the former, the private interests of the litigants are not the only weights on the scale.  Unlike private materials unearthed during discovery, judicial records are public documents almost by definition, and the public is entitled to access by default.  *See Nixon*, 435 U.S. at 597 ... This fact sharply tips the balance in favor of production when a document, formerly sealed for good cause

64

> under Rule 26(c), becomes part of a judicial
> record.  Thus a 'good cause' showing alone
> will not suffice to fulfill the 'compelling
> reasons' standard that a party must meet to
> rebut the presumption of access to
> dispositive pleadings and attachments.

447 F.3d at 1178-1180.

Starlite argues that Textron had no grounds to seek the sealing aspect of the Stipulation and Order, thereby rendering the sealing aspect objectively baseless and not subject to the *Noerr-Pennington* doctrine.

Textron replies that the "sealing of records pursuant to the CRO Order is not actionable, since Starlite cannot show that it had any effect on its conduct, much less that it has any right to challenge this Court's exercise of its 'inherent supervisory power' in sealing the records", citing *Hagestad v. Tragesser*, 49 F.3d 1430, 1433-1434 (9th Cir.1995).

The Stipulation and Order does not state the reasons for the sealing aspect.  *Hagestad* remanded the action to the District Court to make the findings because, otherwise appellate review was impossible.

Given the Ninth Circuit's indication in *Theofel* that the *Noerr-Pennington* doctrine is limited to the filing of the action, the motion to dismiss on this ground is DENIED.  Because of this conclusion, it is not necessary to address whether the sealing aspect of the Stipulation and Order was "objectively baseless."

ii.  California Civil Code § 47(b)(2).

Section 47(b) bars a civil action for damages based on

statements made in any judicial proceeding, in any official proceeding authorized by law, or in the initiation or course of any mandate-reviewable proceedings authorized by law.  The litigation privilege provided in Section 47(b)  applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.  *A.F. Brown Elec. Contractor, Inc. v. Rhino Elec.*, 137 Cal.App.4th 1118, 1126 (2006).  The litigation privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards."  *Rusheen v. Cohen*, 37 Cal.4th 1048, 1057 (2006).  In *Rusheen*, the California Supreme Court concluded:

> [I]f the gravamen of the action is communicative, the litigation privilege extends to noncommunicative acts that are necessarily related to the communicative conduct, which in this case included acts necessary to enforce the judgment and carry out the directive of the writ ... Stated another way, unless it is demonstrated that an independent, noncommunicative, wrongful act was the gravamen of the action, the litigation privilege applies.

*Id.* at 1065.  Section 47(b) establishes an absolute privilege for such statements and bars all tort causes of action based on them except a cause of action for malicious prosecution.  *Hagberg v. California Federal Bank*, 32 Cal.4th 350, 360 (2004).

Starlite argues that the litigation privilege does not apply because "Textron's *conduct* of helping [Turner Company] to

66

fraudulent [sic] induce Starlite to act to its detriment is <u>not</u> a communicative act."

Textron was acting pursuant to the Stipulation and Order. "'If there is no dispute as to the operative facts, the applicability of the litigation privilege is a question of law ... Any doubt about whether the privilege applies is resolved in favor of the person apply it ....'" *American Products Co., Inc. v. Law Offices of Geller, Stewart & Foley, LLP,* 134 Cal.App.4th 1332, 1343 (2005). Here, the facts are undeveloped, precluding dismissal as a matter of law on this ground.

Starlite further cites *Home Ins. Co. v. Zurich Ins. Co.*, 96 Cal.App.4th 17, 26 (2002) as establishing that the litigation privilege does not apply to equitable actions.

In *Home Ins. Co.*, an insurer brought an action against another insurance company alleging fraud and seeking declaratory relief and subrogation or indemnity. Defendant's policy, with a $500,000 limit, covered a permissive automobile driver who had negligently injured Plaintiff's insured. However, during the underlying litigation, Defendant was alleged to have misrepresented the statutory limitations on coverage for permissive users as having restricted its policy limits to $15,000. Relying on these representations, Plaintiff's insured had settled the underlying case for $15,000 and executed a release and then obtained an underinsured motorist arbitration award from Plaintiff. *Home Ins. Co.* affirmed the demurrer without leave to amend, holding that Defendant's representation,

67

which was made during a lawsuit to induce settlement, was absolutely privileged under the litigation privilege in Section 47(b).   96 Cal.App.4th at 22-26.   The Court of Appeal stated that "[t]he litigation privilege does not apply to an equitable action to set aside a settlement agreement for extrinsic fraud", citing *Silberg v. Anderson,* 50 Cal.3d 205, 214 (19 )("Where a civil judgment is procured by extrinsic fraud, the normal remedy is to seek equitable relief from the judgment, not to sue in tort.").   However, the Court of Appeal ruled that the release executed by Plaintiff's insured could not be set aside on that basis since the alleged fraud was not extrinsic.   *Id.* at 26-27.

Starlite cites no authority that the litigation privilege does not apply to a claim for unjust enrichment.   *Home Ins. Co.* is not persuasive authority for Starlite's contention.

Textron's motion to dismiss on the ground of the litigation privilege is DENIED WITHOUT PREJUDICE.

C.   <u>MOTION TO STRIKE</u>.

1.   <u>Governing Standards</u>.

Rule 12(f) provides in pertinent part that the Court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are disfavored and infrequently granted.   *Neveu v. City of Fresno,* 392 F.Supp.2d 1159, 1170 (E.D.Cal.2005).   A motion to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.   *Id.*   The function of a Rule

1   12(f) motion to strike is to avoid the expenditure of time and

2   money that might arise from litigating spurious issues by

3   dispensing with those issues prior to trial.  *Fantasy, Inc. v.*

4   *Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993), *rev'd on other*

5   *grounds*, 510 U.S. 517 (1994).

6        Textron moves to strike the allegations in the FAC that it

7   "acted willfully and fraudulently so as to justify the award of

8   exemplary and punitive damages" and the prayer for punitive

9   damages.  Textron argues that there are no allegations in the FAC

10  which support any claim for punitive damages.  Starlite argues to

11  the contrary.  *See discussion supra.*

12       Textron's motion to strike the allegations and prayer

13  supporting a claim for punitive damages is DENIED.

14                            <u>CONCLUSION</u>

15       For the reasons stated:

16       1.   Textron's motion to dismiss the First Amended Complaint

17  is GRANTED IN PART WITH LEAVE TO AMEND AND DENIED IN PART;

18       2.   Textron's motion to strike is DENIED;

19       3.   Starlite shall file a Second Amended Complaint in

20  accordance with the rulings herein within 30 days of the filing

21  date of this Memorandum Decision and Order.

22  IT IS SO ORDERED.

23  Dated:   July 7, 2008            /s/ Oliver W. Wanger
                                   UNITED STATES DISTRICT JUDGE
24

25

26